Marc J. Randazza, #027861
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Suite 109
Las Vegas, NV 89117
Tel: (702) 420-2001
ecf@randazza.com

David S. Gingras, #021097
GINGRAS LAW OFFICE, PLLC
4802 E. Ray Road, #23-271
Phoenix, AZ 85044
Tel.: (480) 264-1400
Fax: (480) 248-3196
David@GingrasLaw.com

John C. Burns, MBE# 66462*
Burns Law Firm
P.O. Box 191250
Saint Louis, MO 63119
Tel: 314-329-5040
Fax: 314-282-8136
TBLF@pm.me

Attorneys for Plaintiffs
TPG Communications, LLC and Jordan Conradson

*pro hac vice forthcoming

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| TGP Communications, LLC, d/b/a The Gateway Pundit, a Missouri limited liability company; and Jordan Conradson, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>Jack Sellers, Thomas Galvin, Bill Gates, Clint Hickman, and Steve Gallardo, in their respective official capacities as members of the Maricopa County Board of Supervisors; Stephen Richer, in his official capacity as | Case No. 2:22-cv-01925-JJT<br><br>**CORRECTED[1] EMERGENCY *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER** |

---

[1] Corrected only as to the caption of this document.

the Maricopa County Recorder; Rey Valenzuela and Scott Jarrett, in their official capacities as Maricopa County Election Directors; and Megan Gilbertson and Marcus Milam, in their official capacities as Maricopa County Communications Officers,

Defendants.

# EMERGENCY *EX PARTE*
# MOTION FOR A TEMPORARY RESTRAINING ORDER

TGP Communications, LLC, d/b/a The Gateway Pundit ("TGP") and Jordan Conradson ("Conradson") (together, "Plaintiffs") files this Emergency Ex Parte Motion for a Temporary Restraining Order, seeking to restrain Defendants Jack Sellers, Thomas Galvin, Bill Gates, Clint Hickman, and Steve Gallardo, in their respective official capacities as members of the Maricopa County Board of Supervisors; Stephen Richer, in his official capacity as the Maricopa County Recorder; Rey Valenzuela and Scott Jarrett, in their official capacities as Maricopa County Election Directors; and Megan Gilbertson and Marcus Milam, in their official capacities as Maricopa County Communications Officers ("Defendants") from denying the rights guaranteed to Plaintiffs by the First Amendment of the United States Constitution.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**1.0  Introduction**

Open government has been a hallmark of our democracy since our nation's founding. As James Madison wrote in 1822, "a popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both." *Leigh v. Salazar*, 677 F.3d 892, 897 (9th Cir 2012) (citing 9 Writings of James Madison 103 (G. Hunt ed. 1910)).

This case presents an urgent emergency. The nation's eyes are fixed on Maricopa County due to irregularities in handling the 2022 midterm elections. On election day In Maricopa County, an estimated 30% of voting locations experienced issues where their voting machines malfunctioned.[2] And here we are, three days after the election, with votes still being tallied at a seemingly glacial pace.

Understandably, the nation is fixated on this election. This is a matter of great national importance, and its importance stretches far beyond Arizona's borders.

It is no surprise that there is great skepticism on one side of the political divide and there is unqualified trust on the other. Society has degraded to the point that many Americans are skeptical of the good faith, the competence, and the bias of governmental institutions. However, this skepticism almost always comes down as a "Red" versus "Blue" issue. If a Republican makes a claim, one can expect "Team Blue" to scream at the top of their lungs that she must be corrupt, or worse. If a Democrat does the same, the "Red Team" is not going to take her statement at face value. We then depend on the press, such as it is, to inform us all so that we can at least hope to know what in tarnation is going on.

Our press is no less divided than our electorate. Our press has descended into a morass of competing partisan reporting that is no longer something Edward R. Murrow or Ben Bradlee would respect. Nevertheless, when the Free Press clause was placed in the Constitution, our national press was possibly even more divided and biased than it is today.

By the time the infant United States was taking its first furtive steps as a beacon of liberty, its press operated in a system of political patronage from the parties. This was known as "The Party Press Era." Newspapers publishers would cozy up to politicians,

---

[2] *See, e.g.,* Sasha Hupka, "Early glitches with Maricopa County election machines frustrate voters," AZCentral (Nov. 8, 2022), available at: <https://www.azcentral.com/story/news/politics/elections/2022/11/08/arizona-election-problems-maricopa-county-tabulator-issues/8302133001/>.

- 3 -
Emergency *Ex Parte* Motion for a Temporary Restraining Order

endorse their candidates, promote their agendas, and then receive baksheesh in the form of financial support, prestige, and power. Anyone with any degree of media literacy today would be unlikely to say that we have not returned to our roots. The only difference is that today, the mainstream press operates much like the Party Press of the early Republic, but they try and perpetrate the fiction that it is not so.

Meanwhile, if a tree falls in the forest and there is nobody there to hear it, everyone will still tell the public what it sounded like and what it means. National Public Radio will report that it happened because Donald Trump caused it with a post on Truth Social. This claim would be followed by a two hour exposé on how trees in forests are racist. Fox News will report the same story, but suggest that the tree fell because Hillary Clinton was trying to kill a frog who had information about her being on Epstein's island. Who are we to believe? We are all free to make that choice, but the greater the diversity of voices in the marketplace of ideas, the better informed the public.

The Gateway Pundit is a news and opinion publication of national renown. Founded Publisher Jim Hoft in 2004, The Gateway Pundit has grown into one of the largest and most highly read political blogs in the nation. The Gateway Pundit is ranked as one of the top 150 websites in the US, with an average of 2.5 million daily readers. *See* Declaration of James Hoft at ¶ 1. It is considered by many to be a "conservative" publication, as its editorial staff does tend to the libertarian/conservative side of things. In a national media landscape where conservatives are an endangered species, this is a relative rarity. However, the Gateway Pundit is no less a legitimate journalism organization than the New York Times – which famously lied to the American public, at the behest of those who wanted war in the Middle East, to push the agenda that there were WMDs in Iraq and that dutifully reported on Trump's "Russian Collusion." CNN lied about the "Covington Kids." Rolling

- 4 -
Emergency *Ex Parte* Motion for a Temporary Restraining Order

1 Stone lied about "A Rape on Campus." These were knowing lies, not mere mistakes, but
2 Maricopa would certainly permit a New York Times, CNN, or Rolling Stone reporter to
3 cover their actions – because these are politically loyal "Party Papers" as it were. However,
4 the Defendants have decided, using unfettered discretion, to exclude the Gateway Pundit
5 and its reporters from covering the election debacle. The stated reason was:

> Thank you for applying for a Maricopa County Press Pass. This email is to notify you that you have been denied a press credential based on the following criteria which is listed on Maricopa.gov:
>
>     * #4: You (a) do not avoid real or perceived conflicts of interest and (b) are not free of associations that would compromise journalistic integrity or damage credibility. Therefore, you are not a bona fide correspondent of repute in your profession.
>
> If you would like to appeal this decision, please reply to this email stating the reasons it should be reconsidered.
>
> Further, any press conference about the 2022 Election will be streamed to a Maricopa County YouTube channel and you are welcome to view it.
>
> Thank you,
>
> Elections Command Center

*See* **Exhibit 1**, Emailed Denial & Appeal.

These criteria are unconstitutionally vague and reasonable minds could say the same things about the New York Times or CNN or National Public Radio without stretching a bit. Maricopa's decision to exclude the Gateway Pundit is entirely viewpoint based. And thus, both facially and as applied, this regulation must be struck down. With the exigent circumstance of a "hot news" situation, the Gateway Pundit must be permitted to attend press conferences, immediately.

**2.0  Legal Standard**

A party seeking a preliminary injunction or temporary restraining order must meet one of two tests: traditional or alternative. *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319 (9th Cir. 1994). Under the traditional test, a plaintiff must show: (1) he will probably

prevail on the merits; (2) he will suffer irreparable injury if injunctive relief is not granted; (3) the defendant will not be equitably harmed more than the plaintiff is helped by the injunction; and (4) granting the injunction is in the public interest. *See id*. Alternatively, a court may issue a preliminary injunction if the plaintiff shows either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in its favor. *See FDIC v. Garner*, 125 F.3d 1272, 1277 (9th Cir. 1997); *Metro Pub. Ltd. v. San Jose Mercury News*, 987 F.2d 637, 639 (9th Cir. 1993). "The injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).

Under these standards injunctive relief is appropriate when either of these two tests are met. These are not two separate tests, but "merely extremes of a single continuum." *Topanga Press, Inc. v. City of Los Angles*, 989 F.2d 1524, 1528 (9th Cir. 1993). This means that if the balance of hardships strongly favors the plaintiff, he does not need to make as strong a showing of success on the merits, and vice versa. *See Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir. 1999).

When there is a violation of a constitutional right, no further showing of irreparable injury is required. *See Associate General Contractors of California v. Coalition for Economic Equity*, 950 F.2d 1401, 1410 (9th Cir. 1991). In fact, the first prong of the "traditional" test is generally outcome determinative in First Amendment cases, as a chill to one's First Amendment rights is irreparable harm, a governmental entity can have no legitimate interest in enforcing an unconstitutional regulation, and the public is not helped by enforcing such a regulation. *See Thoms v. Maricopa Cty. Cmty. Coll. Dist.*, No. CV-21-01781-PHX-SPL, 2021 U.S. Dist. LEXIS 214822, *35-39 (D. Ariz. Nov. 5, 2021).

**3.0  Argument**

The government's actions in this case are the government requiring a permit or a license to gather news. This has never been permissible in America. In fact, such schemes fell out of favor even before the Revolution. "Licensing of the press was never effective in the American colonies. The last attempt to enforce this common law right of the crown in the American colonies failed in 1725." *Chicago v. Tribune Co.*, 307 Ill. 595, 599 (Ill. 1923). Whether because the colonists would not accept press licensing or by the imposition of our Constitution after the Revolution, there is not, nor should there ever be, press licensing in America. If there were and the Courts did not step in, it "would make it easy for dictators to control their subjects." *Grosjean v. American Press Co.*, 297 U.S. 233, 240 (1936) (discussing press licensing through taxation). Maricopa County appears to believe that it has found a loophole – while it may not restrain opposition media from *publishing* by using a licensing scheme, it has decided that it will impede any opposition media's attempts to serve as a watchdog on government by licensing *newsgathering*.

This court must remind Maricopa County that when Arizona joined the union in 1912, it joined not *despite* this long tradition of embracing the freedom of the press, but *because* of it. Arizona made certain that even if the Federal Constitution ever changed, its state constitution would continue to protect freedom of the press. "Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." Ariz. Const. Art. 2, § 6.

This Honorable Court should grant the Plaintiff the right to gather the news, no matter whether the Maricopa County government likes their viewpoint or their politics or not. The regulations are unconstitutional, both facially and as applied.

### 3.1 Newsgathering and the First Amendment

The First Amendment protects newsgathering. *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978); *see also Branzburg v. Hayes*, 408 U.S. 665, 681, 6 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."); *Cable News Network, Inc. v. Am. Broad. Cos.*, 518 F. Supp. 1238, 1244 (N.D. Ga. 1981) ("[T]he rights guaranteed and protected by the First Amendment include a right of access to news or information concerning the operations and activities of government.")

The media serves an essential role as "surrogates for the public" when it reports on government affairs. *Richmond Newspapers v. Virginia*, 448 U.S. 555, 573 (1980); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 490-91 (1975) ("[I]n a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations."). "[A]rbitrary or content-based criteria for press pass issuance are prohibited under the first amendment." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977).

In *Consumers Union v. Periodical Correspondents' Assoc.*, 365 F. Supp. 18, 22-23 (D.D.C. 1973), rev'd on other grounds, 169 U.S. App. D.C. 370, 515 F.2d 1341 (D.C. Cir. 1975), cert. denied, 423 U.S. 1051 (1976), the court held it was unconstitutional for the government to discriminate against Consumer Reports on grounds that it was "owned and operated" by a "self-proclaimed advocate of consumer interests." The court further stated: "A free press is undermined if the access of certain reporters to facts relating to the public's business is limited merely because they advocate a particular viewpoint. This is a dangerous and self-defeating doctrine." *Consumers Union*, 365 F. Supp. at 25.

The government may not exclude a publication because of their viewpoint or because their readership consists mainly of people who vote differently than they do. *See Quad-City Cmty News Serv. v. Jebens*, 334 F. Supp. 8, 17 (S.D. Iowa 1971) (stating "any classification which serves to penalize or restrain the exercise of a First Amendment right, unless shown to be necessary to promote a compelling governmental interest, is unconstitutional"). "[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media, or the rights of the First Amendment would no longer be tenable." *Am. Broad. Cos. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977). "[A]rbitrary or content-based criteria for press pass issuance are prohibited under the first amendment." *Sherrill v. Knight*, 186 U.S. App. D.C. 293, 569 F.2d 124, 129 (1977) (citing *Branzburg v. Hayes*, 408 U.S. 665, 681, 707 (1972).

The government, in this case, appears to try and save its decision by offering the Plaintiffs to watch streaming video of press conferences. However, this does not purge their actions of their unconstitutional sins. The court in *Consumers Union* stated:

> While it is perfectly true that reporters do not have an unrestricted right to go where they please in search of news, … the elimination of some reporters from an area which has been voluntarily opened to other reporters for the purpose of news gathering presents a wholly different situation. Access to news, if unreasonably or arbitrarily denied …, constitutes a direct limitation upon the content of news.

*Consumers Union*, 365 F. Supp. at 25-26 (citations omitted)

"[A]ll representatives of news organizations must not only be given equal access, but within reasonable limits, access with equal convenience to official news sources." *Westinghouse Broad. Co. Inc. v. Dukakis*, 409 F. Supp. 895, 896 (D. Mass. 1976). In a similar case, the government sought to segregate media into different areas. But even that was not permissible. *See United Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1374 (S.D. Fla. 2002) "[T]o the extent that entry into the 'general-circulation media' press

room provides media representatives with additional access to information, Plaintiffs' First Amendment rights are being violated." *Id*.

### 3.2 The Regulations are Unconstitutionally Vague

A Policy is impermissibly vague if (1) "it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or (2) "it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). Out of concern or arbitrary suppression of free speech, "the Constitution requires a 'greater degree of specificity' in cases involving First Amendment rights." *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 62 (1st Cir. 2011). "The vagueness of such a regulation raises special First Amendment concerns because of the obvious chilling effect on speech." *Reno v. ACLU*, 521 U.S. 844, 872 (1997).

Defendants denied Plaintiffs' press credentials using two unconstitutionally vague criteria. First, the requirement that journalists "avoid real or perceived conflicts of interest," and second, that the journalists be "free of associations that would compromise journalistic integrity or damage credibility." *See* **Exhibit 1**, Denial Email.

As to the first criteria, conflicts of interests, it is unclear what exactly is prohibited. Assuming one can suitably define what Defendants mean by a journalist having a "conflict of interest," it is impossible to determine how a journalist may avoid being *perceived* to have a conflict of interest. Does giving positive coverage to one candidate or party cause a journalist to be perceived as having a conflict of interest, even if none exists? Can reporting critically on an elected official be perceived as having a conflict of interest in favor of their opponent? Moreover, it is not even clear what an actual conflict of interest could be for a journalist. Is appearing to favor a political party a conflict of interest? If that is the case, and the rule were applied evenly, Maricopa's press conferences would likely be given to

- 10 -
Emergency *Ex Parte* Motion for a Temporary Restraining Order

an empty room, or one where only a few high school journalists, still untainted, would be permitted to participate. A person of "ordinary intelligence" would not be able to determine what conduct is actually prohibited by Defendants' conflict of interest criteria. This unconstitutional vagueness lends itself to arbitrary enforcement, as has happened here.

Second, as to Defendants' "free of associations" requirement, it is likewise unclear what conduct is prohibited. What does that even mean? What sort of associations would "compromise journalistic integrity or damage credibility?" Would being a member of a political party do so? Would voting for a certain candidate do so? Attending a candidate rally? Making a political donation? This regulation feels a lot like "Constitutional Violation Inception." To violate the Free Press clause, they have chosen to use the exercise of the Free Association clause.

### 3.3 The Process is void of Due Process

Not only are the standards employed by Maricopa County vague and unworkable, the decision made in a star chamber, with no opportunity to be heard, no articulated standards, and no opportunity for meaningful appeal or review.

In a very closely analogous case, a court ruled that plaintiff had a likelihood of success on the merits for a due process claim because the government failed "to memorialize an explicit and meaningful standard governing its denial of press conference access." *Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1134 (D. Alaska 2021). The court further noted that an "absence of any formal process, policy, or procedure mak[ing] judicial review [of a First Amendment claim] difficult ... [] highlights the importance of due process as the vehicle by which First Amendment rights are protected." *Id*. To bring a claim under the Due Process Clause, a plaintiff must show: "(1) a violation of rights protected by the Constitution or created by federal statute, (2) proximately caused

(3) by conduct of a person (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991) (citation omitted).

Here, the government deprived Plaintiff of the right to gather the news without any due process. There is a protected interest in press access to government press conferences. In *Sherrill*, 569 F.2d at 130 the D.C. Cir. held that this access, for a news correspondent and his parent publication, "*undoubtedly* qualifies as liberty which may not be denied without due process of law under the [Fifth Amendment]." (emphasis added). Further, this is not just a right that benefits the particular plaintiffs – but the public at large. "Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the [First Amendment] in assuring that … individual newsmen not be arbitrarily excluded from sources of information"). *Id* at 129.

Usually in cases where there has been a deprivation of due process, there is an examination of the adequacy of the process. However, here the analysis is easier, since there was no process at all. A bureaucrat decided that The Gateway Pundit was not to their liking and evicted them from the Fourth Estate. Then, to make matters worse, they even continued to push them away from anywhere that they could meaningfully participate in news gathering at all. *See* Complaint at ¶ 33.

### 3.4 Defendants' Regulations and Actions are Content-Based and Viewpoint-Based and act as an Impermissible Licensing of Newsgathering

Content-based and viewpoint-based restrictions "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). Our Constitutional alloy was forged in the fires of mistrust of government power. Therefore, the First Amendment is designed as a shield against government actors who would burden disfavored viewpoints. *Citizens United v. Fed. Election Comm'n*, 558 U.S.

310, 340 (2010). The point of the First Amendment is to deprive the government of the power to disfavor a particular message, ideas, subject matter, or content. *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 538 (1980). To weaken this protection would be to allow the government to control the "search for political truth." Id. Content based restrictions "completely undercut the profound national commitment to the principle that debate on public issues should be uninhibited, robust, and [wide]-open." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 96 (1972) (citation and quotation marks omitted).

The government may not condition the exercise of First Amendment protected rights on "obtaining a license or permit from a government official in that official's boundless discretion." *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (deciding whether an official has unbridled discretion in setting permit fee for public speaking events, parades, or assemblies); *Se. Promotions v. Conrad*, 420 U.S. 546 (1975) (addressing whether municipal board charged with leasing city auditorium had unbridled discretion); *Saia v. People of N.Y.*, 334 U.S. 558, 559-60 (1948) (addressing whether licensing use of amplifiers gave police chief unfettered discretion); *Am. Entert. v. City of Rocky Mount*, 888 F.3d 707, 720 (4th Cir. 2018) (deciding licensing scheme for sexually oriented businesses gave licensing official unfettered discretion). Even Nazis marching, theatrical entertainment, or even nude dancing can not be subject to unfettered government discretion. Certainly the Freedom of the Press deserves at least as much respect as the freedom to perform lap dances.

In this case, the government created a limited public forum where the press may gather to question and observe government officials. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 470 (2009) (defining a limited public forum as one "that is limited to use by certain groups or dedicated solely to the discussion of certain subjects"). However, the

- 13 -
Emergency *Ex Parte* Motion for a Temporary Restraining Order

government limited access to that forum using a vague and unworkable standard, which they employ using unfettered discretion. In a public forum, "there is broad agreement that ... investing governmental officials with boundless discretion over access to the forum violates the First Amendment." *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376, 386 (4th Cir. 2006)); *Kaahumanu v. Hawaii*, 682 F.3d 789, 806 (9th Cir. 2012).

"For this reason, even in cases involving nonpublic or limited public forums, a policy … that permits officials to deny access for any reason, or that does not provide sufficient criteria to prevent viewpoint discrimination, generally will not survive constitutional scrutiny." *Id.* at 387. For time, place, and manner restrictions, "[a]s an application of the requirement that restrictions be narrowly tailored, a law cannot condition the free exercise of First Amendment rights on the 'unbridled discretion' of government officials." *Gaudiya Vaishnava Soc. v. San Francisco*, 952 F.2d 1059, 1065-67 (9th Cir. 1991) (finding unconstitutional ordinance requiring individuals to obtain a "peddling permit" to sell merchandise that was "inextricably intertwined" with fully protected speech when the chief of police had discretion to deny issuance of a permit and the ordinance provided no specific grounds for granting or denying the permit and placed no explicit limits on the chief's discretion). And in a case involving a parade ordinance that allowed the chief of police to move marchers onto sidewalks "in the interest of vehicular or pedestrian safety," the Ninth Circuit found that this gave an unconstitutional degree of discretion to the government because of its breadth and the fact that it did not require officials to articulate their reasons for denying permission to march in the streets, as well as an absence of any mechanism for direct administrative or judicial review. *Seattle*

- 14 -
Emergency *Ex Parte* Motion for a Temporary Restraining Order

*Affiliate of the October 22nd Coalition To Stop Police Brutality, Repression & the Criminalization of a Generation v. City of Seattle*, 550 F.3d 788, 799-802 (9th Cir. 2008).

"Without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 763-64 (1988). A government regulation violates the First Amendment "[w]here the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit." *World Wide Rush, LLC v. City of L.A.*, No. CV 07-238 ABC (JWJx), 2007 U.S. Dist. LEXIS 105249, *35 (C.D. Cal. July 23, 2007) (quoting *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1082 (9th Cir. 2006). The court in *World Wide Rush* enumerated "three considerations … to determine whether an ordinance confers discretion in violation of the First Amendment":

> (1) whether the ordinance contains "reasonably specific" criteria on which a denial may rest; (2) whether the ordinance outlines objective factors to consider in denying an application under the "reasonably specific" criteria; and (3) whether the ordinance requires officials to "state the reasons for his or her decision to either grant or deny a permit so as to facilitate effective review of the official's determination," which allows the determination to be "enforceable on review."

*Id*. at 35-36.

There is no reasonably specific criterion, nor are there objective factors, nor has the Defendant in any way stated the reasons for the decision to allow for effective review. This is unfettered discretion, and the government used this unfettered discretion to discriminate against the Gateway Pundit because they do not want to be challenged by the Gateway Pundit's style of journalism – a style that does not uncritically act as a stenographer for the government narrative.

### 3.5 Equal Protection

The Equal Protection Clause provides that no state shall deny to any person within its jurisdiction equal protection of the laws. *See* U.S. Const. *amend. XIV, § 1*. In other words, "[p]ursuant to the Equal Protection Clause, the government must treat all similarly situated persons alike." *Martinez v. Clark County*, 846 F. Supp. 2d 1131, 1135 (D. Nev. 2012). A plaintiff asserts a valid equal protection argument if it demonstrates that "a group was singled out for unequal treatment on the basis of religion." *Carey v. Piphus*, 435 U.S. 247, 248 (1978). If the law that the plaintiff challenges burdens a fundamental right or makes a distinction based on a suspect classification, the Court should employ strict scrutiny review. *See OSU Student Alliance v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012). Alternatively, if the law does not burden a fundamental right or target a suspect classification, it is subject to rational basis review. *See id.*

"[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 96 (1972). When brought together with claims for violation of one's First Amendment freedom of speech, an equal protection claim typically shares the same analysis as the First Amendment claim. *Ray*, 699 F.3d at 1067.

Here, Plaintiffs were selectively treated – they were singled out for denial of a press pass specifically for the content and viewpoint of their speech. Because, as discussed above, if the standards were equally applied, the Press Conferences would be attended by no more than a Mesa high school reporter and two tumbleweeds.

### 3.6 Irreparable harm

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976).

The freedom of the press does not only serve the press itself but exists to serve the public. *Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1135 ("the foundational principle of the press clause of the First Amendment is that the media serves the public in offering both governmental transparency and information to the citizenry.") Conversely, there is a public harm in only allowing "approved" press to cover government affairs, and the way the government has acted has a high probability of undermining confidence that the election is being tallied in a fair and above-board manner. Permitting the "opposition" press, press that would be critical of the government, will serve the government as well. If the press is excluded because the government thinks that its viewpoint is troubling, will this not stoke conspiracy theories and mistrust? The injunction will not only not burden the government, but it will also serve the government. "Without an unfettered press, citizens would be far less able to make informed political, social, and economic choices. But the press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired." *Zerilli v. Smith*, 656 F.2d 705, 711 (D.C. Cir. 1981).

Maricopa's bureau of elections certainly does look good right now. Arizona's secretary of state is a gubernatorial candidate. A county that was predicted to lean heavily toward her opponent had massive failures in its systems on election day. Does this establish that something dishonest happened? Of course not. But, what would have been different if there was something dishonest afoot? Perhaps if there were something dishonest going on, the government would seek to exclude the press.

"When wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012) (citing Timothy B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 44 Stan. L. Rev. 927, 949 (1992) ("[W]hen the government announces it is excluding the press for

reasons such as administrative convenience, preservation of evidence, or protection of reporters' safety, its real motive may be to prevent the gathering of information about government abuses or incompetence."). And when the government restricts a publication because of its viewpoint, the government is trying to blind the critical press while allowing in the friendly press.

The Defendants will claim they are behaving honestly and unbiasedly in their apparent re-enactment of Florida in the 2000 election. However, if they are so honest, they should have no fear of any eyes and ears in the room, no matter how unfriendly. As a great jurist from neighboring Nevada said, when deciding a press access issue, "What better way to demonstrate to the public that its courts are fair and just than to say to the public, 'come and view the proceedings yourself and judge for yourself'?" *Suen v. Las Vegas Sands, Inc.,* Case No. A493744-C (Dist. Ct., Apr. 16, 2013). Indeed, if the Defendants have nothing to hide, then what better way to show the world that Maricopa County is competent and fair than to let everyone, regardless of viewpoint, see for themselves?

That is the gravamen of the injunctive relief sought.

## 4.0 Conclusion

Plaintiffs ask this Court to enter an immediate emergency injunction as requested.

Dated: November 14, 2022.   Respectfully submitted,

/s/ Marc J. Randazza
Marc J. Randazza, #027861
RANDAZZA LEGAL GROUP, PLLC
2764 Lake Sahara Drive, Ste. 109
Las Vegas, Nevada 89117

David S. Gingras, #021097
GINGRAS LAW OFFICE, PLLC
4802 E. Ray Road, #23-271
Phoenix, AZ 85044

John C. Burns, MBE# 66462*
Burns Law Firm
P.O. Box 191250
Saint Louis, MO 63119

Attorneys for Plaintiffs
TPG Communications, LLC and
Jordan Conradson

*pro hac vice forthcoming