RACHEL H. MITCHELL
MARICOPA COUNTY ATTORNEY

By:   THOMAS P. LIDDY (019384)
      CHARLES E. TRULLINGER (018936)
      JOSEPH J. BRANCO (031474)
      JOSEPH E. LA RUE (031348)
      Deputy County Attorneys
      liddyt@mcao.maricoa.gov
      trullingc@mcao.maricopa.gov
      brancoj@mcao.maricopa.gov
      laruej@mcao.maricopa.gov

CIVIL SERVICES DIVISION
225 West Madison Street
Phoenix, Arizona 85003
Telephone (602) 506-8541
Facsimile (602) 506-4316
ca-civilmailbox@mcao.maricopa.gov
MCAO Firm No. 00032000

*Attorneys for Maricopa County Board of Supervisors, Maricopa County Recorder Stephen Richer, Rey Valenzuela, Scott Jarrett, Megan Gilbertson, and Marcus Milam*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| TGP Communications, LLC, d/b/a The Gateway Pundit, a Missouri limited liability company; and Jordan Conradson, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>Jack Sellers, Thomas Galvin, Bill Gates, Clint Hickman, and Steve Gallardo, in their respective official capacities as members of the Maricopa County Board of Supervisors; Stephen Richer, in his official capacity as the Maricopa County | NO. CV-22-01925-JJT<br><br>**RESPONSE TO CORRECTED EMERGENCY *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER** |

1

Recorder; Rey Valenzuela and Scott Jarrett, in their official capacities as Maricopa County Election Directors; and Megan Gilbertson and Marcus Milam, in their official capacities as Maricopa County Communications Officers,

Defendants.

Defendants Jack Sellers, Thomas Galvin, Bill Gates, Clint Hickman, and Steve Gallardo (in their official capacities as members of the Maricopa County Board of Supervisors), Stephen Richer (Maricopa County Recorder), Rey Valenzuela and Scott Jarrett (Maricopa County Election Directors) and Megan Gilbertson and Marcus Milam (Maricopa County Communications Officers) (together, where appropriate, the "County"), hereby respond to Plaintiffs' Corrected Emergency *Ex Parte* Motion For A Temporary Restraining Order, as follows:

**I.    BACKGROUND**

This case is not about a government entity imposing a restraint on Plaintiffs' freedom to report on the 2022 election. Nor is it about limiting Plaintiffs' access to view and report on press conferences held as part of the County's efforts to provide timely and accurate information to the public. Instead, it involves the County's considered judgment about the best way to allocate its limited resources to make accurate information available to voters in Maricopa County and throughout Arizona. Plaintiffs' eleventh-hour demand to be allowed physical access to a non-public County facility does not warrant the mandatory injunctive relief that Plaintiffs are asking this Court to impose.

Out of a concern for logistical difficulties and security, Maricopa County requires an official Press Pass for members of the press to attend news conferences at, or to otherwise enter, the Maricopa County Tabulation and Election Center ("MCTEC") and the tenth floor of the County Administration building to conduct interviews, take photos, and/or video. This is important not only because of the limited amount of space within the large room where press appearances and interviews are conducted, but also because of security

concerns: one or more of the Maricopa County Board of Supervisors, the County Recorder, other County officials, and Election Department employees are more easily accessible to members of the press than they are to the public at large.

This concern for safety is legitimate. Following the November 3, 2020, general election, large crowds of protesters gathered at MCTEC in response to former president Trump's and others' claims that the election had been "stolen." On the night of Wednesday, November 4, several hundred protesters attempted to storm MCTEC and enter the building while Elections Department employees were present tabulating ballots. *See, e.g.*, KTAR News, "Protesters gather outside Maricopa County Elections Department," Nov. 5, 2020, *available at* https://ktar.com/story/3678840/protesters-gather-outside-maricopa-county-elections-department/. Following the public unrest that occurred at the National Capitol on January 6, 2021, large crowds of pro-Trump supporters gathered at the Arizona Capitol and erected a guillotine, promising "holy hell" to those who had "stolen" the election from him. *See, e.g.*, Madeline Ackley, "'No more political options': Trump rally at Capitol highlights GOP fractures," AZMIRROR, January 7, 2021, *available at* https://www.azmirror.com/2021/01/07/no-more-political-options-trump-rally-at-capitol-highlights-gop-fractures/.

These types of protests, as well as the multitude of death threats that the Defendants and other employees of the Maricopa County Elections Department have received since the 2020 election, are good cause for any election department to be concerned about security. In fact, permanent fencing was placed around MCTEC in early 2021 and additional temporary fencing was installed at the direction of the Maricopa County Sheriff's Office (MCSO) after the primary election in August because of people taking video of voters and Election Department employees and threatening their access to MCTEC.

The criteria for determining whether an applicant qualifies as a "Member of the Press," is clearly set out on the County's website.[1] The criteria is as follows:

---

[1] See attached Exhibit 1 or the following link:

1. Is the person requesting press credentials employed by or affiliated with an organization whose principal business is news dissemination?
2. Does the parent news organization meet the following criteria?
    a. It has published news continuously for at least 18 months, and;
    b. It has a periodical publication component or an established television or radio presence.
3. Is the petitioner a paid or full-time correspondent, or if not, is acting on behalf of a student-run news organization affiliated with an Arizona high school, university, or college?
4. Is the petitioner or its employing organization engaged in any lobbying, paid advocacy, advertising, publicity, or promotion work for any individual, political party, corporation, or organization?
5. Is the petitioner a bona fide correspondent of repute in their profession, and do they and their employing organization exhibit the following characteristics?
    a. Both avoid real or perceived conflicts of interest;
    b. Both are free of associations that would compromise journalistic integrity or damage credibility;
    c. Both decline compensation, favors, special treatment, secondary employment, or political involvement where doing so would compromise journalistic integrity; and
    d. Both resist pressures from advertisers, donors, or any other special interests to influence coverage.

The same criteria were approved in—and drawn directly from—a Seventh Circuit Court of Appeals opinion.

> The first three of the criteria listed in the memorandum are reasonably related to the viewpoint-neutral goal of increasing the journalistic impact of the Governor's messages by including media that focus primarily on news dissemination, have some longevity in the business, and possess the ability to craft newsworthy stories. The list prioritizes access by journalists whose reporting will reach wider audiences, while also allowing room for smaller media outlets (such as tribal publications). The criteria listed in numbers four and five of the memorandum are reasonably related to the viewpoint-

---

https://www.maricopa.gov/5856/Maricopa-County-2022-Elections-Press-Pas#criteria.

4

> neutral goal of increasing journalistic integrity by favoring media that avoid real or perceived conflicts of interest or entanglement with special interest groups, or those that engage in advocacy or lobbying. Similar standards are also used by other governmental bodies such as the United States Congress.

*John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610–11 (7th Cir. 2021), *cert. denied,* 142 S. Ct. 711 (2021). The legal memorandum prepared by the Governor's legal counsel that was used as an exhibit in the *Evers* case is attached hereto as Exhibit 2. The Defendants' guidelines follow that memorandum and Seventh Circuit decision.

On September 27, 2022, Jordan Conradson, from The Gateway Pundit,[2] applied for a Press Pass. On the same day he submitted his application, he wrote an article in The Gateway Pundit entitled:

> BREAKING: Maricopa County Create 'Ministry Of Truth' To Silence the Gateway Pundit – Now Requiring Official Press Pass for Media 'To ENTER ITS FACILITIES And/Or Cover Events Related To the 2022 General Election.'[3]

Thus, even before he received a response to his application, he stated in an article that Maricopa County was "covering its tracks ahead of the 2022 General Election," that the County or newly formed Elections Command Center is a "Ministry of Truth," and that "The Gateway Pundit previously reported on these same tactics employed by the Biden Regime." The article does not identify a single inquiry made to understand the reason behind the policy. The article simply announces the policy and takes the presumptive position that the policy was enacted to suppress opinions like those from The Gateway Pundit.

---

[2]   https://www.thegatewaypundit.com/

[3]   See attached Exhibit 3 or the following link: https://www.thegatewaypundit.com/2022/09/breaking-maricopa-county-creates-ministry-truth-silence-gateway-pundit-now-requiring-official-press-pass-media-enter-facilities-cover-events-related-2022-ge/

5

As part of the application process, Mr. Conradson submitted three links to work examples.[4] Those three articles, similar to the article just mentioned, do little more than proselytize The Gateway Pundit's views. Each article germinates from a news report or press release (such as the County's announcement of Press Pass criteria). Mr. Conradson then expresses an opinion about the news report or press release and supports that opinion by referencing like-minded social media posts, prior articles by The Gateway Pundit, and allying websites that express the same viewpoints. Moreover, each article uses inflammatory and/or accusatory language, such as "Fake News Media," "globalist elitist establishment," and "highly flawed 2022 Primary Elections." And while Mr. Conradson is certainly entitled to express his opinions, his poorly sourced, researched, and reported work lacks the journalistic integrity and credibility required by the Press Pass criteria.

In addition, Mr. Conradson participates in political party events and associates with people and groups that demonstrate an inability to avoid real or perceived conflicts of interest. See attached Exhibit 7 (photo at an event with Wendy Rogers, Jeff Pedersen, David Clements, and Mr. Conradson),[5] Exhibits 8 and 9 (photos of participants in the Cyber Ninja audit, including Mr. Conradson),[6] Exhibits 10 and 11 (photos of Mr. Conradson participating in a Merissa Hamilton campaign event).

The *Society of Professional Journalists* has a code of ethics, which requires ethical journalists to abide by four key principals: (1) Seek truth and report it; (2) Minimize harm;

---

[4] See attached Exhibits 4, 5, and 6 or the following links:
Ex. 4: https://www.thegatewaypundit.com/2022/09/watch-trump-endorsed-kari-lake-joins-tucker-carlson-italy-elects-first-female-populist-leader-not-attacking-probably-not-truly-representing/;

Ex. 5: https://www.thegatewaypundit.com/2022/09/fcked-really-dont-real-true-freedom-speech-youtube-star-pro-boxer-jake-paul-responds-gateway-pundit-reporters-question-big-tech-censorship-pre-fig/;

Ex. 6: https://www.thegatewaypundit.com/2022/09/maricopa-county-appointed-100-democratic-poll-workers-republicans-extremely-flawed-primary-election-eleven-locations-no-republicans/

[5] See full Tweet here: https://www.reuters.com/world/us/kill-them-arizona-election-workers-face-midterm-threats-2022-11-06/

[6] See full Tweet here: https://twitter.com/WendyRogersAZ/status-/1438487340138340358?s=20&t=nb-Ugc2zplCQweKrpexTEQ

(3) act independently; and (4) Be accountable and transparent. *See* attached Exhibit 12.[7]

Among other things, this code requires a journalist to:

> Take responsibility for the accuracy of their work. Verify information before releasing it. Use original sources whenever possible.
>
> Avoid undercover or other surreptitious methods of gathering information unless traditional, open methods will not yield information vital to the public.
>
> Balance the public's need for information against potential harm or discomfort. Pursuit of the news is not a license for arrogance or undue intrusiveness.
>
> Avoid conflicts of interest, real or perceived.
>
> Avoid political and other outside activities that may compromise integrity or impartiality or may damage credibility.

On September 30, 2022, Plaintiff Conradson was sent an email denying his application, stating:

> Thank you for applying for a Maricopa County Press Pass. This email is to notify you that you have been denied a press credential based on the following criteria which is listed on Maricopa.gov:
>
> #4: You (a) do not avoid real or perceived conflicts of interest and (b) are not free of associations that would compromise journalistic integrity or damage credibility. Therefore, you are not a bona fide correspondent of repute in your profession.
>
> If you would like to appeal this decision, please reply to this email stating the reasons it should be reconsidered.
>
> Further, any press conference about the 2022 Election will be streamed to a Maricopa County YouTube channel and you are welcome to view it.[8]

Despite being denied a Press Pass, Plaintiff Conradson appeared at press conference on October 13, 2022, with a hidden camera. On November 10, 2022, he showed up at MCTEC under the guise of being there to pick up his credentials. He became disruptive and

---

[7] See the link here: https://www.spj.org/ethicscode.asp

[8] *See* attached Exhibit 13. The reference to 4(a) & (b) was a scrivener's error and should have been 5(a) & (b). Compare to Exhibit 1.

7

Defendants had to remove him from the facility. Plaintiff Conradson and Ben Bergquam, another person denied a press pass (also removed from the property for trespassing), produced at least one video about their removal.[9]

Despite framing their Motion for Temporary Restraining Order as one for emergency relief, Plaintiffs waited 41 days to seek the TRO, even though the County held multiple press conferences in the weeks leading up to and the days after the November 8, 2022, election. Indeed, Plaintiff Conradson did not even reply to the denial email until November 10, 2022, the same day the Complaint and Motion for Temporary Restraining Order were filed. *See* attached Exhibit 15. However, his purported appeal was not an appeal at all because it failed to state any substantive reasons his application should be reconsidered or how he met the criteria.

## II. LEGAL STANDARD

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Brown Jordan Int'l, Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002). The only distinction between the two is that under the federal rules of civil procedure, a preliminary injunction requires notice to the adverse party, whereas a temporary restraining order may be issued without notice. Fed. R. Civ. P. 65.

To succeed on a motion for preliminary injunction, the moving party must establish each of the following four elements: "(1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest." *Alaska Landmine, L.L.C. v. Dunleavy*, 514 F. Supp. 3d 1123, 1128 (D. Alaska 2021), *appeal dismissed,* No. 21-35137, 2021 WL 2103741 (9th Cir. Mar. 4, 2021) (citing *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7 (2008)).

---

[9] See Exhibit 14 (still shot). Full video is linked here: https://twitter.com/BenBergquam/status/1590893457249558528?s=20&t=Ot_HxMs48Ekt1_Z2UET_3w

"[I]f a plaintiff shows 'that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips *sharply* in the plaintiff's favor.'" *Dunleavy*, 514 F. Supp. 3d at 1128. "Serious questions are 'substantial, difficult, and doubtful,' as to make them a fair ground for litigation and thus for more deliberative investigation." *Id*.

There are two types of preliminary injunctions, those that prohibit a party from taking action and thus preserve the status quo (a prohibitory injunction), and those that seek to order a responsible party to take action (a mandatory injunction). "Where a movant seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is 'subject to a higher standard' and is 'permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Atwood v. Days*, No. CV2000623PHXJATJZB, 2021 WL 5811800, at *3 (D. Ariz. Dec. 7, 2021), *clarified on denial of reconsideration,* No. CV2000623PHXJATJZB, 2021 WL 6091278 (D. Ariz. Dec. 23, 2021) (citing *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017). Plaintiffs' motion requests a mandatory injunction subject to the higher standard. Specifically, they request that "the Gateway Pundit must be permitted to attend press conferences, immediately," which would mandate the Defendants to issue a Press Pass. *See* Corrected Emergency *Ex Parte* Motion for a Temporary Restraining Order (Doc. 7) at 5:20-21.

A plaintiff alleging constitutional torts under 42 U.S.C. § 1983 must allege that "every government defendant—supervisor or subordinate—acted with the state of mind required by the underlying constitutional provision." *OSU Student All. v. Ray*, 699 F.3d 1053, 1070 (9th Cir. 2012).

### III. ANALYSIS

**A.     Plaintiffs are not likely to succeed on the merits**.

The aim of the Press Pass criteria is to provide safety and security for County officials, temporary employees, and credentialed political party volunteers to perform their important duties while also allocating limited resources to permit credentialed journalists to

attend conferences, observe the actions of the elections department, and interact with election officials so they can report accurate information to the public.

A traditional public forum, *e.g.*, public streets, is open to anyone and speakers cannot be excluded from a traditional public forum without a compelling governmental interest. *Dunleavy*, 514 F. Supp. 3d at 1130. But press conferences are nonpublic forums and public entities are entitled to limit persons who can attend. "[I]n 'nonpublic forums,' access may be restricted 'as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Id.* (citing *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)). Moreover, "Control over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806. "The Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *Id.* at 808. The government also has the ability to restrict access to a government building that is not intended as a public forum. *Seattle Mideast Awareness Campaign v. King Cnty.*, 781 F.3d 489, 497 (9th Cir. 2015) (granting selective access under pre-established guidelines that impose speaker-based or subject-matter limitations negates any suggestion that the government intends to open its property to the "indiscriminate use by all or part of the general public.").

Once the government decides to restrict attendance at press conferences, it must have written guidelines that are subject to evaluation. "In essence, given the import of First Amendment rights, the government must publicly memorialize the applicable standards to ensure both due process and compelling government interests for any and all denials of access." *Dunleavy*, 514 F. Supp. 3d at 1132 (citing *Sherrill v. Knight*, 569 F.2d 124, 129–30 (D.C. Cir. 1977)). Here, the County articulated the written criteria that would be applied when considering an application for a Press Pass. And the criteria are viewpoint neutral.[10]

---

[10] See Exhibit 1, or the link here: https://www.maricopa.gov/5856/Maricopa-County-2022-Elections-Press-Pas#criteria.

Although Plaintiffs' motion claims the criteria for a Press Pass are vague, Plaintiff Conradson failed to inquire about them at any time, either before he applied for a Press Pass, at the time he wrote his article criticizing the policy, or after his application was denied—or even when he filed his belated "appeal." Thus, the criteria were either clear enough to him or he didn't care enough to ask. In any event, as indicated above, the same criteria were approved in—and drawn directly from— *John K. MacIver Inst. for Pub. Pol'y, Inc. v. Evers*, 994 F.3d 602, 610–11 (7th Cir. 2021), *cert. denied,* 142 S. Ct. 711 (2021). Seventh Circuit Court of Appeals opinion.

Plaintiff Conradson's actions of appearing at the MCTEC office lobby, trying to sneak into the building alongside credentialed Press Pass members, and refusing to leave until escorted out of the building, can only be described as disruptive. In addition, his article about the creation of the Press Pass criteria, the three articles he submitted, as well as his associations, clearly indicate that he was properly denied a Press Pass for the reasons cited in the denial email.

Plaintiffs are unlikely to succeed on the merits of their complaint because the Defendants were permitted to limit access to their building and nonpublic press conferences, the criteria for obtaining limited access via a Press Pass are clearly stated on the website and content neutral, Plaintiff Conradson does not meet the criteria, and the criteria used have been approved by the Seventh Circuit Court of Appeals. While the Seventh Circuit's decision is not binding on this Court, it is certainly sufficient authority to deny Plaintiffs' motion.

**B.    Plaintiffs are not likely to suffer irreparable harm in the absence of preliminary relief**.

As the denial email stated, "Further, any press conference about the 2022 Election will be streamed to a Maricopa County YouTube channel and you are welcome to view it."[11] Any alleged harm is greatly minimized when the press conference at issue is live

---

[11]   *See* Exhibit 13.

11

streamed over the internet. "Harm is admittedly *de minimis* while the COVID-19 pandemic requires events like press conferences to be held virtually and the governor's office offers a public livestream that anyone can access." *Dunleavy*, 514 F. Supp. 3d at 1135.

Moreover, access to a press conference does not mean a member of the press has a right to be called on or to have his or her questions answered. *Dunleavy*, 514 F. Supp. 3d at 1135 ("[T]he Governor possesses the discretion to refrain from calling on Plaintiffs or answering their questions."). Plaintiff Conradson thus cannot make out a showing of any actual harm: he can view the press conference online to gather any information from the County about which he wants to report, and he would not be constitutionally entitled to ask questions even if he were physically present within the press conference room.

**C.   The balance of equities and public interest favors denial of Plaintiffs' motion.**

The harm to the opposing party and consideration of the public interest elements merge when the government is the opposing party. *Dunleavey*., 514 F. Supp. 3d at 1128–29. Here, there is a strong public interest in ensuring that individuals who have a record of providing accurate information to the public have access to the limited space in the building and press conferences to gather the news and report to the public.

However, the County would be overly burdened if it granted access to everyone with a social media presence and a propensity to write opinion pieces that are not fact checked by writers who fail to avoid conflicts of interest. The Gateway Pundit has been identified as the reason for threats made against election officials. *See* Exhibit 16 (12/2/2021 Reuters article regarding two Georgia workers suing The Gateway Pundit for their articles leading to workers being harassed and threatened);[12] Exhibit 17 (12/3/2021 Reuters article citing The Gateway Pundit as being responsible for 25 election workers being targeted);[13] Exhibit

---

[12]   See article linked here: https://www.reuters.com/business/media-telecom/two-georgia-election-workers-sue-far-right-website-over-false-fraud-allegations-2021-12-02/

[13]   See article linked here: https://www.reuters.com/investigates/special-report/usa-election-threats-gatewaypundit/

12

18 (11/6/2022 Reuters article regarding harassment and threats made to Maricopa County employees, including how The Gateway Pundit published the name and photos of a staff technician against whom readers then made threats);[14] Exhibit 19 (11/7/2022 Vice news article regarding how many threats made against Arizona election workers were fueled by coverage from far right blogs and pundits, including The Gateway Pundit).[15] In addition, Plaintiff Conradson posted an article and video about harassing State Senator Michelle Ugenti-Rita until he was ordered to leave the building. *See* attached Exhibit 20.[16]

During the days following the General Election, when County officials and members of the public assist with the process of finalizing the election results, it is especially important that the process not be disrupted by individuals with an agenda antithetical to ethical reporting. And, given Plaintiff Conradson's behavior following the denial of a Press Pass and his previous disruptive behavior at campaign-related events, it is not unreasonable to believe he would be similarly disruptive at County press conferences designed to provide accurate information about election processes. This, coupled with concerns about Plaintiff Conradson's journalistic impartiality—as evidenced by his attendance as a participant (not a reporter) at political and campaign events—more than justifies the County' decision to deny him press credentials. Both the public interest in obtaining true reporting on the election process, and the government's interest in security and optimizing it limited manpower and resources balances if favor of the Defendants.

### D. Plaintiffs' Equal Protection argument has no merit.

Finally, Plaintiffs' motion alleges a violation of the Fourteenth Amendment Equal Protection Clause. However, the analysis is essentially the same as the First Amendment analysis. Because the forum in question is nonpublic, the County needs only to articulate a

---

[14] See article linked here: https://www.reuters.com/world/us/kill-them-arizona-election-workers-face-midterm-threats-2022-11-06/

[15] See article linked here: https://www.vice.com/en/article/z348da/arizona-election-workers-threats-midterms

[16] See article and video (at the end) here: https://www.thegatewaypundit.com/2021/07/state-senator-michelle-ugenti-rita-tgp-reporter-removed-trump-rally-arrested-booed-off-stage-video/

rational basis for the Press Pass policy. In *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37 (1983), a school board of education granted exclusive access of the interschool mail system and teacher mailboxes to the exclusive bargaining representative for the school district and denied that same access to any rival union. Plaintiff sued the school district under both the Equal Protection Clause of the Fourteenth Amendment and the First Amendment. The Supreme Court first held that the First Amendment was not violated by the preferential access because the public property at issue was not a forum for public communication, the regulation of speech was reasonable and not an effort to suppress expression that the school officials opposed, and because the differential access was consistent with the school board's legitimate interest in preserving the property for the use to which it was lawfully dedicated. *Id*. at 37–38. Regarding appellant's Equal Protection argument, the Court stated,

> The differential access provided the rival unions does not constitute impermissible content discrimination in violation of the Equal Protection Clause. Since the grant of exclusive access to PEA does not burden a fundamental right of PLEA, the School District's policy need only rationally further a legitimate state purpose. That purpose is clearly found in the special responsibilities of an exclusive bargaining representative.

*Id*. at 38; *see also OSU Student All. v. Ray*, 699 F.3d 1053, 1067 (9th Cir. 2012) (noting that a party's Equal Protection claims rise and fall with their First Amendment claims when they do not allege membership in a protected class or contend that the government's conduct burdened any fundamental right, and that "[o]nly when rights of access associated with a public forum are improperly limited may we conclude that a fundamental right is impinged." (citing *Monterey Cnty. Democratic Cent. Comm. v. U.S. Postal Serv.*, 812 F.2d 1194, 1200 (9th Cir. 1987)).

In summary, Plaintiffs are not likely to prevail on their Equal Protection claim for the same reasons they are not likely to prevail on their First Amendment claims.

**IV.   CONCLUSION**

As was stated in the introduction, this case is not about a government entity imposing a restraint on Plaintiffs' freedom to report on the 2022 election. Nor is it about limiting

Plaintiffs' access to view and report on press conferences held as part of the County's efforts to provide timely and accurate information to the public. Instead, it involves the County's considered judgment about the best way to allocate its limited resources to make accurate information available to voters in Maricopa County and throughout Arizona. Based on the articulated Press Pass criteria, Plaintiff Conradson was properly denied a press pass. Plaintiffs' motion for a Temporary Restraining Order should be denied.

**RESPECTFULLY SUBMITTED** this 16th day of November 2022.

>
> RACHEL H. MITCHELL
> MARICOPA COUNTY ATTORNEY
>
> BY: */s/ Charles E. Trullinger*
>     THOMAS P. LIDDY
>     CHARLES E. TRULLINGER
>     JOSEPH J. BRANCO
>     JOSEPH E. LA RUE
>     *Attorneys for Maricopa County Board of Supervisors, Recorder Stephen Richer, Rey Valenzuela, Scott Jarrett, Megan Gilbertson, and Marcus Milam*

# **CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2022, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Honorable John J. Tuchi
Judge of the United States District Court
Sandra Day O'Connor U. S. Courthouse Suite 525
401 West Washington Street SPC 83
Phoenix Arizona 85003 2161

Marc J. Randazza
RANDAZZA LEGAL GROUP, PLLC
ecf@randazza.com

David S. Gingras
GINGRAS LAW OFFICE, PLLC
David@GingrasLaw.com

John C. Burns
BURNS LAW FIRM
TBLF@pm.me
*Attorneys for Plaintiffs*
*TGP Communications, LLC and Jordan Conradson*


*/s/ D. Shinabarger*

S:\CIVIL\CIV\Matters\GN\2022\TGP Communications v. Sellers 2022-3214\Pleadings\Word\Response to Motion for TRO Final.docx