**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TGP Communications LLC, *et al.*, | No. CV-22-01925-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| Jack Sellers, *et al.*, | |
| Defendants. | |

At issue is the Corrected Emergency *Ex Parte* Motion for a Temporary Restraining Order (Doc. 7, "Mot.")[1] filed by Plaintiffs TGP Communications, LLC, d/b/a The Gateway Pundit ("TGP") and Jordan Conradson ("Mr. Conradson"), to which Defendants Jack Sellers, Thomas Galvin, Bill Gates, Clint Hickman, and Steve Gallardo in their official capacities as members of the Maricopa County Board of Supervisors; Stephen Richer in his official capacity as the Maricopa County Recorder; Rey Valenzuela and Scott Jarrett in their official capacities as Maricopa County Election Directors; and Megan Gilbertson and Marcus Milam in their official capacities as Maricopa County Communications Officers (hereinafter collectively referred to as "the County") filed a Response (Doc. 17, "Resp."). On November 17, 2022, the Court held a hearing at which the parties presented witness testimony and the Court heard argument on Plaintiffs' Motion. For the reasons set forth below, the Court denies the motion.

---

[1] Plaintiffs' Motion corrected only the caption of the Emergency *Ex Parte* Motion for a Temporary Restraining Order (Doc. 2) they filed on November 12, 2022. (Mot. at 1 n.1)

## I. BACKGROUND

TGP is an online news and opinion publication. (Doc. 7-3, Decl. of James Hoft ¶ 1.) Founded in 2004, TGP has developed a large readership and now averages more than two-and-a-half million readers daily. (Decl. of James Hoft ¶ 1.) It describes itself as "a trusted news source for the stories and views that are largely untold or ignored by traditional news outlets." (Compl. ¶ 26.) Mr. Conradson is a reporter with TGP who covers Arizona politics. (Transcript of November 17, 2022 Hearing ("Tr.") 35.) Neither TGP nor Mr. Conradson are shy about their libertarian conservative political leanings. (*See* Mot. at 4.) Mr. Conradson testified that his favorite political party is the Republican Party "but I wear that on my sleeve." (Tr. 38.) He noted that his readers understand his political views: "everybody who reads my work knows that I am very transparent about it." (Tr. 38.)

On September 27, 2022, Mr. Conradson applied for credentials to attend press conferences given by Maricopa County officials and to access certain County facilities. (Doc. 7-2, Decl. of Jordan Conradson ¶ 3.) The County requires reporters to obtain such credentials—a "press pass"—in order to attend press conferences at, or otherwise enter, the Maricopa County Tabulation and Election Center ("MCTEC") and the tenth floor of the County Administration building in Phoenix, Arizona. (Compl., Ex. 1; Resp. at 2–3.)

Roy Fields Moseley, the Communications Director for the County, explained that the County instituted the press-pass requirement in light of logistics and security concerns. (Tr. 60–64.) For example, the Board of Supervisors' conference room on the tenth floor of the County Administration building can accommodate approximately 50 seats for reporters; after the extensive media interest in the 2020 election in Maricopa County, Mr. Moseley testified it was fair to say that they were anticipating there would be a lot more people wanting to attend press conferences. (Tr. 60–62.) He also testified that there were security issues at MCTEC after the 2020 election, including an incident in which

> [s]everal people were not members of the media but perhaps might say they are, but they are not what we would call news reporters. They managed to follow legitimate news crews into the lobby of MCTEC. This was a security concern. They had to be removed. There was a large crowd gathered outside

and we didn't want a repeat of that type of situation when we came up on 2022.

(Tr. 63.) The County also has installed temporary and permanent fencing at MCTEC, where the Maricopa County Sheriff's Office maintains security. (Tr. 64.)

Reporters can apply for a press pass through a page on the County's website. (Compl. Exs. 1, 2.) The webpage states that "[t]he official press pass will allow members of the press to attend news conferences or enter the Elections Department's office to conduct interviews, take photos, and/or video." (Compl. Ex. 1.) The webpage states that the County evaluates "member of the press" based on the following criteria:

   a. Is the person requesting press credentials employed by or affiliated with an organization whose principal business is news dissemination?

   b. Does the parent news organization meet the following criteria?

      i. It has published news continuously for at least 18 months, and;

      ii. It has a periodical publication component or an established television or radio presence.

   c. Is the petitioner a paid or full-time correspondent, or if not, is acting on behalf of a student-run news organization affiliated with an Arizona high school, university, or college?

   d. Is the petitioner or its employing organization engaged in any lobbying, paid advocacy, advertising, publicity, or promotion work for any individual, political party, corporation, or organization?

   e. Is the petitioner a bona fide correspondent of repute in their profession, and do they and their employing organization exhibit the following characteristics?

      i. Both avoid real or perceived conflicts of interest;

      ii. Both are free of associations that would compromise journalistic integrity or damage credibility;

      iii. Both decline compensation, favors, special treatment,

> secondary employment, or political involvement where doing so would compromise journalistic integrity; and
>
> iv. Both resist pressures from advertisers, donors, or any other special interests to influence coverage.
>
> This list is not exhaustive. The time, manner, and place limitations or needs of any one event may require consideration of additional factors.

(Compl. Ex. 1.) Mr. Moseley testified that a team of eight County employees reviews press pass-applications, which must receive two "yes" votes to be approved. (Tr. 64–65.)

On September 30, 2022, three days after Mr. Conradson applied for a press pass, the County notified him by email that his application was denied. (Def. Ex. 13.) The email stated that he was denied based on the following criteria: "You (a) do not avoid real or perceived conflicts of interest and (b) are not free of associations that would compromise journalistic integrity or damage credibility. Therefore, you are not a bona fide correspondent of repute in your profession." (Def. Ex. 13.) When asked to summarize, in his words, why Mr. Conradson was denied a press pass, Mr. Moseley testified that it was "because he doesn't avoid real or perceived conflicts of interest. If you look at his social media or his articles, they not only present a conflict. He doesn't seek the truth and his articles have led to direct threats to Board of Elections officials and employees." (Tr. 72.) To support the allegation about threats, the County points to *Reuters* articles stating that TGP was cited in highly threatening communications directed at County election employees. (Def. Exs. 17, 18.) The County further cites to a TGP article by Mr. Conradson (Def. Ex. 23) alleging that a County employee deleted files from the County's Elections Management Server—allegations the County denies. (*See* Def. Ex. 18.) In the article, Mr. Conradson included the employee's name and photograph. (Def. Ex. 23; Tr. 47.) According to one of the *Reuters* articles, readers left highly threatening comments about the employee in the comments section of the article. (Def. Ex. 18.) Mr. Conradson testified that he was "not aware that people got threats as a result of something I wrote." (Tr. 47–48.)

The September 30, 2022 denial email stated that Mr. Conradson could appeal the

decision by sending a reply email "stating the reasons it should be reconsidered." (Compl. Ex. 4.) It also stated that "any press conference about the 2022 Election will be streamed to a Maricopa County YouTube channel and you are welcome to view it." (Compl. Ex. 4.)

On November 10, 2022, Mr. Conradson sent a reply email appealing the County's decision. (Compl. Ex. 4.) In his email, Mr. Conradson stated that the denial violated his rights under the First Amendment and that "I will be coming in shortly to attend a press conference and receive my credentials." (Compl. Ex. 4.)

On November 12, 2022, TGP and Mr. Conradson filed their Complaint in this Court raising one claim alleging a violation of the First Amendment under 42 U.S.C. § 1983. The same day, Plaintiffs filed the instant motion. The relief that Plaintiffs request includes the "[i]immediate authorization of [Mr.] Conradson's press credentials or in the absence of such credentials, access to newsgathering and press conferences equal to other press outlets"; a declaration that the denial of press credentials to Mr. Conradson was unconstitutional; and a declaration that the press-credential regulations are unconstitutional. (Compl. at 11–12.)

## II. LEGAL STANDARD

Courts use the same standard for issuing a temporary restraining order as that for issuing a preliminary injunction. *Spears v. Ariz. Bd. of Regents*, 372 F. Supp. 3d 893, 926 (D. Ariz. 2019). To obtain preliminary injunctive relief, plaintiffs must show: (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Employing a sliding scale, the Ninth Circuit has stated that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1085 (9th Cir. 2013), *cert. denied*, 747 F.3d 1073 (2014) (quoting *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1132 (9th Cir. 2011)).

The Ninth Circuit also has stated that mandatory injunctions—those ordering a responsible party to take a specific action, as Plaintiffs seek here—are subject to a higher standard than prohibitory injunctions that preserve the status quo. *Hernandez v. Sessions*, 872 F.3d 976, 998–99 (9th Cir. 2017). "Mandatory injunctions . . . are permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Id.* (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)).

### III. ANALYSIS

At the outset, the Court recognizes the importance of the constitutional rights at issue. The First Amendment protects the freedom not only to publish news and opinion, but also to engage in newsgathering. *Calif. First Amend. Coal. v. Calderon*, 150 F.3d 976, 981 (9th Cir. 1998). "The right of the press to gather news and information is protected by the First Amendment because 'without some protection for those seeking out the news, freedom of the press could be eviscerated.'" *Id.* (quoting *Branzburg v. Hayes*, 408 U.S. 665, 681 (1978)). These rights are not absolute, *see, e.g.*, *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 570 (1976), but the Court is, as it must be, solicitous of the First Amendment protections of the free press.

#### A. Likelihood of Success on the Merits

Plaintiffs put forth several arguments to support a facial challenge to the County's press-pass restrictions and an as-applied challenge to the denial of a press pass in this case. Broadly, Plaintiffs argue that the County's press-pass restrictions violate the First Amendment because they are unconstitutionally vague; the procedure in which Mr. Conradson was denied a press pass is void of due process; the denial of a press pass to Mr. Conradson was impermissibly content- and viewpoint-based; and Plaintiffs were selectively treated based on the content and viewpoint of their speech in contravention of equal protection principles. (Mot. at 7–16.) The Court discusses these arguments in turn.

##### 1. Unconstitutional Vagueness

A statute or regulation is unconstitutionally vague if it "fails to provide people of

- 6 -

ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 733 (2000). Vagueness scrutiny is more stringent when First Amendment rights are implicated. *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022). However, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)).

Plaintiffs argue that the two criteria under which the County denied a press pass to Mr. Conradson—that he neither "avoid[ed] real or perceived conflicts of interest" nor remained "free of associations that would compromise journalistic integrity or damage credibility"—are facially unconstitutional because they fail to make sufficiently clear "what conduct is prohibited." (Mot. at 10–11.) The Court is unpersuaded at this juncture.

As an initial matter, the County has not "prohibited" reporters such as Mr. Conradson from the conduct described in the criteria, at least not in the sense of triggering any kind of civil or criminal penalties. Rather, the press-pass criteria are just that—a set of standards by which the County determines whether to grant reporters access to events and facilities that, although "public" in the sense that they are maintained for the benefit of the community, are not open to the general public as a matter of right. Moreover, the criteria that Plaintiffs challenge are only two among several characteristics of journalistic practice that the County considers. These criteria should be considered in the context of the press-pass scheme as a whole. *See Butcher*, 38 F.4th at 1176 ("We agree that in assessing a vagueness challenge, we must consider [the] law as a whole.") (citations omitted).

Undercutting Plaintiffs' argument is the fact that the County drew its press-pass criteria directly from the criteria used by the Office of the Governor of Wisconsin, which were in turn based on standards used by the Wisconsin Capitol Correspondent's Board and in the United States Congress. (*See* Def. Ex. 2.) The Seventh Circuit upheld the constitutionality of these same criteria just last year. *John K. MacIver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602, 606, 610–15 (7th Cir. 2021) ("*MacIver*"). Although the

Seventh Circuit did not consider a vagueness challenge in that case, the court of appeals nonetheless provided detailed analysis of these criteria, indicating that their meaning is not as elusive as Plaintiffs suggest. *See id.* at 610–15; *see also id.* at 610–11 (noting "[s]imilar standards are also used by other governmental bodies such as the United States Congress").

Regarding the first challenged criteria, Plaintiffs question whether it is sufficiently clear "what an actual conflict of interest could be for a journalist." (Mot. at 10–11.) They further argue that "it is impossible to determine how a journalist may avoid being *perceived* to have a conflict of interest." (*Id.* (emphasis in original).) Conflicts of interest are familiar to the legal system. *See, e.g.*, Ariz. R. Sup. Ct. 42, ER 1.7, 1.8. It is true that what constitutes a conflict of interest is less obvious in the journalism context—for one thing, journalists do not have clients with discernable interests in the way that lawyers do. However, the Society of Professional Journalists' ("SPJ") Code of Ethics uses the term, indicating that the term has broadly understood meaning among practicing journalists. (Def. Ex. 12 (stating that "[j]ournalists should . . . [a]void conflicts of interest, real or perceived").)[2] Plaintiffs' expert, Professor Gregg Leslie, testified that conflicts of interest in the journalism context would include, for example, reporting favorably on a publicly traded company while owning stock in that company. (Tr. 15–16.)

The County urges and employs a broader interpretation of the term that includes a reporter such as Mr. Conradson reporting on issues for which, and candidates for whom, he also advocates. (*See* Tr. 70.) There is therefore some merit to Plaintiffs' argument about a lack of consensus as to the meaning of a conflict of interest in the journalism context. (Tr. 93.) But there is reason to believe that the County's interpretation is not an outlier. For example, the Arizona Senate's Media Rules state that applicants for media credentials "must not be engaged in any lobbying or advocacy, advertising, publicity or promotion of any individual, political party, group, corporation, organization or a federal, state or local

---

[2] The Court references the SPJ's Code of Ethics as evidence only of the use and meaning of the terms in the County's criteria within the journalism community. Plaintiffs' expert, Professor Gregg Leslie, noted that the Code was not intended to establish legally enforceable rules of journalistic practice; the Code itself states that it "is not, nor can it be under the First Amendment, legally enforceable." (Def. Ex. 12.) The point is well taken.

government agency . . . ." Arizona State Senate, "Media Rules," https://www.azsenate.gov/alispdfs/SenateMediaRules.pdf.

Turning to the second challenged criteria, Plaintiffs question what it would mean to be "free of associations that would compromise journalistic integrity or damage credibility." (Mot. at 11.) As before, there is reason to believe these terms are more broadly understood than Plaintiffs suggest. These criteria find analogue in the SPJ's Code of Ethics, which states that "[j]ournalists should . . . avoid political and other outside activities that may compromise integrity or impartiality, or may damage credibility." (Def. Ex. 12.) Prof. Leslie agreed that part of being a good journalist is to "stay away from anything that makes you look biased" and "don't do anything that is going to damage your credibility," although he disputed that this was anything more than a "very broad statement" and "an aspirational goal." (Tr. 16–17.) Further, it is not clear that these criteria "authorize[] or even encourage[] arbitrary and discriminatory enforcement," *Hill*, 530 U.S. at 733, given that the County granted press passes to other publications considered to be conservative-leaning, such as Fox News and Newsmax. (Tr. 65–66.)

Thus, while Plaintiffs have validly questioned the precise contours of the County's criteria, they have not established they are likely to succeed on their vagueness claim. Law demands clarity, of which the criteria are not a perfect model. But "'perfect clarity is not required'"—even where First Amendment rights are implicated—and "'we can never expect mathematical certainty from our language.'" *Human Life of Wash. v. Brumsickle*, 624 F.3d 990, 1019 (9th Cir. 2010) (first quoting *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001), and then quoting *Grayned*, 408 U.S. at 110).

### 2. Due Process

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Matthews v. Eldridge*, 424 U.S. 319, 332 (1976). Courts considering challenges brought by journalists denied access to government press conferences have persuasively held that, in view of the First Amendment

rights at stake, such access qualifies as a liberty interest that may not be denied without due process. *See Sherrill v. Knight*, 569 F.2d 124, 130–31 (D.C. Cir. 1977); *Alaska Landmine, LLC v. Dunleavy*, 514 F. Supp. 3d 1123, 1134 (D. Alaska), *appeal voluntarily dismissed*, No. 21-35137, 2021 WL 2103741 (9th Cir. Mar. 4, 2021); Doc. 22, Oral Ruling at 6–7, *CNN v. Trump*, No. CV-18-02610-TJK (D.D.C. Nov. 16, 2018); *Getty Images News Servs. Corp. v. Dep't of Def.*, 193 F. Supp. 2d 112, 121 (D.D.C. Mar. 7, 2002).

    Plaintiffs argue that the procedure by which the County denied a press pass to Mr. Conradson is void of due process. (Mot. at 11–12.) But they have not established that the County failed to afford Mr. Conradson the process he was due. They contend that the County has "no articulated standards" and fails to provide "opportunit[ies] to be heard" or "for meaningful appeal or review." (Mot. at 11.) Not so. The County published the standards by which it considers press-pass applications, which are reviewed and voted on by a team of eight County employees. (Tr. 64–65.) The denial email stated that Mr. Conradson could appeal the decision by sending a reply email. (Def. Ex. 13.) Mr. Conradson did not take immediate advantage of this appeal process, waiting 41 days to send his reply. (Tr. 45.) He filed this lawsuit two days later. In short, it is incorrect to say, as Plaintiffs do, that "there was no process at all." (Mot. at 12.) To the extent Defendants had not considered Mr. Conradson's appeal by the time Plaintiffs filed the instant complaint, that was due entirely to Plaintiffs' unilateral delay in appealing.

    Plaintiffs rely on *Alaska Landmine, LLC v. Dunleavy* and *Sherrill v. Knight* to support their due process argument, but each case is distinguishable. In *Alaska Landmine*, the governor stopped providing press-conference invitations to the plaintiff, an online news publication, without ever formalizing a process for determining press access. 514 F. Supp. 3d at 1127–28. The district court held the plaintiff was likely to succeed on the merits of its due process claim "given the government's failure to memorialize an explicit and meaningful standard governing its denial of press conference access." *Id*. at 1134. Similarly, in *Sherrill*, the United States Secret Service denied White House press credentials to a journalist with *The Nation* magazine based on vague and unarticulated

security concerns without any "published or internal regulations stating the criteria upon which a White House press pass security clearance is based." 569 F.2d at 126–27. The D.C. Circuit held that the "failure to articulate and publish an explicit and meaningful standard governing denial of White House press passes for security reasons, and to afford procedural protections to those denied passes, violates the first and fifth amendments." *Id*. at 131.

Here, however, the County memorialized and published criteria for evaluating press-pass applications; employed those criteria in a semi-formal review process; explained the basis for the denial to Mr. Conradson; and provided an opportunity for reconsideration. Plaintiffs have not shown a likelihood of success on a due process theory.

### 3. Viewpoint Discrimination

The First Amendment does not provide a right of free and unconditional access to all government properties or events. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799–800 (1985). "The existence of a right of access to public property and the standard by which limitations placed upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). Moreover, the First Amendment rights of access enjoyed by members of the press are no broader than those enjoyed by the general public. *See Branzburg*, 408 U.S. at 684; *Pell v. Procunier*, 417 U.S. 817, 833–35 (1974); *see also Cal. First Amen. Coal. v. Woodford*, 299 F.3d 868, 873 n.2 (9th Cir. 2002) ("As members of the press, plaintiffs' First Amendment right of access to governmental proceedings is coextensive with the general public's right of access.") (citations omitted).

The Supreme Court generally considers challenges to restrictions on access to government property or events under the public forum doctrine, which provides a framework for evaluating such restrictions based on the type of government property or event in question. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018); *Cornelius*, 473 U.S. at 799–800; *Perry*, 460 U.S. at 44. Courts have considered closely analogous challenges to restrictions on access to government press conferences under the public forum doctrine. *See MacIver*, 994 F.3d at 609–10; *Alaska Landmine*, 514 F. Supp.

3d at 1130–31. Both parties here agree that public forum analysis is relevant, although they dispute where that analysis ultimately leads. (Mot. at 13–14; Resp. at 10–11.)

The public forum doctrine generally places government-controlled spaces in three categories: (1) "traditional public forums"; (2) "designated public forums"; and (3) "nonpublic forums." *Mansky*, 138 S. Ct. at 1885. Different levels of scrutiny apply depending on the forum. *Id*. In traditional public forums—such as parks, streets, and other spaces traditionally held open for public speech—"the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited." *Id*. (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 469 (2009)). The same standards apply to designated public forums—spaces "that are not traditionally open for public speech" but which the government has made available for "'expressive use by the general public or by a particular class of speakers.'" *Koala v. Khosla*, 931 F.3d 887, 900 (9th Cir. 2019) (quoting *Seattle Mideast Awareness Campaign*, 781 F.3d 489, 496 (9th Cir. 2015)).

The Supreme Court has stated that "the government has much more flexibility" in the third category. *Mansky*, 138 S. Ct. at 1885. The cases variously label forums in this category as "limited public forums"—referring to those "limited to use by certain groups or dedicated solely to the discussion of certain subjects," *Pleasant Grove*, 555 U.S. at 470—or "nonpublic forums"—referring to those that are "not by tradition or designation a forum for public communication." *Perry*, 460 U.S. at 46. However, the Ninth Circuit has stated that "'[t]he label doesn't matter, because the same level of First Amendment scrutiny applies to all forums that aren't traditional or designated public forums.'" *Koala*, 921 F.3d at 900 n.6 (quoting *Seattle Mideast Awareness Campaign*, 781 F.3d at 496 n.2). Control over access to such forums "can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806; *accord Pleasant Grove*, 555 U.S. at 470.

The forums to which Plaintiffs seek access in this case are nonpublic County facilities and press conferences given by County officials. The Court agrees with other

courts that have considered closely analogous challenges and concludes that these are nonpublic forums. *See MacIver*, 994 F.3d at 610; *Alaska Landmine*, 514 F. Supp. 3d at 1121. Plaintiffs resist this conclusion, arguing the forums here are "limited" public forums, rather than "nonpublic" ones. (Mot. at 13; Tr. 88.) But the Ninth Circuit has stated that this is a distinction without a difference, at least in terms of the scrutiny that applies. *Koala*, 921 F.3d at 900 n.6. No matter the label, the test is the same: The County's press-pass restrictions must be reasonable in light of the purposes served by granting members of the press access to certain County facilities and to press conferences held in those facilities, and the restrictions must be viewpoint neutral. *See Cornelius*, 473 U.S. at 806; *Pleasant Grove*, 555 U.S. at 470.

The County argues that it has "a right to set criteria for allowing people to get into buildings and to attend press conferences." (Tr. 81.) This must be true given the County's well-founded safety concerns and limited space. Plaintiffs do not apparently disagree in principle, conceding that the County is not required simply to let in anyone who presents themself as a journalist. (*See* Tr. 90–93.) With respect to the specific criteria the County employs to further these interests, the Court agrees with the Seventh Circuit's analysis in *MacIver* that the first three challenged criteria are "reasonably related to the viewpoint-neutral goal of increasing the journalistic impact of the [government's] message by including media that focus primarily on news dissemination, have some longevity in the business, and possess the ability to craft newsworthy stories." 994 F.3d at 610.

The County further argues that it has "the right to set up criteria for ethical reporting" (Tr. 83), which broadly summarizes the fourth and fifth challenged criteria. This a more controversial proposition, with which Plaintiffs and their expert, Prof. Leslie, strongly disagree. (*See, e.g.*, Tr. 21.) The Court agrees that this proposition is problematic insofar as it invites the government to play a role in policing the free press, whose constitutionally protected function is to hold the government to account. *See New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring).

Here, however, the County does not assert a right to establish criteria for ethical

reporting to justify policing the practice of journalism, at least not directly.[3] Rather, the County asserts this right to justify evaluating reporters' practices to determine whether to grant them access to press conferences and nonpublic County facilities and thereby further the County's legitimate interest in disseminating accurate information to the public. Cabined to this purpose, the Court agrees with the Seventh Circuit's analysis that the fourth and fifth criteria "are reasonably related to the viewpoint-neutral goal of increasing journalistic integrity by favoring media that avoid real or perceived conflicts of interest or entanglement with special interest groups, or those that engage in advocacy or lobbying." *MacIver*, 994 F.3d at 610. Whether better or more precise standards exist is not the point. The County's press-pass restrictions "need only be *reasonable*; [they] need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808 (emphasis in original). The Court is not persuaded that the County's restrictions are unreasonable.

Nor is the Court persuaded that the County's denial of a press pass to Mr. Conradson was viewpoint-based. In short, Plaintiffs have not substantiated their claim that "[the County] used [its] unfettered discretion to discriminate against the Gateway Pundit because they do not want to be challenged by the Gateway Pundit's style of journalism." (Mot. at 15.) Plaintiffs suggest that the County's decision is related to Plaintiffs' reporting about former Maricopa County Supervisor Steve Chucri (Tr. 69), but this is conjectural. They further suggest that the County discriminated against Plaintiffs because of a particular bias against Plaintiffs (Tr. 78), pointing to Defendant Richer's retweet of a tweet hinting that the County instituted the press-pass restrictions to keep Plaintiffs out of press conferences (Doc. 25). Such behavior may be beneath the dignity of the office, but Plaintiffs have not substantiated their claim that keeping them out was the animating reason behind the restrictions. Finally, Plaintiffs suggest that the County discriminated against them based on their political leanings. (Mot. at 4–5.) While the County did take note of Mr. Conradson's

---

[3] For this reason, the Court is also not persuaded by Plaintiffs' argument that the press-pass criteria are akin to licensing regimes that "condition the exercise of First Amendment protected rights on 'obtaining a license or permit from a government official in that official's boundless discretion.'" (Mot. at 13, quoting *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992).) The County is not requiring a license to gather news.

political leanings—which the Court acknowledges is a fraught consideration—it did so in the context of evaluating whether he was free from associations that would compromise his journalistic integrity. (Tr. 70.) Mr. Moseley denied that the County rejected Mr. Conradson's application based on his opinions and noted that the County has granted passes to other conservative leaning publications. (Tr. 65–66, 72.)

In sum, while Plaintiffs have raised thorny questions about the County's press-pass restrictions, they have not shown they are likely to succeed in arguing that the restrictions or their application in this case are unreasonable or constitute viewpoint discrimination.[4]

## B. Irreparable Injury

Plaintiffs seeking a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original) (citing *Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983)). Plaintiffs note that the "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). But the Court has already concluded that Plaintiffs have not shown any violations of their First Amendment rights at this juncture.

Plaintiffs further argue that there is irreparable harm flowing from the County's actions here because of Mr. Conradson "not being able to report fully." (Tr. 86.) The County responds that Mr. Conradson is free to watch broadcasts of County press conferences livestreamed on YouTube. (Resp. at 11–12.) *See Alaska Landmine*, 514 F. Supp. 3d at 1135 (finding the harm of being excluded from press conferences *de minimis* where the public can access livestreams of such conferences). Prof. Leslie testified that the livestreams are "certainly better than nothing," but noted that "[t]here's a big difference between being in the room and getting to observe multiple people at once versus what the camera happens to focus on." (Tr. 23.) Prof. Leslie's point is well taken, but it is also true that even if Mr. Conradson were permitted to attend press conferences, County officials

---

[4] Because Plaintiffs' equal protection argument is premised on the same analysis as their First Amendment claim (*see* Mot. at 16), the Court concludes for the same reasons stated herein that Plaintiffs have not shown a likelihood of success on an equal protection theory.

would be under no obligation to interact with him. *See Alaska Landmine*, 514 F. Supp. 3d at 1135 (noting that "the Governor possesses the discretion to refrain from calling on Plaintiffs or answering their questions.").

The more fundamental problem with Plaintiffs' irreparable injury argument is that they waited 41 days between receiving the denial email on September 30, 2022 and replying to that email to appeal the County's decision on November 10, 2022. (Tr. 45.) The County argues that this delay entirely undercuts Plaintiffs' claims about the urgency of their request for injunctive relief. (Tr. 82–83.) Plaintiffs respond that the circumstances only became urgent on election day, when issues involving voting machines made the County's elections a national news story. (Tr. 84.) The Court is not persuaded. Plaintiffs' own evidence demonstrates a focus on the County and its administration of elections that existed long before election day, which would itself inevitably be an important news event. Nor is the Court persuaded by Plaintiffs' argument that there was "escalation of the exclusion" by the County. (Tr. 94.) It was Mr. Conradson who initiated further contacts with County officials that led to the alleged escalation. (Tr. 44–45, 51.)

### C. The Balance of Equities and the Public Interest

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24 (citing *Munaf v. Green*, 553 U.S. 674, 689–90 (2008)). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,'" paying particular attention to the public consequences. *Id.* (quoting *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987)). Analyses of the third and fourth *Winter* factors—harm to the opposing party and consideration of the public interest—merge where the government is the party opposing a preliminary injunction. *Alaska Landmine*, 514 F. Supp. 3d at 1120 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

There are burdens on both sides of the balance in this case. Although Plaintiffs' claims to irreparable injury are not as strong as Plaintiffs contend, they are not trivial: Mr. Conradson is not permitted to report from "the room where it happened," as Prof. Leslie

testified in reference to the line from the musical *Hamilton*. (Tr. 28.) On the other side, the County would be significantly burdened by a requirement to open access to its facilities and press conferences, which would create logistics issues and might also exacerbate security concerns. As to Plaintiffs specifically, the County has produced evidence suggesting—though not definitively proving—that their articles have been associated with threats against County employees.

Finally, Plaintiffs argue that the County's actions here are ultimately counterproductive because they create "a high probability of undermining confidence that the election is being tallied in a fair and above-board manner." (Mot. at 17.)  Whether or not this proposition is correct, the Court does not find it to be a matter appropriate for judicial determination. In view of the counterbalancing burdens in this case, the Court cannot conclude that the balance tips in Plaintiffs' favor. *Winter*, 555 U.S. at 374.

## IV.   CONCLUSION

Based on the foregoing, the Court finds that Plaintiffs have not carried their burden to show that they are entitled to preliminary injunctive relief at this juncture.

**IT IS THEREFORE ORDERED** denying Plaintiffs' Emergency *Ex Parte* Motion for a Temporary Restraining Order (Doc. 7).

Dated this 23rd day of November, 2022.

Honorable John J. Tuchi
United States District Judge