CV22-01925-PHX-JJT, November 17, 2022

1    **UNITED STATES DISTRICT COURT**

2    **FOR THE DISTRICT OF ARIZONA**

3    _____

4

5    **TGP Communications, L.L.C., a**            )
     **Missouri limited liability company** )
     **doing business as Gateway Pundit,**  )
6    **et al.,**                                 )
                                                 )
7                          Plaintiffs,    )
                                                 )
8                vs.                       ) CV22-01925-PHX-JJT
                                                 )
9    **Jack Sellers, et al.,**                    )
                                                 ) Phoenix, Arizona
10                      Defendants.        ) November 17, 2022
     _____ ) 10:03 a.m.

11

12       **BEFORE:  THE HONORABLE JOHN J. TUCHI, JUDGE**

13       <u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

14       <u>**TEMPORARY RESTRAINING ORDER HEARING**</u>

15

16

17

18

19

20

21   Official Court Reporter:
     **Elaine Cropper, RDR, CRR, CCP**
     Sandra Day O'Connor U.S. Courthouse
22   401 West Washington Street
     Suite 312, SPC 35
23   Phoenix, Arizona  85003-2150
     (602) 322-7245

24

25   Proceedings Reported by Stenographic Court Reporter
     Transcript Prepared by Computer-Aided Transcription

2

CV22-01925-PHX-JJT, November 17, 2022

1                              **APPEARANCES**

2

For the Plaintiffs:
3          **MARC JOHN RANDAZZA, ESQ.**
           Randazza Law Group, P.L.L.C.
4          4974 S. Rainbow Blvd., Ste. 100
           Las Vegas, NV  89117
5          702.420.2001

6          **DAVID SCOTT GINGRAS, ESQ.**
           Gingras Law Office, P.L.L.C.
7          4801 E. Ray Road., Ste. 23-271
           Phoenix, AZ  85044
8          480.668.3623

9   For the Defendants:
           **CHARLES E. TRULLINGER, ESQ.**
10         **THOMAS P. LIDDY, ESQ.**
           Maricopa County Attorney's Office
11         Civil Division
           222 North Central Avenue, Ste. 1100
12         Phoenix, AZ  85004-2206
           602.506.8541

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

CV22-01925-PHX-JJT, November 17, 2022

### **P R O C E E D I N G S**

1

2          (Court was called to order by the courtroom deputy.)

3          (All counsel are present in the courtroom.)

4          (Proceedings begin at 10:03.)

5          COURTROOM DEPUTY:  This is civil case 22-1925, *TPG*          10:03:03

6  *Communications LLC v. Jack Sellers*.

7          This is the time set for Temporary Restraining Order

8  hearing.

9          Counsel, please announce.

10          MR. RANDAZZA:  Good morning, Your Honor.  Marc          10:03:13

11  Randazza on behalf of the plaintiffs.

12          THE COURT:  Mr. Randazza, good morning.

13          MR. GINGRAS:  Good morning, Your Honor.  David

14  Gingras on behalf of plaintiffs.

15          THE COURT:  Mr. Gingras, good morning.          10:03:23

16          MR. TRULLINGER:  Good morning, Your Honor.  Charles

17  Trullinger and Thomas Liddy on behalf of the Maricopa County

18  defendants.

19          THE COURT:  Mr. Trullinger, Mr. Liddy, good morning.

20          MR. LIDDY:  Good morning, Your Honor.          10:03:33

21          THE COURT:  Give me just one moment, please.

22          All right.  One housekeeping matter.  I watched the

23  witness list potentially grow a little bit over the subsequent

24  filings.  I understand everybody's moving fast in this

25  situation.          10:04:00

United States District Court

CV22-01925-PHX-JJT, November 17, 2022

1          Mr. Randazza, you had one logistical issue with        10:04:03
2   regard to having two experts on the issue of journalistic
3   ethics.  One of them -- and the logistical issue is, one of
4   them is not physically present and your request to me was could
5   they testify telephonically; correct?                          10:04:17
6          MR. RANDAZZA:  Yes, Your Honor, but I may be able to
7   make this easy for you.  I don't think we're going to need
8   Mr. Glasser.
9          THE COURT:  All right.  Thank you because, in my
10  mind, especially for an executive hearing at this point that we 10:04:26
11  need to move in a limited amount of time, I was not inclined to
12  allow two experts on the same subject matter and so you've
13  resolved that for me.
14         What I'd like to do now, counsel, is as follows:
15  I've read and internalized everything that you have supplied to 10:04:40
16  me, not just the briefs but all of the background materials and
17  exhibits and so we're going to dispense with any kind of
18  openings.  I want to get into any witnesses or evidence that
19  the parties want to present to me today.  I'm going to give
20  each side 45 minutes to do that because I need to reserve time  10:05:00
21  for you to then sum up and I may well have questions for you as
22  well.  We will start with plaintiffs.
23         So, Mr. Randazza, if you would call your first
24  witness.
25         MR. RANDAZZA:  Yes, Your Honor.                          10:05:12

United States District Court

GREGG LESLIE - Direct

1          Your Honor, I would proffer Professor Gregg Leslie as    10:05:17

2    our expert.

3          THE COURT:  All right.

4          Mr. Leslie, if you would please step forward to my

5    courtroom deputy, she'll swear you in.                          10:05:22

6          MR. RANDAZZA:  And, Your Honor, having not appeared

7    before you before, do you prefer me at the podium or at counsel

8    table?

9          THE COURT:  It's changed since the COVID protocols

10   have gone off and I've gotten a little bit more permissive one   10:05:33

11   way or the other.  Historically, it's always from the podium

12   but I'm fine if you want to do it from your counsel table today

13   and that means from your seat if you like.

14         MR. RANDAZZA:  Okay.  Thank you, Your Honor.

15         COURTROOM DEPUTY:  Please state your name and spell      10:05:48

16   your first and last name for the record.

17         THE WITNESS:  Gregg Leslie.  L-E-S-L-I-E.

18         (602.506.8541, a witness herein, was duly sworn or

19   affirmed.)

20         THE COURT:  Whenever you're ready, sir.  Thank you.      10:06:13

21                      **DIRECT EXAMINATION**

22   BY MR. RANDAZZA:

23   Q.   Professor Leslie, can you please tell us your current

24   employment position?

25   A.   I am a Professor of Practice and the Executive Director of   10:06:20

United States District Court

GREGG LESLIE - Direct

1  the First Amendment Clinic at the ASU Sandra Day O'Connor      10:06:23

2  College of Law.

3  Q.    And can you tell me about your educational background,

4  sir?

5  A.    I have a BA from Georgetown University from 1985 and then   10:06:31

6  I attended Georgetown University Law Center, graduating in

7  1990.

8  Q.    And what did you do after you graduated, sir?

9  A.    Soon after I ended up as a legal fellow at the Reporter's

10  Committee for Freedom of the Press, a nonprofit organization in  10:06:50

11  Washington, D.C., that defends free press rights and helps

12  journalists with all kinds of legal issues.

13        After that when the fellowship ended after a year and

14  a half, I was between jobs so I volunteered for the Clinton

15  campaign.  This was in '92.  And then within a year of that I   10:07:08

16  came back to the Reporter's Committee as a staff attorney and I

17  was there for 23 years, ultimately as Legal Defense Director.

18        THE COURT:  Counsel, I'm sorry.  I need to interrupt

19  you for just a moment.  I think I need to disclose to you that

20  while I have never met Professor Leslie before, I do from time  10:07:27

21  to time teach as an adjunct faculty member at the ASU College

22  of Law Professional Responsibility Course.  I'm doing it this

23  semester.

24        I don't know that that presents a problem here with

25  anybody's perception of the Court's balance on this because, as  10:07:44

United States District Court

GREGG LESLIE - Direct

1  I said, I've never met the professor before.  But if anybody   10:07:48

2  wants to raise that point, this would be a good time.

3         MR. LIDDY:  Your Honor, on behalf of Maricopa County,

4  we are very proud to have the Walter Cronkite School in our

5  county.  We understand how important it is to have the next   10:08:02

6  generation prepared, and we have no problem with this witness

7  teaching at the same institution that you sometimes teach so no

8  objection, Your Honor.

9         THE COURT:  All right.  Thank you.

10        MR. RANDAZZA:  I concur with my friend.   10:08:15

11        THE COURT:  All right.  Thank you.

12        And I'll try not to interrupt again.

13        Go ahead.

14        MR. RANDAZZA:  Thank you, Your Honor.

15  BY MR. RANDAZZA:   10:08:21

16  Q.   Mr. Leslie, during your tenure at the Reporter's

17  Committee, can you give me a brief outline of your

18  responsibilities and projects that you worked on there?

19  A.   Well, we really got ourselves involved in any freedom of

20  information or First Amendment related problem that journalists   10:08:37

21  face.  So we were constantly helping reporters when they were

22  involved in libel suits, when they were -- when they were

23  credentialing issues, we were often involved.  When they had

24  news-gathering restrictions placed on them, like by maybe

25  police during a protest and a reporter wanted to cover it and   10:08:57

GREGG LESLIE - Direct

1   yet were stopped from doing so because they were treated like          10:09:02
2   protesters or just -- their news-gathering rights were
3   violated.  So really anything to do with news gathering and
4   presenting the news to the public we would get involved in.

5              Usually we got involved as amicus curiae, filing          10:09:18
6   amicus briefs; but in many of the cases, we worked closely with
7   defense counsel.  You know, usually if the reporter was
8   somebody from the Associated Press or the New York Times or any
9   other decently sized publication, they had in-house counsel and
10  so we worked with them.  And then in the later years I was          10:09:37
11  there, we directly litigated on behalf of reporters as well.
12  Q.   And did you have any part in working on, for example,
13  media education at the time?
14  A.   We were often involved in that.  Both educating reporters
15  about their rights but also educating public officials and          10:10:05
16  police officials about reporters' rights.  Every four years at
17  both national political conventions we would run a hotline for
18  reporters who had legal issues and part of that hotline work
19  involved going to those cities beforehand, before the
20  conventions, and actually working with police and with usually          10:10:23
21  the mayor's office would have a representative who coordinated
22  it.  We would work with them to talk about what the media does
23  and how it might look like they are part of a protest when
24  instead, they are not.  They are there to cover it and pass
25  that information on the public so -- onto the public.          10:10:43

GREGG LESLIE - Direct

1    And, you know, and then as kind of an awkward part,    10:10:46

2 we would warn them about what a 1983 suit is and what happens

3 if they violate a reporter's First Amendment rights.

4    So, yes, public education and education of the

5 officials who might be tempted to interfere with reporter's    10:10:59

6 rights was a big part of the job.

7 Q.   And was that at state, federal, local, congressional

8 levels?

9 A.   We did it at all levels, sure.  Yeah.  We worked with

10 Congress -- you know, the press galleries there are the ones    10:11:13

11 that handle credentialing of journalists.  Congress purposely

12 avoided -- they didn't want to take on the role of deciding who

13 was a journalist or who was fit to cover the proceeding, so

14 they ceded that authority to the press galleries.  And we often

15 worked with them, almost on a consulting basis to -- especially    10:11:34

16 when they wanted to modify their policies to accommodate what

17 was then 15 years ago the emerging field of bloggers and online

18 journalists who traditionally had not fit in the definition of

19 a journalist at the Capitol.

20    MR. RANDAZZA:  Your Honor, I would present him as an    10:11:55

21 expert in media credentialing, media ethics, media practices.

22    THE COURT:  Mr. Randazza, this Court does not certify

23 experts per se.  If he's on the stand, I'm allowing him to

24 testify absent objections.  And especially since there's no

25 jury here, I think I'm able to weed anything out that is    10:12:12

United States District Court

GREGG LESLIE - Direct

1  inappropriate.                                                    10:12:14

2          So please go ahead and ask your substantive

3  questions.

4          MR. RANDAZZA:  Okay.

5  BY MR. RANDAZZA:                                                  10:12:18

6  Q.  Professor Leslie, you've reviewed the pleadings next?

7  A.  Yes.

8  Q.  Is it your understanding that in large part the Government

9  is relying on Society of Professional Journalists' standards

10 for their position?                                               10:12:32

11 A.  Yes.  It does seem that that is a big factor in their

12 determinations, yes.

13 Q.  Are you familiar with the Society of Professional

14 Journalists which I'll abbreviate by SPJ for everyone's

15 convenience?                                                      10:12:45

16 A.  Yes.  I've worked with them many times on an almost weekly

17 basis for almost 20 years.  I've known all of their attorneys

18 at Baker and Hostetler who handle their legal matters.  And,

19 yes, I'm very familiar with their practices and their ethics

20 code.                                                             10:13:03

21 Q.  Can you tell me what the SPJ is?

22 A.  It's a group that has got a very interesting history.

23 It's a society of professional journalists and it was started

24 by a number of journalists who wanted to make journalism a

25 professional -- well, a profession rather than just what was     10:13:16

GREGG LESLIE - Direct

1   seen as a lesser practice where just anybody could do it.  So       10:13:21
2   they wanted to elevate the standards of the industry and so
3   they very early on adopted an ethics code that was meant to be
4   aspirational to talk about what a professional journalist
5   should be.                                                          10:13:38
6           And I don't know if they knew at the time but it
7   certainly has been understood since that journalism is not
8   really a profession.  You don't invite licensing by the
9   Government.  You don't invite admission to the field through
10  Government regulation.  So in the traditional sense, it's not       10:13:53
11  really a profession but they just wanted to elevate the
12  profession and they created an aspirational code to do that.
13  Q.   Have you seen their standards sheet used or attempted to
14  be used in litigation very often?
15  A.   I think reflexively it always is.  People always want to       10:14:15
16  say, "Well, this is what a journalist is supposed to do and if
17  they fall short of the SPJ code, they must be negligent," and
18  that is never what the code was supposed to be.
19          In fact, the SPJ on its own website talks about the
20  code and says it was never meant to punish journalists.  It was     10:14:31
21  never meant to be a legal standard.  It was always supposed to
22  be an aspirational code and, I mean, I think that's a big part
23  of working with journalists as a lawyer.  Looking at a question
24  from the aspect of whether there's a legal standard that
25  governs and whether there's an ethical standard and the lawyers     10:14:53

12

GREGG LESLIE - Direct

1   are always concerned about the legal standard.  Somebody                    10:14:55

2   committed to being the best journalist they can be would be

3   definitely committed to the ethics standards.  But, you know,

4   they are not meant to regulate the field certainly.

5   Q.   Are there competing ethics codes?                                       10:15:11

6   A.   There are many.  Every association that starts up often,

7   you know -- especially more than ten years ago, people would

8   decide they didn't want to be a part of SPJ or, in an emerging

9   field like online journalism, a group called The Online News

10  Association emerged and every time one of these groups started,             10:15:30

11  they did develop an ethics code because they wanted to

12  distinguish themselves.  They wanted to say what they stood for

13  but they never made it a bar to admission or a standard for

14  becoming a journalist.  They just said, "Here's what we aspire

15  to.  Here's what our educational purpose will be."                          10:15:50

16          And then as well every news organization of any

17  decent size has its own standards, usually specifically

18  targeted to a community.  And it was very popular a century ago

19  when every newspaper wanted to say to the City exactly what

20  they stood for and how their reporters would behave.                        10:16:10

21  Q.   So would it be accurate to say that if you followed the

22  SPJ's code, you're not necessarily following a universal code?

23  A.   Right.  You've just adopted a standard that you think

24  holds you out as a more professional -- you know, a higher

25  level of a journalist.                                                      10:16:30

United States District Court

GREGG LESLIE - Direct

1  Q.   Do you think there's any bias in the SPJ's code?                    10:16:31

2  A.   I think, you know, because it's so old, there has been

3  bias all along.  Once you decide that you're the standard for a

4  professional journalist, by definition, you start weeding out

5  people who you don't think qualify.                                      10:16:45

6         And so for many years that included free-lance

7  journalists.  SPJ was not always big on allowing free-lance

8  journalists.

9         Once we got into the Internet age, they were very

10  slow to accommodate online journalists.  They wanted to say you    10:16:58

11  had to work for a newspaper or an established publication.  And

12  that's why we now have multiple organizations dedicated to

13  online journalism, because SPJ was very slow to get into that

14  field.  So they have had a bias in favor of what is a

15  well-established definition of a journalist.                             10:17:25

16  Q.   In your professional opinion and academic opinion then,

17  would using the SPJ's code to determine who is and who is not a

18  credentialed journalist be a good practice?

19  A.   It's not a good practice at all.  I would say it's similar

20  to an actor, if they want to become an actor in movies, they      10:17:48

21  have to meet the minimums to join Actors Equity or whatever the

22  union is, but that's different than meeting aspirational goals

23  that get you to winning an Oscar, for instance, so it's a big

24  divide.

25         The SPJ code is really about developing you as the             10:18:07

United States District Court

GREGG LESLIE - Direct

1  best journalist you can be, what you should be concerned about.    10:18:10

2  But it's never meant to be a bar to admission to the field.

3          And again I would stress that SPJ notes that.  I'm

4  not criticizing SPJ there.  They have disclosed that they don't

5  mean this to be a definition of who is a journalist and who    10:18:27

6  qualifies for protection as a journalist.

7  Q.   So in your experience, SPJ wouldn't even want their code

8  used this way?

9  A.   Right.  Yes.  And they've seen so many battles over that,

10  that's why they specifically wrote that into a statement that    10:18:44

11  is still on their website.

12  Q.   So let's set that aside for a moment.  We will accept your

13  position on that but let's just look at the code itself.  Part

14  of the code that is at issue in this case is that to determine

15  if someone is a bona fide correspondent of repute, there are    10:19:05

16  two factors that the Government has cited to reject my client,

17  one being that both the journalist and the publication, quote,

18  avoid real or perceived conflicts of interest and that both are

19  free of associations that would compromise journalistic

20  integrity or damage credibility.    10:19:34

21          Professor Leslie, I would like to first address the

22  real or perceived conflicts of interest.  In your professional,

23  educational and learned opinion, what does that mean in the

24  context of the practice of journalism, conflicts of interest?

25          MR. TRULLINGER:  Objection, Your Honor.  The witness    10:19:55

GREGG LESLIE - Direct

| 1 | is not a journalist. | 10:19:56 |

THE COURT:  I'm going to allow him to answer the question in this context.  As I said before, I think I can sift through the information for the Court as the finder of fact as it were.  The objection is overruled.  10:20:15

You can answer the question.

Do you need it repeated back to you?

THE WITNESS:  Sure.

MR. RANDAZZA:  Actually, I'm going to rephrase it.

THE COURT:  Okay.  10:20:27

BY MR. RANDAZZA:

Q.   In your opinion, how does the journalistic -- I guess it's not a profession; correct, sir?

A.   Right.  Yeah, in the strict definition.

Q.   How does the journalism world define conflict of interest?  10:20:39

A.   I think this gets to that distinction between how you can be the best journalist to impress people and impress the public versus what you have to do before you're considered so biased you shouldn't be a journalist.  And so what this means is in that context -- and, again, I've worked with SPJ lawyers on  10:21:01
this before.  They are -- mainly you would be concerned with somebody, say, owning a stock of a publicly traded company and not disclosing that and reporting on that company favorably knowing it will affect the market value of what you have owned. There can be other conflicts of interest but they are really  10:21:23

GREGG LESLIE - Direct

1  meant to be very specific things to make sure you're not          10:21:27
2  undermining journalism directly by, say, if your true purpose
3  is to get a law passed as a lobbyist or an advocate of some
4  type, they don't want you to masquerade as a journalist when
5  you've got that conflict of interest.                              10:21:48
6  Q.   So would that have anything to do with being opinionated?
7  A.   I don't think it does at all because, you know, as I said,
8  this battle early on was about what a professional journalist
9  is because there was always a history in journalism of being
10  incredibly opinionated, directly working in collusion with        10:22:07
11  political parties and all and yet those journalists still have
12  First Amendment rights even if you go that far.
13           So, yeah, I think that's -- it doesn't -- having an
14  opinion still does not determine whether you are a journalist.
15  I think Rachel Maddow at MSNBC is always brought up as an         10:22:30
16  example of this.  It's clear what perspective she has and what
17  opinion she's promoting, but she does good journalism at the
18  same time.  So you can be a journalist have a strong opinion.
19  Q.   What about the second factor here, to be free of
20  associations that compromise journalistic integrity or damage    10:22:55
21  credibility?
22  A.   I think, again, it's when you hear that at first, they
23  don't give examples.  It's a very broad statement and it's
24  because its an aspirational goal.  So if you think of it as an
25  aspirational goal, it makes sense.  You just stay away from      10:23:14

United States District Court

GREGG LESLIE - Direct

1  anything that makes you look biased.  You don't do anything                10:23:18

2  that is going to damage your credibility, whatever that may be,

3  and they don't list factors there because it just means be a

4  good journalist.

5          If you try to bring it down to the position of where              10:23:33

6  it's going to be used in the statute to regulate journalism,

7  you know, it should only be used when it's actually something

8  like you have a direct conflict of interest, usually meaning

9  monetary.  Journalists just don't regulate their own field that

10 way by saying if you have a political opinion or if you do                 10:23:56

11 something that makes you look biased that you can't be a

12 journalist.  That's never been part of the definition of who is

13 a journalist.

14 Q.  So your example of Rachel Maddow, the fact that she might

15 really support a candidate, would that be relevant to her                  10:24:17

16 status as a journalist?

17 A.  I think it would be relevant.  I think people would

18 question various things about then is she telling the truth

19 when she questions other candidates?  And so that's why it's an

20 aspirational goal that you shouldn't look biased in that sense.            10:24:32

21 But at the same time, you know, nobody would say she's not a

22 journalist because she's endorsed the candidate.  There's a

23 long tradition in this country dating back to the founding era

24 of newspapers endorsing candidates.  They sometimes see that as

25 a separate role of an editorial board that is not part of the              10:24:54

United States District Court

GREGG LESLIE - Cross

 1  news room but that's not a law and that's not a required custom    10:24:58
 2  either.
 3  Q.   So that isn't a conflict of interest?
 4  A.   No.  I mean, it's not the kind of conflict of interest
 5  that would define who can be a journalist.  It might be    10:25:10
 6  considered a conflict to say, you know, if you're trying to
 7  present yourself as the best journalist out there.  Other
 8  journalists might use that against you to say you shouldn't be
 9  doing that but not in the sense of not saying you're not a
10  journalist.    10:25:31
11          MR. RANDAZZA:  Thank you, sir.  I have no more
12  questions for you.
13          THE COURT:  All right.  Thank you.
14          Mr. Trullinger, do you have questions for this
15  witness?    10:25:44
16          MR. TRULLINGER:  I do, Your Honor.  Thank you.
17          Is it okay if I come to the podium, Your Honor?
18          THE COURT:  Yes.  That's fine.
19                   **CROSS - EXAMINATION**
20  BY MR. TRULLINGER:    10:25:56
21  Q.   Good morning, Mr. Leslie.  How are you doing?
22  A.   Good morning.  All right.
23  Q.   First of all, the criteria that is at issue here is not
24  based on the Society of Professional Journalism.  It's based on
25  a Seventh Circuit Court of Appeals' opinion.  Are you not aware    10:26:20

United States District Court

GREGG LESLIE - Cross

1  of that?                                                    10:26:24

2  A.   No.  I think that language came from the code of ethics,

3  didn't it?

4  Q.   There are some overlap but there's a difference between

5  the Society of Professional Journalism rules or codes I should   10:26:33

6  say and the criteria that has been adopted by Maricopa County

7  to whether or not to allow Press Passes.  So just for clarity,

8  your focus is on the Society of Professional Journalism and

9  that code of ethics, that's what you're testifying about today;

10 correct?                                                     10:26:53

11 A.   It's really about what standards Government officials can

12 use to determine who is a journalist and the language is so

13 similar in the code of ethics and some of these regulations

14 because of this temptation to say, "Well, if this huge

15 journalism society has adopted these codes, that must be the    10:27:08

16 rule."  And so that's the important thing, to weed that out, to

17 say that these are not rules of the profession as much as

18 aspirational goals.

19 Q.   Sure.  But as we sit here today, you've not looked at the

20 criteria that the county is using; true?                     10:27:23

21 A.   No.  I've read the regulation that they use, yes.

22 Q.   So you agree that the Government does have a right to

23 limit press -- access to press conferences and buildings for

24 photographs and interviewing people and things like that;

25 correct?                                                     10:27:38

United States District Court

GREGG LESLIE - Cross

1  A.    For noncontent or viewpoint-related reasons, they do and                    10:27:39

2  that's --

3  Q.    That's my point.    I just asked you -- you've answered the

4  question.

5              And you agree also that when -- well, in fact, let me        10:27:50

6  ask you this.    I assume a lot of your clients have faced that

7  issue where they have had to get some sort of credentials

8  before they could get into a press conference; true?

9  A.    Yes.

10 Q.    And that's not uncommon for a Government to require a                     10:28:06

11 journalist to be credentialed before they get into a press

12 conference.    Yes?

13 A.    It's much less common than it used to be but it is still a

14 practice, yes.

15 Q.    And the Government agency that sets those criteria has a              10:28:17

16 right to set whatever criteria they want so long as it's

17 content-neutral; true?

18 A.    I would say if it comes down to litigation, no, that they

19 should only make reasonable time, place, and manner

20 restrictions, like if they don't have enough room to let people       10:28:34

21 into a particular press conference.

22 Q.    Okay.    So one of the criteria that's acceptable in your

23 eyes is that if there's a concern about logistics or how big

24 the building is or how much room there is.    Fair?

25 A.    That's common, yes.                                                              10:28:49

GREGG LESLIE - Cross

1   Q.   And another concern would be security, right, the need for          10:28:55
2   security in the building.   True?
3   A.   Sure.   That could be a factor.
4   Q.   And ethical practice, making sure attorneys have ethical
5   practice and they have integrity, that would be another factor.          10:29:06
6   True?
7   A.   You said attorneys?
8   Q.   I'm sorry.   Journalists.
9   A.   See, that points to the difference between, you know,
10   attorneys' rule of ethics really is a governing rule of the            10:29:16
11   profession.   With a journalist, no, I don't think the State
12   should look into what it should consider ethical consideration
13   of a journalist.
14   Q.   Do you think the Government has a right to base criteria
15   on ethical standards for journalists?                                  10:29:34
16   A.   I don't think so for the same reason the courts don't do
17   that when they determine who gets into a courtroom, including
18   media.   You know, they recognize that they shouldn't be making
19   those kind of judgment calls because the public wants all
20   voices or all listeners to be represented there.                      10:29:52
21   Q.   You said earlier that bloggers and YouTube posters and
22   social media influencers were traditionally not thought of as
23   journalists; right?
24   A.   As the field was emerging, groups like The Society of
25   Professional Journalists were slow to recognize them as               10:30:14

United States District Court

GREGG LESLIE - Cross

1    journalists.                                                    10:30:16

2    Q.    Is it fair to require that a journalist be ethical.  Fair?

3    A.    Are you saying for the Government to require that they be

4    ethical?

5    Q.    It's fair for the Government to want a journalist to be    10:30:27

6    ethical.

7    A.    But that's such a loaded term to say the Government can

8    require you to be ethical because does that mean you have to

9    interview two people before you go with the fact or does that

10   mean you shouldn't be engaged in fraud?  Yes, there's a certain  10:30:40

11   amount of ethical standard that they can enforce but they

12   should not be enforcing a code of ethics.

13   Q.    The Government has a right to expect journalists to write

14   truthful articles; true?

15   A.    Well, everybody does but, again, once you make that a      10:30:55

16   Government standard --

17   Q.    That's all I need.  That's all I needed.

18         It's appropriate for a Government to expect that a

19   journalist will do fact checking before he or she writes an

20   article.  Fair?                                                  10:31:10

21   A.    No, especially before a public body, no.

22   Q.    That's all I asked.

23         Journalists have other ways of covering press

24   conferences, especially if they are, for example,

25   live-streamed; correct?                                          10:31:41

GREGG LESLIE - Cross

1  A.   Especially if they are what, live-streamed?                    10:31:42

2  Q.   Live streamed.

3  A.   You see a lot of the elements of a press conference if you

4  get a live stream.  It's certainly better than nothing.

5  Q.   Sure.  And a journalist doesn't have to be called on even   10:31:51

6  if they do attend a press conference; correct?

7  A.   Right.

8  Q.   So watching a press conference live-streamed without

9  asking questions is just as good as being in the room and not

10 asking questions, isn't it?                                        10:32:10

11 A.   No.  I would say it's not.  There's a big difference

12 between being in the room and getting to observe multiple

13 people at once versus whatever the camera happens to be focused

14 on.

15 Q.   Do you agree that a journalist should take responsibility    10:32:36

16 for the accuracy of their work?

17 A.   As an ethics matter, yes.

18 Q.   And you think that journalists should only publish

19 articles that they know to be true?

20 A.   As an ethics matter, yeah.  I mean, sometimes you report    10:32:49

21 things that you think are newsworthy that somebody has alleged

22 and you can't confirm whether they are true or false and so

23 there are judgment calls involved.

24 Q.   Do you agree with me that citing a Twitter feed of someone

25 else's opinion is not a source of fact?                            10:33:05

United States District Court

GREGG LESLIE - Cross

1   A.   Of someone else's opinion.  By definition, an opinion is          10:33:08

2   not a source of fact, yes.  But, I mean, the issue here is

3   whether Government agencies enforce that.

4   Q.   You've answered my question.  Thank you, sir.

5        Do you agree that a journalist should balance the                 10:33:23

6   public's need for information against the potential harm or

7   discomfort that could come from writing an article?

8   A.   That's always something to think about and part of the

9   ethics considerations the journalists make all the time.

10  Q.   Do you agree that journalists should avoid political and          10:33:39

11  other outside activities that may compromise integrity or

12  impartiality?

13  A.   Again, that's the aspirational goal.  Everybody's

14  definition of what kind of activity would compromise their

15  credibility is going to be different.  It's going to be a            10:33:55

16  case-by-case call that is not up to the Government to decide.

17  Q.   Well, you've already said the Government has the right to

18  establish standards before they allow journalists to attend a

19  press conference, do they not?

20  A.   All of the standards you're talking about are either            10:34:08

21  content or viewpoint based.  If it's -- if you're saying if

22  you've worked for --

23  Q.   I'm just asking you -- let me just ask it again.  Do you

24  agree that the Government has the right to set standards before

25  allowing a journalist into a press conference; true?                 10:34:21

United States District Court

25

GREGG LESLIE - Cross

1  A.   Well, the word "standards" is so wide open that I would    10:34:25

2  say yes, very small things like time, place, and manner

3  restrictions.

4  Q.   Do you agree that if a journalist is a member of any

5  particular group and they write an article in -- against --    10:34:41

6  they write articles against another group, whatever that group

7  happens to be, there is a -- their bias comes into -- their

8  bias and credibility can be questioned?

9  A.   That would come into play certainly and that would be

10  exactly what the public is judging when they read that    10:35:04

11  journalism.

12  Q.   Do you think that a journalist should say that they have a

13  bias when they write an article?

14  A.   If it's not obvious they usually do and it's a good

15  practice if you know you are approaching something from a    10:35:17

16  particular perspective and it's not obvious by the nature of

17  the writing, then it's a good ethical practice to disclose

18  that, yes.

19  Q.   Whether aspirational or not, do you believe journalists

20  should practice good ethics?    10:35:32

21  A.   They should, yes.

22  Q.   And do you believe that journalists should try to aspire

23  to ethical standards?

24  A.   Again aspire to, Yes, that's always it's issue.  You

25  should always be training and learning to improve your skills.    10:35:46

United States District Court

GREGG LESLIE - Cross

Q.   Do you agree that if you publish an article that is   10:35:57
negative about a person, just an ordinary citizen, you
shouldn't publish along with it that citizen's picture or
contact information?

A.   I mean, I don't think there's a rule like that.  If you   10:36:13
were talking about aspirational standards, you should always
try to minimize harm caused but there's no absolute rule as to
what you should or shouldn't publish.

Q.   And do you agree that if a journalist tries to get --
tries to get an answer out of somebody and they don't want to   10:36:32
answer the question, they turn away, the journalists shouldn't
run after them and yelling questions at them, should they?

A.   That is by no means a rule.  I mean, every situation is
different and there can be a lot of circumstances where the
journalist feels their article will only be fair if they get a   10:36:48
comment.  And many times that comment only comes after pursuing
somebody.

Q.   One of the things you said earlier is that you mentioned
that newspapers sometimes endorse candidates or do it all the
time maybe you said.  But they endorse candidates.  But you   10:37:04
also said that that endorsement is in the editorial section,
not in the news section; correct?

A.   Not always.  I said that's often a practice.

Q.   And that's a good practice, that if you're going to write
an opinion piece, it should be in the editorial section rather   10:37:19

United States District Court

GREGG LESLIE - Cross

1  than in the news section where facts are supposed to be          10:37:23
2  presented.  Fair?
3  A.   That is the tradition from cren journalism.  It doesn't
4  always have to carry over, as a matter of law.
5  Q.   Shouldn't online journalism follow that same rule?          10:37:35
6  A.   It's much, much, more difficult.  You don't have different
7  sections in the same way.  You don't have different staffs.  I
8  mean, you know, a well-funded newspaper a century ago had a big
9  staff for writing editorials and including endorsements and
10 they just don't do that much any more.  Newspapers just don't    10:37:53
11 have an opinion-based staff at all.
12 Q.   If a journalist has a question about something that a
13 Government does, the journalist should call the Government and
14 ask a question, should it not?
15 A.   They should always try to get everybody's response, sure.   10:38:20
16 Q.   They shouldn't just write something because it was an
17 opinion somewhere else on a Twitter feed or somewhere else?
18 A.   Well, but I worry when you say they shouldn't do it.  They
19 should aspire to do better than that, yes.
20 Q.   And just because a journalist is not physically located in  10:38:35
21 the building, so long as they have access to the same
22 information, either by watching through a YouTube live feed or
23 by calling the Government and asking questions, they have the
24 same ability to write a story about something that they are
25 interested in.  Fair?                                            10:38:51

United States District Court

GREGG LESLIE - Redirect

1    A.    I think that is too general.  Journalism isn't a science.    10:38:53

2    You know, it's a still.  And if you can be there in the room,

3    like the musical Hamilton said, "In the room where it

4    happened," if you can be there, you can see other people

5    involved.  You can see who's got an interest.  You can talk to    10:39:10

6    others as they leave the room.  There's just a lot about

7    journalism that benefits from having access to the official

8    proceedings.

9    Q.    And you've already said that you're not a journalist;

10   right?    10:39:24

11   A.    I'm not now, no.

12   Q.    Have you ever attended a press conference yourself

13   personally?

14   A.    Yes, as journalist.  I was a journalist during law school.

15   Q.    When was that?    10:39:34

16   A.    1986 to 1990.

17   Q.    That's all I have, sir.  Thank you.

18           THE COURT:  All right.  Thank you.

19           Any redirect, Mr. Randazza?

20           MR. RANDAZZA:  Yes, Your Honor.    10:39:45

21           THE COURT:  Go ahead, please.

22           MR. RANDAZZA:  Thank you.

23                    **REDIRECT EXAMINATION**

24   BY MR. RANDAZZA:

25   Q.    Professor Leslie, you said it is -- I believe you said --    10:39:50

United States District Court

GREGG LESLIE - Redirect

1  and tell me if I'm mischaracterizing it -- sometimes it's only          10:39:54
2  fair to get a comment from somebody before you write about
3  them?
4  A.    Right.
5  Q.    And my friend was asking you about whether you're chasing          10:40:03
6  someone for that comment.   Is that commonplace in the
7  journalism field?
8          MR. TRULLINGER:   Objection, Your Honor.   That's
9  speculation, foundation.
10          THE COURT:   I'll allow him to answer the question for          10:40:16
11 what it's worth.
12          Go ahead.
13          THE WITNESS:   I would say it's common in my
14 experience with libel cases, especially where a lot of these
15 news-gathering elements get examined and pursued.   I've often          10:40:27
16 heard journalists say they just don't get the story by asking
17 one question at a press conference.   Sometimes you have to look
18 a little bit like a bully and rephrase the question and come
19 again and then follow the person to the elevator.   Some of the
20 best journalism is done that way and it doesn't always look          10:40:47
21 good but that's kind of the aggressiveness that gets you a good
22 story as a journalist and it's considered perfectly ethical
23 behavior.
24 BY MR. RANDAZZA:
25 Q.    And is it more ethical in your view or less ethical in          10:41:05

United States District Court

GREGG LESLIE - Redirect

1    your view to ask a source a question directly before writing                    10:41:08

2    about it?

3    A.    It's more ethical, yes, to pursue as much information as

4    you can.  So if you have an opportunity to ask a source

5    directly, that's always beneficial.                                            10:41:22

6    Q.    So would it be more or less ethical to write about that

7    source by speaking to them directly or watching them on a video

8    feed?

9    A.    Again, because you can get so much of a different reaction

10   from the room, from other participants, from people as they       10:41:41

11   walk away from an interview, it's always more useful to be

12   there in person.  That's how good journalism is done.

13   Q.    So if a journalist could go to a press conference or could

14   stay at home and watch it on a feed, which would be the better

15   decision?                                                                      10:42:04

16   A.    I would think the practice of journalism is that you would

17   always rather be there in person.

18   Q.    Do you believe it's unethical for a journalist who happens

19   to be an Arizona Cardinals fan to write about the National

20   Football League?                                                              10:42:24

21   A.    No, not at all.

22   Q.    What if they had been a life-long fan of the Cardinals

23   since before they even moved to Arizona?

24   A.    I think that shows, you know, that's the kind of case

25   where you don't even have to disclose a bias like that, because  10:42:36

United States District Court

GREGG LESLIE - Redirect

1  people kind of assume there's a little home town interest in                  10:42:39

2  the home town team.  So I think a bias like that is going to be

3  known, is going to be assumed maybe or maybe would be directly

4  disclosed and is commonplace.

5  Q.   But would it be unethical to cover the NFL?                               10:42:57

6  A.   No.  I don't think it would at all.

7  Q.   What if you had a Cardinals tattoo?

8  A.   I don't think those factors really matter.  I think the

9  things that would make it directly unethical in the sense of

10 violating standards versus not reaching the aspirational goals,                10:43:13

11 the things that would make a difference would be if you're

12 somehow making a profit off of that.  If you got money because

13 you had positive coverage or if that led to some company you

14 have stock in being more profitable.  It's that kind of direct

15 conflict of interest that's much more relevant.                                10:43:35

16 Q.   You mentioned that credentialing is less and less common.

17 A.   Right.

18 Q.   Can you tell me more about that?

19 A.   It used to be there was a day when every police department

20 and every public body knew exactly who the journalists were.                   10:43:50

21 Every courtroom had every daily newspaper represented, you

22 know, every -- most trials would at least have a pop-in by a

23 reporter.  Everybody knew who the journalists were because they

24 were working full time for a newspaper or a broadcast station

25 or maybe a magazine.  Those days are gone.  That has been the                  10:44:11

United States District Court

GREGG LESLIE - Redirect

1    toughest question for all public institutions is answering the          10:44:15

2    question of who is a journalist.

3          And so many organizations have given up.  The U.S.

4    Congress, the White House, they have actually, you know, given

5    the question up to the press itself to let the press galleries        10:44:32

6    decide who is a journalist.

7          So the same thing with police departments.  It used

8    to be when we were doing these hotlines for journalists at the

9    political conventions, we would say, "Make sure you register

10   with the police department to get police credentials," because       10:44:50

11   police credentials are meaningful in the sense that they get

12   you behind a police line.

13         I would say now most police departments do not issue

14   media Press Passes because they just found it too difficult to

15   answer who is and isn't a journalist.                                 10:45:07

16   Q.   When they did, did you ever encounter one that would judge

17   the quality of the writing prior to issuing the pass?

18   A.   No.  The credentials were almost always -- were never

19   related to that.  They would give you credentials and then if

20   there was a certain press conference where they could only fit        10:45:27

21   20 people in the room or something, they might go to the

22   biggest circulation publications for instance.  They would

23   always -- well, I can't say always but the tradition would be

24   that they would try to avoid content- or viewpoint-based

25   determinations and, instead, look for objective facts that            10:45:46

United States District Court

GREGG LESLIE - Redirect

 1    would -- where the information is most likely to get out to the          10:45:49

 2    public.  So they would look for the largest circulation

 3    publications usually.

 4  Q.    Would you say you're judging -- you were asked about this

 5    Seventh Circuit case, the *MacIver* case, and I'm not going to           10:46:06

 6    ask you for any legal analysis of it.  But are you familiar

 7    with that case?

 8  A.    Yes.

 9  Q.    Was it a journalist seeking credentials in that case?

10  A.    No.  The important thing there was that it was something            10:46:18

11    that described itself as a think tank and so, you know, that's

12    always going to be a different evaluation, because that's

13    exactly what a lot of credentialing is meant to weed out.  If

14    somebody's really an advocacy organization trying to actually

15    get legislation passed but they also print a newsletter, they          10:46:39

16    are going to want to say they are a journalist.  But the way

17    it's mostly done now is you look at not the title of what the

18    person says they are but the function of what they're

19    performing.  And I think we've got better Ninth Circuit case

20    law on who is a journalist than the Seventh Circuit standard.          10:46:56

21  Q.    You said you did look at the Government's brief and you

22    saw this kind of schedule of standards that they are talking

23    about; correct?

24  A.    Right.

25  Q.    Did you see anything in it that talked about security?            10:47:13

United States District Court

1    A.    I remember a discussion of security but I don't remember          10:47:19

2    if that was in the standard or not.   I think in their briefing

3    they did discuss security issues but I don't remember it in the

4    standard.

5    Q.    Is anything in the standards about how much room there is          10:47:29

6    or how much space?

7    A.    No, because the standards are supposed to define who gets

8    a credential and not who gets in the room necessarily.   So I

9    think that would be a later determination.

10   Q.    Thank you, sir.                                                    10:47:45

11             I have no further questions, Professor.

12             THE COURT:   All right.   Thank you, sir.

13             You may step down, sir.

14             (Witness excused.)

15             THE COURT:   Please call your next witness,                    10:47:53

16   Mr. Randazza.   You have -- hang on for a second -- 18 minutes.

17             MR. RANDAZZA:   I'm going to call Jordan Conradson.

18             THE COURT:   Mr. Conradson, if you would come up to

19   the bar to my courtroom deputy, she'll swear you in.

20             COURTROOM DEPUTY:   Please state your first and last           10:48:23

21   name and spell them both for the record.

22             THE WITNESS:   It's Jordan Conradson.   J-O-R-D-A-N.

23   C-O-N-R-A-D-S-O-N.

24             COURTROOM DEPUTY:   Raise your right hand.

25             (JORDAN CONRADSON, a witness herein, was duly sworn            10:48:35

United States District Court

```
 1   or affirmed.)                                              10:48:35
 2                     DIRECT EXAMINATION
 3   BY MR. RANDAZZA:
 4   Q.    Hello, Mr. Conradson.
 5   A.    Hi.                                                  10:48:59
 6   Q.    Can you -- how are you employed, sir?
 7   A.    I'm a full-time journalist with thegatewaypundit.com.  How
 8   long did you say?
 9   Q.    No.  But I will ask that.  How long have you been doing
10   that?                                                      10:49:12
11   A.    Oh, I have been doing it for over a year and a half now.
12   Q.    And what is the primary topic you cover?
13   A.    I cover politics in Arizona.
14   Q.    Have you ever interviewed Katie Hobbs?
15   A.    I've tried to but she refused to speak with me.      10:49:29
16   Q.    Have you ever interviewed Kari Lake?
17   A.    Yes.  She has spoken with me so I have covered Kari Lake.
18   Q.    If Ms. Hobbs would speak to you, would you report her
19   perspective?
20   A.    Yes.                                                 10:49:46
21   Q.    Have you ever received press credentials anywhere?
22   A.    Yes.  The Arizona Senate gave me press credentials.
23   Q.    And how long ago was that?
24   A.    That was sometime in 2021.
25   Q.    And have they ever threatened to revoke them?        10:50:05
```

JORDAN CONRADSON - Direct

1   A.   No.                                                              10:50:07

2   Q.   Are you aware -- I'm sorry.  You wrote a series of

3   articles last year about Maricopa County Supervisor Steve

4   Chucri; is that correct?

5   A.   Yes.  Steve Chucri, he was a Maricopa County Supervisor    10:50:27

6   but he resigned shortly after I broke my series of articles.

7   Q.   And what were your articles about?

8   A.   They are undercover -- I wouldn't say undercover.  He was

9   having a conversation with some people and they recorded it

10  and, basically, in the conversation, he admitted to everything  10:50:45

11  that the Board of Supervisors was publicly stating, he admitted

12  that all of was false.  He didn't believe it.  He did not stand

13  by them.  He even made some disparaging comments about his

14  colleagues.

15  Q.   Were you the first one to report on that?                  10:51:04

16  A.   Yes.

17  Q.   Were you the only one?

18  A.   I believe so.  I think some people covered his resignation

19  but I don't think anyone put out the actual audiotapes.

20  Q.   Are you aware of why he resigned?                          10:51:16

21  A.   Yes.  He stated that it was over some comments that he

22  made.

23  Q.   The comments you reported on?

24  A.   The comments that I reported on, yes.

25  Q.   Have you encounter the any hostility from the Board of     10:51:29

JORDAN CONRADSON - Direct

1    Elections and other defendants in this case since then?                    10:51:31

2    A.    Yes.  So the -- it has been increasing since then,

3    especially recently.  They followed me off of their property

4    with a drone after I tried to gain entry and they used

5    sheriff's deputies to intimidate me and threaten arrest.          10:51:46

6    Q.    And do you recall when they -- when the defendants

7    instituted this credentialing requirement?

8    A.    Yes.  It was sometime in September, at the end of

9    September, maybe the 27th.

10   Q.    And did a member of your -- a competing news organization   10:52:08

11   write a tweet about that?

12   A.    Yes.  They said that -- they hinted that it was

13   specifically designed to keep me out of the press conferences.

14   Q.    And then did any Government official retweet that?

15   A.    Yes.  Stephen Richer, the Maricopa County Recorder, he     10:52:25

16   retweeted it and it looked like he was agreeing with it and

17   confirming it.  He put a GIF on it saying -- agreeing with her

18   that he was fancy in doing this to, basically, do that, keep me

19   out.

20   Q.    When you applied for your press credentials, did you        10:53:09

21   submit samples of your work.

22   A.    Yes, I did.

23   Q.    Was that requested?

24   A.    Yes.

25   Q.    How many did you submit?                                    10:53:19

JORDAN CONRADSON - Direct

1   A.   I think I did three.                                   10:53:21

2   Q.   Did you submit any other information, though?

3   A.   Pretty much all of my information.  I believe I had to put

4   where I lived, all of my contact information, the contact

5   information for my editors, and I think there was a few more   10:53:32

6   things on the list.

7   Q.   Did they ask you any questions geared towards security

8   threats?

9   A.   I don't believe so.

10  Q.   Did they ask you any questions as to how much room you   10:53:46

11  would need at a press conference?

12  A.   No.

13  Q.   Have you ever been ejected from a press conference?

14  A.   No.

15  Q.   Have you ever been disruptive in a press conference?   10:53:56

16  A.   No.

17  Q.   Thank you, sir.  Actually, I do have another question for

18  you.  Sir, what is your favorite political party?

19  A.   The Republican Party but I wear that on my sleeve.  Most

20  people who actually -- actually, everybody who reads my work   10:54:23

21  knows that I am very transparent about it.

22  Q.   So you've never tried to hide that?

23  A.   I've never tried to hide it whatsoever.

24  Q.   Why do you need these press credentials?

25  A.   So that I can fairly cover the actual -- the election   10:54:37

United States District Court

JORDAN CONRADSON - Direct

1  that's going on.  It was for the election press conferences, so        10:54:41
2  I can fairly cover it and receive firsthand information of what
3  is going on in that room.
4  Q.   Do you think it would be more fair to someone you're
5  reporting on to ask them questions directly?                            10:54:51
6  A.   Yes.
7  Q.   Can you do that over a video feed?
8  A.   No.
9  Q.   Can you do that from the free speech zone with the
10 protesters off the curtilage of the property of the Board of           10:54:59
11 Elections?
12 A.   No.
13              MR. RANDAZZA:  I have no further questions, sir.
14              THE COURT:  All right.  Thank you, Mr. Randazza.
15              Mr. Trullinger or Liddy, any questions for this           10:55:08
16 witness?
17              MR. TRULLINGER:  A few, Your Honor.  Can you tell me
18 how much time I have, please.
19              THE COURT:  You have 30 minutes.
20              MR. TRULLINGER:  30 minutes.  Thank you, sir.              10:55:16
21          It's my understanding if they have exhibits for the
22 Court, we can just submit them; is that correct?
23              THE COURT:  As long as the other side has seen them
24 or has copies, yes.
25              MR. TRULLINGER:  I'm going to offer to the Court 25        10:56:03

JORDAN CONRADSON - Cross

1    exhibits, the first 20 of which were --                          10:56:05

2              THE COURT:  Attached to the response; correct?

3              MR. TRULLINGER:  Yes.

4              THE COURT:  So I have those.

5              MR. TRULLINGER:  The first 20 were in response, the   10:56:11

6    last five were not.  So those are the extra ones.

7              COURTROOM DEPUTY:  How are you going to show them to

8    the witness, on the document camera or your computer?

9              MR. TRULLINGER:  Document camera.

10                   **CROSS - EXAMINATION**                         10:56:44

11   BY MR. TRULLINGER:

12   Q.   Mr. Conradson, when you wrote the article --

13             Can you see it up there on your screen?

14   A.   Yes.

15   Q.   This is an article you wrote September 26, 2022, and that  10:57:09

16   has your by line; correct?

17   A.   Yes.

18   Q.   So is it fair to say that everything that has your by line

19   is something that you wrote?

20   A.   Yes.                                                        10:57:19

21   Q.   When you wrote that article, did you call anybody from the

22   County to find out about the Press Pass?

23   A.   The one that's on my screen?

24   Q.   I apologize.

25             Sorry.  The one on your screen now is Exhibit 3        10:57:44

United States District Court

JORDAN CONRADSON - Cross

1    entitled "Breaking:  Maricopa County creates 'Ministry Of    10:57:47

2    Truth' To Silence The Gateway Pundit -- Now Requiring Official

3    Press Pass for Media 'To ENTER ITS FACILITIES And/Or Cover

4    Events Related To The 2022 General Election."

5            Just to clarify again, that's written by you;    10:58:05

6    correct?

7    A.    Yes.

8    Q.    Did you call anybody from the County to ask about the

9    Press Pass criteria?

10   A.    I did.    10:58:12

11   Q.    Is there a reason that you don't cite anything in there,

12   in that article?

13   A.    Because they just told me to go online and email for a

14   press credential, which I did.

15   Q.    So the headline "Ministry of Truth"?    10:58:21

16   A.    Yes.  I put that in quotes.

17   Q.    What's that?

18   A.    I put that in quotes.

19   Q.    Right.  That's just your opinion; correct?

20   A.    Yes, but it's also the opinion of many others.    10:58:37

21   Q.    I'm just asking if it's -- it was your opinion?

22   A.    Yes.

23   Q.    Is there a reason you didn't say it is my opinion that

24   this is a ministry of truth?

25   A.    I'm sorry.  Can you repeat the question?    10:58:47

United States District Court

JORDAN CONRADSON - Cross

1   Q.   You present this as if it was a true thing, right, instead     10:58:49
2   of just your opinion, I mean?
3   A.   I mean, everyone who reads my work, they know I'm very
4   opinionated, maybe not very opinionated but opinionated, yes.
5   Q.   And Exhibit Number 6 is another article written by you; is     10:59:05
6   that correct?
7   A.   Yes.
8   Q.   It says, "ELEVEN Locations Had No Republicans At All" and,
9   "OVER 100 More Democratic Poll Workers Than Republicans" were
10  hired.                                                              10:59:44
11          Did you call the County to ask whether that was fact
12  or not?
13  A.   I don't believe so.
14  Q.   You just assumed it or where did you get the information?
15  A.   Well, there was a lawsuit against Maricopa County which is     10:59:53
16  where I took that information from.
17  Q.   So you got it from secondhand information; correct?
18  A.   I wouldn't say that.
19          MR. RANDAZZA:  Objection.
20  BY MR. TRULLINGER:                                                  11:00:06
21  Q.   Is there a reason that you didn't --
22          THE COURT:  Hold it.  There's an objection pending.
23          Mr. Randazza, the rule?
24          MR. RANDAZZA:  Mischaracterizes the testimony.
25          THE COURT:  No.  I'll allow it.  He's free to agree         11:00:15

United States District Court

JORDAN CONRADSON - Cross

1   or disagree.                                                              11:00:18

2          Mr. Conradson, do you need to have the question read

3   back to you.

4          THE WITNESS:  Yes, can you repeat the question?

5          THE COURT:  Elaine, please.                                       11:00:24

6          (Question not read.)

7   BY MR. TRULLINGER:

8   Q.    Is there a reason that you did not call anyone from the

9   County to verify whether this was a truthful statement or a not

10  truthful statement?                                                      11:00:32

11  A.    I wasn't sure.  A lot of the times I've called the County

12  in the past, people give me conflicting answers.  So I wasn't

13  sure if that was the best place to go.

14  Q.    Okay.  So you didn't call the County?

15  A.    To the County employees, no, I did not.                            11:00:43

16  Q.    You were denied a Press Pass on September 30 of 2022; is

17  that correct?

18  A.    Yes.

19  Q.    And after being denied a Press Pass, you came into the

20  building on October 13, 2022, and tried to get in with other            11:01:02

21  people that had Press Passes correct?

22  A.    I tried to see if there was -- yes, I did.  I came to the

23  building.

24  Q.    And you had a camera with you that was hidden on you;

25  correct?                                                                 11:01:14

JORDAN CONRADSON - Cross

1    A.    I don't have a hidden camera.  It was not hidden.                    11:01:15

2    Q.    Okay.  Where was the camera?

3    A.    It was open and notoriously on my chest, just around my

4    chest.  Lens cap was off.  Everybody could see it.

5    Q.    But in any event, you tried to -- you knew you weren't          11:01:30

6    supposed to be there because you didn't have a Press Pass;

7    true?

8    A.    I didn't know I wasn't supposed to be there.  It's a

9    public building.  I just attempted to speak to them and plead

10   my case for why I should be there.                                        11:01:42

11   Q.    Sure.  But you're aware that you were not supposed to be

12   in the building or attending press conferences without a Press

13   Pass?

14   A.    I was not aware that I was not supposed to be in the

15   building.                                                                 11:01:55

16   Q.    You applied for a -- well, you had applied for a Press

17   Pass and were denied; correct?

18   A.    Yes.

19   Q.    So what led you to believe that you could be in the

20   building without it?                                                      11:02:04

21   A.    It's a public building.  So I went up there and tried to

22   see if I could possibly get -- I told them exactly who I was in

23   the building.  I told them what outlet I was with.

24   Q.    And when they asked you to leave, you didn't leave.  You

25   continued to argue your case until they walked you out of the            11:02:21

United States District Court

JORDAN CONRADSON - Cross

1    building; correct?                                                          11:02:24

2    A.    They did not walk me out of the building.  I walked out

3    myself.

4    Q.    I'm sorry?

5    A.    I walked out myself.                                                  11:02:28

6    Q.    You showed up again on November 10, 2022, again, without a

7    Press Pass; correct?

8    A.    I believe that it was November 10, yes.

9    Q.    And by that time, you knew for sure you weren't supposed

10   to be there without a Press Pass; true?                                    11:02:42

11   A.    No.  I had submitted an appeal to my application and I

12   also had a cease and desist order from my attorney, so I was

13   going to go in and present that to them and see if they had

14   gotten me through the appeals process.

15   Q.    So let's talk about that just for a minute.  The appeal          11:02:58

16   that you presented, that was an email sent on that same day of

17   November 10, 2022; correct?

18   A.    Yes.

19   Q.    So between September 30 and November 10, you didn't

20   appeal; correct?                                                           11:03:12

21   A.    I wasn't sure that I would need to but with the increasing

22   news store --

23   Q.    I'm just asking you, did you or did you not appeal within

24   that 41-day time period?

25   A.    I did not.                                                           11:03:24

JORDAN CONRADSON - Cross

1    Q.    Looking at Exhibit Number 13, is that a copy of the denial        11:03:48
2    letter that you got?
3    A.    Yes.
4    Q.    And one of the things on there, the last paragraph
5    basically says, "Further, any press conference about the 2022        11:03:58
6    election will be streamed to a Maricopa County YouTube channel
7    and are you welcome to view it"; correct?
8    A.    Yes.
9    Q.    Did you take advantage of that?  Did you watch all of the
10   other press events on the YouTube stream after that?               11:04:11
11   A.    I watched a few of them but some of them were not
12   live-streamed I noticed on Maricopa County's YouTube page.
13   Q.    Did you watch all of them that were live streamed?
14   A.    I tried to.
15   Q.    When you say "tried to," that means some you just weren't      11:04:25
16   interested in or what?
17   A.    No.  Sometimes there were complications with getting onto
18   it, getting the Internet working and everything like that.  But
19   I was able to watch it but not actually be there which damages
20   my ability to gather news.                                          11:04:41
21   Q.    And there were a number of press conferences between
22   September 30 and November 8 and yet you didn't appeal during
23   that time period; correct?
24   A.    No, because the news story --
25   Q.    Thank you.  You answered the question.                        11:04:59

United States District Court

JORDAN CONRADSON - Cross

1  A.    -- got a lot bigger after November 8.                    11:05:00

2  Q.    Do you agree that it's important to keep privacy of

3  individuals in the back of your mind when you're writing a

4  story?

5  A.    Yes.                                                     11:05:24

6  Q.    I'm going to show you real quick Exhibit 18.  This is an

7  article from Reuters dated November 6, 2022, entitled "'Kill

8  them':  Arizona election workers face midterm threats."

9        Do you see that?

10 A.    Yes.                                                     11:06:20

11 Q.    One of the things this article talks about is that on July

12 31 that Gateway Pundit reported that Maricopa County election

13 staff technician gained unauthorized access to a computer

14 server room where he deleted 2020 election data that was set to

15 be audited.  That's a story you wrote; correct?              11:06:47

16 A.    I believe so.

17 Q.    And the website, the story that you published also

18 included the name of the staff technician and his photo;

19 correct?

20 A.    It wasn't -- you couldn't -- you couldn't identify his   11:06:57

21 face in the photo but yes.

22 Q.    You put his name in the article?

23 A.    Yes.

24 Q.    And you're aware that when you put someone's name in an

25 article after you're criticizing them, that they are likely to  11:07:08

48

JORDAN CONRADSON - Cross

| | | |
|---|---|---|
| 1 | get threats? | 11:07:11 |

MR. RANDAZZA:  Objection.  Calls for speculation.

THE COURT:  He can either agree or disagree.  The
objection is overruled.

You can answer, Mr. Conradson.

THE WITNESS:  I would disagree with that.

BY MR. TRULLINGER:

Q.   You're aware that people have claimed to have gotten
threats as a result of something you wrote; correct?

A.   I have not aware that people got threats as a result of
something that I wrote.

Q.   And the information that you got or the information that
your article was based on didn't come from the County, did it?

A.   No.

Q.   It came from some blogger out there that --

A.   Well, not from a blogger.  It came from security footage
that did come from the County and using time stamps on the
footage, I linked that to another report.

Q.   Exhibit 23 is an article that you wrote on July 31, 2022;
correct?

A.   Yes.

Q.   And in that article you posted a picture and the name of
the staff technician; correct?

A.   Oh, yes.  I did that to show that he is employed with
Maricopa County Elections.

United States District Court

JORDAN CONRADSON - Cross

1  Q.   And at the top of the picture it says, "On Saturday it was    11:08:58

2  revealed by Vanbibber that Maricopa County election Database

3  Administrator Brian Ramirez was granted unauthorized entry to

4  the server room on multiple occasions."  That's the source of

5  your information; correct?    11:09:14

6  A.   Yes, but, actually, I would say the source of my

7  information is the video that I saw.

8  Q.   All right.  But you didn't see the video.  Vanbibber saw

9  the video and reported on it?

10 A.   No.  I was there to see the video.  I believe I included    11:09:25

11 the video in my report.

12 Q.   Did you ever call Maricopa County to ask them about that?

13 A.   I don't think so.

14        UNIDENTIFIED MALE:  Can I have a word just before you

15 guys continue?  Do you mind?  It's Board of Commission, transit    11:09:48

16 of commerce to USC, and an individual that was marked about an

17 arrest stop.  I am from California.

18        THE COURT:  Sir, you cannot interrupt this proceeding

19 in this way.

20        UNIDENTIFIED MALE:  Okay.  Just say you mind and I    11:10:12

21 won't, until the end.

22        THE COURT:  I'm not going to allow you to address the

23 Court.  You're not a party in this matter.  Please be seated.

24        Call the marshals, please, Julie.

25        UNIDENTIFIED MALE:  Well, yeah, but it's just that I    11:10:22

JORDAN CONRADSON - Cross

| | | |
|---|---|---|
| 1 | sued the state and I want to get what department pays. | 11:10:25 |
| 2 | THE COURT:  Sir, we are in the middle of a proceeding | |
| 3 | on a specific matter that has been noticed. | |
| 4 | UNIDENTIFIED MALE:  Well, I'm in the middle of | |
| 5 | changing my address. | 11:10:38 |
| 6 | THE COURT:  That has nothing to do with this matter. | |
| 7 | UNIDENTIFIED MALE:  All right.  This is the time | |
| 8 | stamped and I get paid for the -- in the center heading, so | |
| 9 | it's kind of a bother.  I mean, you guys can go ahead and call | |
| 10 | but I have to know.  You're the judge; right?  You're just -- | 11:10:52 |
| 11 | Are you telling me to get out? | |
| 12 | THE COURT:  Sir, that is not something I can help you | |
| 13 | in any event.  Maybe the Clerk's Office can help you on the | |
| 14 | first floor.  Yes.  But to just come into a random courtroom -- | |
| 15 | UNIDENTIFIED MALE:  So I won't get ignored.  You're | 11:11:08 |
| 16 | going to send them out after the U.S. Post Office post card? | |
| 17 | THE COURT:  No, I am not, sir.  You are disrupting a | |
| 18 | proceeding. | |
| 19 | UNIDENTIFIED MALE:  Okay.  The post card. | |
| 20 | THE COURT:  The marshals have been contacted and I | 11:11:20 |
| 21 | need you to please either leave or be seated and be silent. | |
| 22 | UNIDENTIFIED MALE:  Yeah.  Maybe you go ahead and | |
| 23 | consume some chemicals. | |
| 24 | THE COURT:  I'm sorry, counsel, and to the members of | |
| 25 | the gallery. | 11:11:41 |

JORDAN CONRADSON - Cross

| | | |
|---|---|---|
| 1 | Please proceed. | 11:11:42 |
| 2 | BY MR. TRULLINGER: | |
| 3 | Q.   Mr. Conradson, two days ago you went back to the Maricopa | |
| 4 | County Tabulation and Election Center and you tried to get in | |
| 5 | again; correct? | 11:11:53 |
| 6 | A.   Yes, I tried to appeal my case. | |
| 7 | Q.   And, again, you had to be escorted out of the building, | |
| 8 | did you not? | |
| 9 | A.   I did not have to be. | |
| 10 | Q.   Were you? | 11:12:04 |
| 11 | A.   No.  I was asked to leave and I left.  I did not enter the | |
| 12 | building either. | |
| 13 | Q.   One of the stories you wrote about Katie Hobbs you | |
| 14 | mentioned that when you tried to interview her, she walked away | |
| 15 | from you.  You actually -- did you chase after her?  Did you | 11:12:23 |
| 16 | run after her? | |
| 17 | A.   I didn't run.  I walked after her but that's standard of | |
| 18 | journalists.  That's what we do I would say. | |
| 19 | MR. TRULLINGER:  That's all I have, Your Honor. | |
| 20 | Thank you. | 11:12:46 |
| 21 | THE COURT:  Thank you, Mr. Trullinger. | |
| 22 | Do you have any redirect, Mr. Randazza? | |
| 23 | MR. RANDAZZA:  I do, Your Honor. | |
| 24 | | |
| 25 | | |

United States District Court

JORDAN CONRADSON - Redirect

1                    **REDIRECT EXAMINATION**                          11:12:51

2  BY MR. RANDAZZA:

3  Q.    Sir, when you were asked about Exhibit-- actually, I'm

4  going to come up there.

5          When you were asked about Exhibit 3, do you recall      11:13:11

6  that, the article?

7  A.    Which one was that exactly?

8  Q.    This one here.

9  A.    Yes.

10 Q.    You said you got information for that article from the    11:13:31

11 court file?

12 A.    No, not this one.  From the one about poll workers.

13 Q.    Okay.  You got information for that one from the court

14 file?

15 A.    Yes.                                                      11:13:43

16 Q.    Do you often get information from the court file before

17 you report on something?

18 A.    Yes.

19 Q.    Why from the court file?

20 A.    Because it has the facts of the case and what one party is 11:13:52

21 arguing and what the other party is also arguing.

22 Q.    And you've discussed a tweet where one of the defendants

23 retweeted somebody essentially mocking you for getting

24 excluded?

25 A.    Basically, yes.                                           11:14:10

United States District Court

JORDAN CONRADSON - Redirect

1  Q.   Is this a true and correct copy of that?                    11:14:11

2  A.   Yes.  That is the exact tweet.  Jen Fifield said:  County

3  elections are getting all fancy.  Really gonna miss The Gateway

4  Pundit rolling in and trying to listen in on legitimate

5  reporter conversations, slash, intimidate public officials.      11:14:24

6         And Stephen Richer retweeted it saying -- agreeing

7  saying, "Yes, I am so fancy," with this GIF cartoon.

8         MR. RANDAZZA:  Your Honor, this is the only exhibit

9  that the Court has not had.

10        THE COURT:  The defense has seen it?                       11:14:44

11        MR. RANDAZZA:  Yes.  We provided them with a copy.

12 BY MR. RANDAZZA:

13 Q.   And then you were questioned about your hidden camera;

14 correct?

15 A.   Yes.  I -- I don't own a hidden camera, though.             11:14:51

16 Q.   Did you try to bring the camera with you today?

17 A.   I did, yes.

18 Q.   What happened?

19 A.   They told me I couldn't bring a camera into the courtroom.

20 Q.   Is this photograph a true and correct copy of that camera?  11:15:03

21 A.   Yes.

22 Q.   Now there's two cameras in that picture.  Can you specify

23 which one?

24 A.   Oh.  Okay.  So there's my cell phone, which is the camera

25 I'm taking a photo of myself with.  The one on my stomach,       11:15:14

JORDAN CONRADSON - Redirect

1    that's my hidden camera.  It's not actually hidden.  It's right    11:15:17
2    out in the open.  It's pretty big, too.
3    Q.    You were provided with -- when you were rejected for your
4    press credentials, the rejection said that all of the press
5    conferences would be live-streamed; correct?    11:15:35
6    A.    Yes.
7    Q.    Were they?
8    A.    Not all of them.
9    Q.    Do you take any money from any subjects of anything that
10   you write about?    11:15:49
11   A.    No.
12   Q.    Do you own any -- do you have any ownership interest in
13   any subject that you write about?
14   A.    No.
15   Q.    Are you related to anybody that you write about?    11:15:56
16   A.    No.
17   Q.    Are you in any way -- do you have any relationship with
18   anybody that would call your ethics or bias into question?
19   A.    I'm sorry, can you repeat the question?
20   Q.    Yeah.  That was a terrible question.  I'm ashamed of it.    11:16:12
21         Is there -- you heard the expert testify about
22   journalistic standards, bias?
23   A.    Yes.
24   Q.    Would you say that any of those are a problem for you?
25   A.    No.    11:16:26

United States District Court

1   Q.   Do you meet any of those criteria?  Do you own stock in

2   any company that you report on?

3   A.   No.

4   Q.   Are you -- you're not related to any candidates?

5   A.   No.

6   Q.   I have no further questions for you, sir.

7   A.   Thank you.

8           THE COURT:  All right.  Mr. Conradson, you may step

9   down.  Thank you.

10          THE WITNESS:  Thank you, Your Honor.

11          (Witness excused.)

12          THE COURT:  Mr. Randazza, you have about six minutes

13  left.  Do you have any other witnesses?

14          MR. RANDAZZA:  Yes.  I call Joseph Hoft.

15          THE COURT:  We're going to have to hold for a second

16  until my courtroom deputy returns.  There's no one that can

17  administer the oath properly.

18          Folks, if everybody wants to take a break, you can

19  stand up and stretch.

20          MR. RANDAZZA:  May I take a brief break?

21          THE COURT:  Comfort break, yes.

22          If anybody needs to use the restroom, we will resume

23  in about five minutes.

24          MR. TRULLINGER:  Could you let me know my time,

25  please.

                 United States District Court

11:16:29

11:16:38

11:16:49

11:17:04

11:17:34

11:17:44

```
 1            MR. LIDDY:  Because there was an interruption and      11:17:45
 2    we --
 3            THE COURT:  I took it off.  I still have you with 17
 4    minutes on the defense side.
 5            MR. TRULLINGER:  That's for witnesses and stuff?       11:17:51
 6            THE COURT:  Yes.
 7            MR. TRULLINGER:  Thank you, sir.
 8            (Recess at 11:18; resumed at 11:26.)
 9            (Court was called to order by the courtroom deputy.)
10            THE COURT:  All right.  Thank you, everyone.  Please   11:26:09
11    be seated.
12            And Mr. Hoft, if you could step forward now,
13    Ms. Martinez will swear you in.
14            COURTROOM DEPUTY:  Please state your name and spell
15    your first and last name for the record.                      11:26:18
16            THE WITNESS:  My name is Joseph Hoft, Joseph Walter
17    Hoft.  J-O-S-E-P-H; Walter, W-A-L-T-E-R; and Hoft, H-O-F-T.
18            COURTROOM DEPUTY:  Raise your right hand.
19            (JOSEPH HOFT, a witness herein, was duly sworn or
20    affirmed.)                                                     11:26:29
21                        DIRECT EXAMINATION
22    BY MR. RANDAZZA:
23    Q.   Mr. Hoft, what is your position with The Gateway Pundit?
24    A.   Currently, I'm vice president, contributor and editor of
25    The Gateway Pundit.                                            11:27:06
```

1    Q.    How long has The Gateway Pundit been publishing?                11:27:08

2    A.    Since approximately 2004.  My twin brother founded the

3    site.

4    Q.    And do you know approximately how many readers per month

5    it gets?                                                              11:27:23

6    A.    It varies.  Right now, like last week with the election,

7    we probably had three and a half million people a day.  We have

8    had as much as seven million people a day.  We've had nearly --

9    well, close to a billion hits last year, 900 million and

10   growing.  Every year we've grown.                                    11:27:42

11   Q.    I have no further questions, sir.

12              MR. TRULLINGER:  No questions, Your Honor.

13              THE COURT:  All right.  It sounds like you can step

14   down then, Mr. Hoft.  Thank you.

15              (Witness excused.)                                        11:28:07

16              THE COURT:  That was your last witness; is that

17   correct?

18              MR. RANDAZZA:  It is, Your Honor.  Thank you.

19              THE COURT:  All right.  Very good.

20              Then we'll pass over to the defendants.  I believe        11:28:16

21   you're calling someone telephonically; is that right,

22   Mr. Trullinger?

23              MR. TRULLINGER:  Yes, Your Honor.

24              THE COURT:  All right.  Mr. Moseley is already on the

25   line?                                                                11:28:29

```
 1              All right.  Very good.                            11:28:29

 2              Mr. Moseley, this is Judge Tuchi.  Can you hear me

 3     all right, sir?

 4              THE WITNESS:  Yes, sir.  Judge.  Thank you for

 5     letting me appear in court today.                          11:28:38

 6              THE COURT:  Thank you.  My courtroom deputy is now

 7     going to administer the oath.

 8              Go ahead, Julie.

 9              COURTROOM DEPUTY:  Mr. Moseley, can you state your

10     name, first and last, and spell them both for the record,  11:28:45

11     please.

12              THE WITNESS:  My name is Roy Fields Moseley.  R-O-Y.

13     F-I-E-L-D-S.  M-O-S-E-L-E-Y.

14              COURTROOM DEPUTY:  Thank you.  I can't see you but if

15     you can raise your right hand, please.                     11:29:02

16              (ROY MOSELEY, a witness herein, was duly sworn or

17     affirmed.)

18              COURTROOM DEPUTY:  Mr. Moseley are you on a speaker

19     phone?

20              THE WITNESS:  I am not.                            11:29:20

21                        DIRECT EXAMINATION

22     BY MR. TRULLINGER:

23     Q.   Mr. Moseley, can you hear me?

24     A.   I can.

25     Q.   All right.  This is Chuck Trullinger, just so you know who  11:29:25
```

ROY MOSELEY - Direct

1   is speaking.                                                    11:29:28

2          Could you tell us your current job title, please.

3   A.   I am the Communications Director for Maricopa County.

4   Q.   How long have you been doing that job?

5   A.   Approximately seven and a half years.                      11:29:43

6   Q.   And prior to that, did you work in journalism or somewhere

7   else?

8   A.   I was a television journalist for almost 22 years.

9   Q.   And did you do both writing and on the air or can you

10  describe that a little bit for us?                              11:30:01

11  A.   Yes.  I reported regularly throughout my career so writing

12  my own stories.  At the local level, you don't have big, fancy

13  entourage of people that are writing things for you.  You write

14  it yourself and get it approved by the editorial process and

15  then broadcast it.                                              11:30:22

16  Q.   And I understand at one point you worked for azfamily.com;

17  is that right?

18  A.   Yes.  That's the digital portion of the Channel 3.  It

19  used to be Channel 3, now it's 3 and 5 here in this market.

20  Q.   And did you cover events in Utah at the Capitol?           11:30:42

21  A.   Yes.  I worked in Utah for the CBS affiliate for a little

22  over ten years.

23  Q.   In your experience as a journalist, have you ever had to

24  apply for some sort of credentials or access to attend an

25  event?                                                          11:31:00

United States District Court

ROY MOSELEY - Direct

A.    Many times.  I have a whole pile in a drawer of
memorabilia of various events that I've applied for over the
years.

Q.    The Press Pass credentials that are at issue in this
present case, those are -- you put those into place; is that
correct?

A.    I did.

Q.    And I want to ask you some questions about that.  Was the
intention of the Press Pass criteria to keep people out who may
write negative articles about the county?

A.    No, it was not.  We have a lot of tough questions every
day.

Q.    What was the purpose of the Press Pass conference or the
criteria?

A.    It was mainly to make sure that we were making space and
for people that we knew were legitimate members of the media
that could reach a large audience to help spread facts.  And
also reflect the fact that we had a cross of national and
international media in 2020 and that wasn't expected at that
time.  That happened somewhat organically.

      And then we understand that we can't allow everyone
in our buildings or access to our leadership without limits,
and we wanted to ensure that they at least had our side and are
regularly -- in a regular fashion so we could control the size
of the crowd and the security at those events.

United States District Court

11:31:01

11:31:15

11:31:32

11:31:51

11:32:12

11:32:30

ROY MOSELEY - Direct

1  Q.    Okay.  I'm going to read to you from Exhibit Number 1    11:32:33

2  which is the maybe 2022 election pass criteria.  One of the

3  things it says is, "Because of logistical and security

4  considerations, it is impossible to give the public and the

5  media limitless access to Members of the Board of Supervisors,    11:32:49

6  the County Recorder and election experts for events such as

7  press conferences and availabilities."

8          And I want to ask you first about logistics.  Is

9  there limited space for press conferences?

10  A.    That is correct.    11:33:05

11  Q.    I understand that they started off at the 10th floor of

12  Building 301 and then since then they have moved to the

13  Maricopa County Tabulation and Election Center; is that

14  correct?

15  A.    Yeah.  The one that's in 301 on the 10th floor is in the    11:33:19

16  Board of Supervisors' conference room.  That room also affords

17  us the ability to stream to YouTube.  It's a built-in system

18  because that room is used for meetings of the Board that are

19  streamed publicly.

20          So once we made room for cameras and everything, we    11:33:34

21  had approximately 50 seats that could accommodate reporters.

22  Q.    Sure.  And after the 2020 election, did you anticipate

23  there would be a whole lot more people wanting to attend press

24  conferences?

25  A.    I think it's fair to say yes.  And I think it's fair to    11:33:53

United States District Court

ROY MOSELEY - Direct

```
 1  say that we needed a venue where we could address people        11:33:55
 2  instead of having 50 requests a week, that, "Can I get 15
 3  minutes, ten minutes, an hour with the Chairman," or the
 4  Recorder or whoever it might be.  I'm not the press person for
 5  the Recorder, so I can't speak for him.  But I think all of     11:34:10
 6  them try to make themselves available when they can.  But this
 7  was a way to streamline that and make sure everyone's needs
 8  were served.
 9           THE COURT:  Mr. Trullinger, I need to interrupt you
10  for a moment.                                                   11:34:25
11           Mr. Moseley, this is Judge Tuchi.  The quality of the
12  phone connection is not great and so I'm going to ask you to
13  slow down just a little bit because I'm concerned about the
14  court reporter and her ability to get it completely accurate
15  record for review later.                                        11:34:39
16           Is that all right?
17           THE WITNESS:  Okay.  Does this sound better?
18           MR. TRULLINGER:  We'll see.  I'll ask a question and
19  we'll see.
20  BY MR. TRULLINGER:                                              11:34:48
21  Q.   You can't see but there's a court reporter here and she's
22  taking down what all of us say, so we just need to make sure we
23  slow down a little bit so that she can catch everything we say.
24  A.   I apologize.
25  Q.   All right.  With regard to security concerns, was there    11:35:01
```

United States District Court

ROY MOSELEY - Direct

1  anytime after 2020 when people tried to get into the Elections    11:35:05

2  Department Center?

3  A.   Well, during 2020, yes, following the 2020 election, on

4  the Wednesday night afterward, people tried to follow media.

5  We had no formal process over at MCTEC at that time and I was    11:35:26

6  trying just --

7         THE COURT:  Okay.  Mr. Moseley.  Mr. Moseley.  You

8  have not slowed down one bit, sir.  I need you to be very

9  conscious of that.  I need you to go a little slower for the

10  purposes of the court reporter and for my understanding.  Thank    11:35:41

11  you, sir.

12  BY MR. TRULLINGER:

13  Q.   Go ahead and start over, just so we make sure that

14  everybody hears you.  Thank you, sir.

15  A.   The night after the election in 2020, a large crowd    11:35:52

16  gathered outside of MCTEC, which is the Maricopa County

17  Tabulation and Election Center.  Several people were not

18  members of the media but perhaps might say they are, but they

19  are not what we would call news reporters.  They managed to

20  follow legitimate news crews into the lobby of MCTEC.  This was    11:36:14

21  a security concern.  They had to be removed.  There was a large

22  crowd gathered outside and we didn't want a repeat of that type

23  of situation when we came up on 2022.

24  Q.   Gotcha.  And one of the things that were instituted as

25  well was fencing; is that correct?    11:36:37

ROY MOSELEY - Direct

A.    Correct.  There is now permanent fencing outside of MCTEC    11:36:42

which houses a smaller parking lot for certain employees who

work there all the time.  There is some temporary fencing along

the exterior.

        And I think it's fairly well-documented that what    11:36:57

happened leading up to the primary this year, that certain

people who call themselves First Amendment auditors were

outside.  They were videotaping or recording or taking pictures

of employees, their license plates as they came into the

parking area and, therefore, there was a temporary fencing.    11:37:17

        That evolved into a larger security effort by MCSO

and the Sheriff has spoken extensively about this to set up

Free Speech Zones and put up barricades to make sure nobody was

in danger from traffic or anything like that if they chose to

come and protest at MCTEC.    11:37:38

Q.    With regard to the Press Pass criteria, I understand

there's an online form that people have to fill out and submit;

is that correct?

A.    That is correct.

Q.    And who gets that form?  Who is part of the -- is it you    11:37:55

or is it a team or who is it?

A.    That is a team of eight of us that were -- that receive

that form.  Some of them are on there because they handle

logistics of responding and about six of those people are all

communicators, most of them with the journalism background as    11:38:17

United States District Court

ROY MOSELEY - Direct

1  well, and it takes two yeses to approve somebody.                    11:38:20

2  Q.  So if two of the people say yes, the person who has

3  applied gets a Press Pass, otherwise they do not; is that

4  correct?

5  A.  Well, it would take it to another level of consideration.        11:38:35

6  Why are we -- what are the -- what are the reasons under the

7  criteria that are listed on the website.

8  Q.  Okay.  Has the County granted Press Passes to members of

9  press who write regularly negative stories about the County?

10  A.  I think everybody in this market has written a negative        11:38:56

11  story at least once about the County.

12  Q.  Can you give us some examples of news media that have

13  gotten Press Passes?

14  A.  In addition to local --

15  Q.  Well, let me --                                                 11:39:13

16  A.  -- local TV stations and their crews?

17  Q.  I'm sorry.  I missed that.

18  A.  So please repeat the question.

19  Q.  Let me ask you again.  Was a Press Pass given to Newsmax,

20  for example?                                                        11:39:31

21  A.  Correct.

22  Q.  And does Newsmax --

23  A.  Newsmax --

24  Q.  Sorry.  Go ahead.

25  A.  Yes.  In addition to local journalists with whom we are        11:39:41

ROY MOSELEY - Direct

```
 1   more familiar, most of the well-known networks, also some not    11:39:45
 2   so well-known perhaps, Newsmax, Fox News, The Center Square,
 3   Epoch Times, Fox Business.  And most recently, surprisingly,
 4   after the election, a reporter from The Western Journal applied
 5   as well and they are not always kind to us.                      11:40:08
 6   Q.   Is the County afraid of being asked hard questions?
 7   A.   Of course not.
 8   Q.   Would you rather have a journalist ask a question than
 9   present something without asking?
10   A.   I would always prefer that.                                 11:40:31
11   Q.   And are you available and others available in the County
12   if someone wants to call and ask a question or to verify a
13   story?
14   A.   I handle probably 90 percent of the questions, at least
15   initially that come to the Board of Supervisors and some other  11:40:48
16   departments and, yes, we handle those by email, phone calls,
17   interviews if appropriate all the time.
18   Q.   And with regard to the criteria that has been set out
19   for getting a Press Pass, what sort of journalist is the County
20   expecting?  What sort of ethical rules or guidelines or what    11:41:15
21   are you looking for with those Press Pass criteria?
22   A.   Well, we are really interested in serving journalists who
23   are interested in selling the truth or at least pursuing the
24   truth and that's always our goal.
25   Q.   Has Mr. Conradson ever called you to ask you to verify any 11:41:47
```

United States District Court

ROY MOSELEY - Direct

1   information?

2   A.    Not that I'm aware of.

3   Q.    Are you aware of whether he's ever called anybody else

4   from the County that you're aware of to ask about -- or to fact

5   check on anything?                                                    11:42:05

6   A.    I believe he has tried to call Megan Gilbertson at the

7   Elections Department.

8   Q.    The press conferences are YouTube streamed; is that

9   correct?

10  A.    That was part of our communications plan as we headed       11:42:28

11  toward the 2022 general election, correct.

12  Q.    And do you try to live stream all of the press

13  conferences?

14  A.    We did and when we -- if we ran into a bandwith issue or

15  some sort of other technical interruption, we were regarding it   11:42:46

16  and we posted it later so it is available to the general

17  public.

18  Q.    Okay.  So if there was a problem while you were live

19  streaming it, it was still recorded and it would be available

20  later.  Is that what you're saying?                                11:43:00

21  A.    That is correct.

22  Q.    Did Mr. Conradson ever call you to ask you about the Press

23  Pass criteria or why he was not granted a Press Pass?

24  A.    He did not.

25  Q.    And when he sent his appeal letter in, did he give any       11:43:24

United States District Court

11:41:52

ROY MOSELEY - Cross

1    reason why the decision should be changed?                    11:43:27

2    A.    He said we should change it because -- I believe it was

3    because -- and I know this is an exhibit but from memory, I'm

4    just saying he believed his First Amendment rights were being

5    violated.  He did not address the reasons that we felt his pass    11:43:43

6    should be denied.

7    Q.    All right.  Mr. Moseley, in the interest of time, I'm

8    going to -- I think I may be done for now so the other attorney

9    will be asking you some questions.  So hold on.

10            THE COURT:  Mr. Randazza, you have four minutes left.    11:44:05

11            MR. RANDAZZA:  Thank you.

12                    **CROSS - EXAMINATION**

13    BY MR. RANDAZZA:

14    Q.    Sir, you said that you tried to stream all the press

15    conferences; correct?                                          11:44:15

16    A.    That is correct.

17    Q.    But you haven't been successful?

18    A.    I think it depends on which things you're calling a press

19    conference.

20    Q.    When you do live stream a press conference, is there an    11:44:33

21    opportunity through that platform for journalists or members of

22    the public to ask questions?

23    A.    No, there is not.  Like a Webinar you mean?

24    Q.    Your answer is sufficient, sir.

25            You said in 2020 some people had to be removed from    11:44:52

United States District Court

ROY MOSELEY - Cross

1    the premises; is that correct, sir?                              11:44:57

2    A.   That's my recollection.

3    Q.   Were any of them Mr. Conradson?

4    A.   Not that I know of.

5    Q.   When this team of eight meets to decide which journalists   11:45:09

6    are approved and not approved, do you record those meetings?

7    A.   No.

8    Q.   Do you take minutes of those meetings?

9    A.   No.

10   Q.   So there's no record of those meetings at all?             11:45:22

11   A.   There were no meetings.  It's an email chain.

12   Q.   And you said that Newsmax got approved; correct?

13   A.   That is correct.

14   Q.   Did Newsmax ever write a story that cost a member of the

15   commission their job?                                           11:45:42

16   A.   Are you talking about the member of the Board of

17   Supervisors?

18   Q.   Yes, sir.

19   A.   Not that I know of.  I'm not a Newsmax viewer, though.

20   Q.   Who fact checks stories published by the media in your     11:46:04

21   office?

22   A.   I would say we all have a role in observing what is going

23   on out there, but there's no way we can ever fact check every

24   single publication and story that is written about Maricopa

25   County.                                                         11:46:27

ROY MOSELEY - Cross

1    Q.   Can you tell me which conflicts of interest that either        11:46:30

2    The Gateway Pundit or Mr. Conradson presents to you?

3    A.   Mr. Conradson doesn't present as an ethical journalist who

4    practices with integrity or professionalism.  He doesn't

5    contact us to seek the truth or to seek our response to what an     11:46:55

6    accusation might be.

7    Q.   Is that your definition of a conflict of interest, sir?

8    A.   My definition of a conflict of interest would be advocacy.

9    As your Professor Leslie said, you know, are you an advocacy

10   organization?  Are you advocating for one conclusion or            11:47:19

11   somebody or some thing to get passed?

12   Q.   Can you tell me about --

13   A.   He's someone that exhibits those characteristics.

14   Q.   Can you tell me what legislation Mr. Conradson was

15   advocating to pass?                                                11:47:38

16   A.   He was advocating for candidates.

17   Q.   And you derive that from the content of his reporting?

18   A.   I can, yes.

19   Q.   Can you tell me which associations he has that would

20   compromise his journalistic integrity?                            11:48:02

21   A.   I believe he just told everybody that his political

22   leanings, that he wears that on his sleeve and everybody that

23   reads his work knows that's where he stands.

24   Q.   Thank you, sir.  I appreciate your time.

25        I have no further questions.                                  11:48:25

United States District Court

ROY MOSELEY - Redirect

| | | |
|---|---|---|
| 1 | THE COURT:  All right.  Thank you, Mr. Randazza. | 11:48:27 |
| 2 | Mr. Trullinger, do you have any redirect? | |
| 3 | MR. TRULLINGER:  Yes, Your Honor.  Thank you. | |
| 4 | **REDIRECT EXAMINATION** | |
| 5 | BY MR. TRULLINGER: | 11:48:33 |
| 6 | Q.   Mr. Moseley, does the Election Department have any drones? | |
| 7 | A.   No. | |
| 8 | Q.   Are there drones flying around at the -- were there drones | |
| 9 | flying up put up -- by the Maricopa County Sheriff's | |
| 10 | Department? | 11:48:53 |
| 11 | A.   You would have to ask the Maricopa County Sheriff's | |
| 12 | Department about that, but I did see drones around MCTEC during | |
| 13 | the past week and a half. | |
| 14 | Q.   On a regular basis? | |
| 15 | A.   Not a regular basis, no.  I saw them -- I saw them as | 11:49:06 |
| 16 | security went up the day before the election. | |
| 17 | Q.   Mr. Conradson, has he tried to get back into the building | |
| 18 | or attend Press Passes since being denied a Press Pass? | |
| 19 | A.   I believe you outlined this earlier, but yes.  He came two | |
| 20 | days ago and went to the gate, the doorbell at the gate, and he | 11:49:31 |
| 21 | said he was, once again, there to take up pick up media | |
| 22 | credentials for which he wasn't approved. | |
| 23 | Q.   One of the things he alleged is that when he was not | |
| 24 | allowed into the building, that somehow drones were following | |
| 25 | him.  Did the Elections Department send drones to follow him? | 11:49:50 |

1  A.    Of course not.                                               11:49:55

2  Q.    Do you care whether Mr. Conradson writes articles that are

3  adverse or negative to the County?  Or are you interested in

4  something else -- I'm sorry.  Go ahead.

5  A.    I don't care if he writes articles that are adverse to the  11:50:22

6  County.

7  Q.    Was he denied a Press Pass because of his opinions?

8  A.    No.

9  Q.    In your words, can you just tell us why was he denied a

10 Press Pass?                                                        11:50:43

11 A.    Did you want the official statement?

12 Q.    Sure.

13 A.    He was denied because he doesn't avoid real or perceived

14 conflicts of interest.  If you look at his social media or his

15 articles, they not only present a conflict.  He doesn't seek      11:51:04

16 the truth and his articles have led to direct threats to Board

17 of Election officials and employees.

18 Q.    All right.  Thank you, Mr. Moseley.  I think that's all I

19 have.

20        THE COURT:  All right.  Thank you.  That exhausts the       11:51:25

21 witnesses that all parties had for the Court today; is that

22 right?

23        MR. TRULLINGER:  That's correct, sir.

24        (Witness excused.)

25        MR. RANDAZZA:  Yes, Your Honor.                             11:51:31

United States District Court

```
 1          THE COURT:  Very good.                              11:51:32

 2          Mr. Moseley, you can stay on the line if you like or

 3   go off.  But I can excuse you from testifying now.

 4          Thank you.

 5          Mr. Randazza, I'm going to go ahead and hear your   11:51:51

 6   argument now.  Before you do that, I'm sorry, there was one

 7   housekeeping matter I wanted to note.  In the moving papers

 8   before the Court, and I believe it was from plaintiff, you had

 9   asked the Court to take judicial notice of the exhibits that

10   were submitted.  That's not going to be necessary because they 11:52:07

11   are all before the Court and they all will be considered so

12   nobody needs to worry about the formality of that point.

13          They are all before me.  And you can argue off of any

14   of those.

15          Go ahead, please.                                   11:52:20

16          MR. RANDAZZA:  Thank you.

17          Your Honor, we have heard and read a lot about

18   integrity here but the integrity that I hope that this Court

19   focuses on is the integrity of the First Amendment, the

20   integrity of freedom of the press, the integrity of our       11:52:54

21   governmental institutions and the integrity of that fourth

22   estate, that watchdog on these -- you heard testimony that

23   Gateway Pundit is a massive publication, huge readership.  They

24   cannot possibly be excluding them because they are too small.

25   They do make some arguments about there are security issues.   11:53:17
```

United States District Court

1  Well, nobody raised any concerns about this as a matter of                11:53:21

2  security.  There was no question about Mr. Conradson's

3  background, no question about him as a violent person, no

4  question about him trying to bring a weapon on the grounds.

5       I think often when the Government wants to engage in           11:53:37

6  censorship, it does raise this specter of security.  The one

7  thing that we did hear at the end is his reporting led to death

8  threats and the basis for that, nothing.  Nothing at all.

9       They cite to a Reuters article that claims that I saw

10  ten percent of some threats came in, cited The Gateway Pundit      11:53:56

11  as their source, but I don't accept Reuters -- competition for

12  The Gateway Pundit -- to be a definitive source of how many

13  came in, but we don't even have the universe.  So were there

14  ten and one, 100 and ten?

15       And then when we have -- we had testimony that there          11:54:17

16  were millions upon millions of readers.  I think if we went out

17  and we just got a random sampling of a million human beings,

18  we've got about 15 here today, and I don't mean to disparage

19  the gentleman who seemed to have some mental health issues who

20  stood up during Court today, but even in that little sampling,    11:54:36

21  what percentage of the people in your courtroom were crazy?  It

22  happens.

23       So if we have some crazy readers, I would say we

24  probably have no greater of a percentage than the New York

25  Times or then ABC news.  But that's not before you.  That is      11:54:49

United States District Court

11:54:55

1    not really what this is about.

2        If the press's function is to act as a watchdog on

3    Government, the press's job is to inform the public.  We cannot

4    have the Government making all of the determinations that it

5    really -- it rarely admits.  It's very rare that the Government

6    admits its determinations are content based but they have done

7    that today.  All day long.  All hearing long.  Every bit of

8    testimony here was based on we don't like the content of his

9    work.  It wasn't that he's caused problems.  It wasn't that The

10   Gateway Pundit isn't a real publication.  It isn't that The

11   Gateway Pundit is too small.  And we heard testimony that we

12   have to limit it for room.  Yeah.  Okay.  If he had showed up

13   with his Press Pass and they had said, "We're sorry.  We only

14   have 50 seats.  51 people showed up.  We all drew straws.  You

15   got the short straw.  Go watch it on television, Jordan," I

16   think we would have a very different argument before you today,

17   but that's not what we have.

18       We have we don't like The Gateway Pundit's content.

19   Now, we have seen this argument that the Seventh Circuit

20   decision in *MacIver* is somehow persuasive.  I don't find it

21   persuasive at all.  I think that adopting those standards is a

22   legal standard for whether somebody is a journalist or not.  I

23   would trust professor Leslie over the Seventh Circuit panel on

24   that case, and you are no more bound by that than you are bound

25   by the *Alaska Land Mine* decision that we cited in our briefing

11:55:10

11:55:30

11:55:48

11:56:03

11:56:23

United States District Court

1    which I think gets it right.                                    11:56:28

2            However, I'm not going to say that the Seventh

3    Circuit's decision was completely wrong because it did say:  It

4    is worth emphasizing, however, that First Amendment rights do

5    not turn on, nor are they calibrated to, the quality of the    11:56:44

6    reporting.  Imagine a system where the Government doled out the

7    freedom of press based on a Government official's assessment of

8    the quality of the reporting or the credentials of the

9    reporters.

10           We just got testimony that doesn't require us to        11:57:00

11   imagine that.  We're living it.  We're here.

12           Now, if that watchdog over the press happens to be a

13   member of the Republican Party or the Democratic Party or the

14   Communist Party or the Fascist Party, I don't think it matters.

15   What difference does it make?                                   11:57:21

16           We heard testimony and, frankly, I think we can all

17   take notes of the fact that Rachel Maddow is a darn good

18   journalist and Rachel Maddow doesn't make any bones about the

19   fact that she's hard left.  She supports left-wing candidates.

20   Good for her.  She's a fellow American.  She should be able to  11:57:38

21   do that.

22           But The Gateway Pundit serves a large audience and

23   that large audience, you know, we look through -- they look at

24   Maricopa County through the eyes of The Gateway Pundit.  They

25   trust them.                                                     11:57:53

1          Now, we have had I think -- you know, there's this
2    epithet that goes around a lot called election denier.  We had
3    a member of the Board of Elections here that was one.  Gateway
4    Pundit reported on that.  They may have reported on it because
5    they agreed with him, but they were the only ones who exposed
6    that.  And being an election denier, whether you like it or not
7    or I like it or not, our opinion is irrelevant.  The public
8    generally doesn't like it.  And that public outcry, that public
9    influence, that public weight, that was only brought to bear
10   because this was the only journalism outfit that would report
11   on it and that led to the resignation of a member of the
12   defense.

13         It's Woodward and Bernstein on a small scale.  I'm
14   sure that the Nixon Administration didn't find them to be
15   credible journalists or good journalists, found them to be
16   biased, just like President Trump found Jim Acosta from CNN to
17   be and threw him out of the White House Press Corps, a decision
18   that was quickly reversed by the D.C. Circuit -- I'm sorry,
19   District of Columbia.

20         Freedom of the Press in Arizona is not something that
21   I generally worry about.  This is a place where Freedom of the
22   Press does seem to be well-respected.  When Arizona joined the
23   Union, it didn't need to also put a Freedom of the Press clause
24   in its state constitution.  It could have just relied on the
25   federal one.  But the founders of this state chose to follow

1  the founders of this country and follow its Freedom of the

2  Press constitutional provision.  That provision, as well as the

3  federal one, is at threat here.

4       So what have we heard today that justifies this, this

5  conflict, we heard testimony from one member of this

6  eight-member panel that doesn't keep minutes, that doesn't have

7  meetings, that doesn't record any of it.  One member, the only

8  member who testified today, told us this conflict was

9  absolutely viewpoint based.  I believe he may have been the

10 best witness for the plaintiffs that we heard from today.

11      So how can we -- how can we trust the Government to

12 make this determination?  You're going to make a determination

13 on who's going to look over your shoulder?  Who is going to

14 report the facts?  Who's going to be your watchdog?  Well, if

15 you do that, then you have nothing more than a lap dog, not a

16 watchdog.

17      So I would ask that Your Honor examine all of the

18 evidence that we've shown here today including -- including one

19 thing that was missing.  One thing that was missing in the

20 *MacIver* case, evidence of bias.  When you have a member -- we

21 have one of the defendants actually mocking Gateway Pundit for

22 being excluded because there was an approved member of the

23 press that also was mocking them.  I guess they are in the cool

24 kids club.  Gateway Pundit isn't and I understand.  Even the

25 Society of Professional Journalists, as we heard, is somewhat

1    biased towards new media.  But there is nothing about this              12:01:12

2    media that is any different than the Arizona Republic and any

3    other organization that might want to watch the Government.

4            Another epithet that we've heard not in this

5    courtroom, not from anybody here but we hear a lot of this,           12:01:29

6    conspiracy theorist.  Nobody likes this speculation that calls

7    everything into question.  I do because I'm an incurable cynic

8    but it doesn't make Government happy but, you know, the best

9    place to create one, if this Court wants to create one, the

10   best environment for that is a shadow, not sunshine.  So where        12:01:53

11   is that shadow?  Gateway Pundit obviously looks at things from

12   a different perspective than anyone else just as a matter of

13   the human condition.

14           But Mr. Conradson asks probing questions, sure.  Did

15   he follow somebody to ask them for a comment?  I don't think         12:02:11

16   any of us are unfamiliar with reporters doing that, whether

17   it's Bernie Madoff fleeing from the reporters or anybody

18   fleeing from reporters with a hood over their head saying, "No

19   comment."  That's a problem?

20           We heard that he brought a hidden camera in.  That            12:02:25

21   wasn't true.  So what did this guy do?  He acted as a

22   hard-hitting journalist.  Frankly, it sounds like he acted as

23   an ethical journalist.

24           Now the alternate avenues, argument that the

25   Government tries to make that he could have just watched it on        12:02:39

United States District Court

1  live stream, well, not all of it.  And whether that was by                    12:02:42

2  design or simply by an honest mistake, not all of -- we heard

3  that it's more ethical to question a witness, question a direct

4  source.  Well, how can you do that?  You can't do that if

5  you're not in the room and if you're excluded from the room.       12:03:00

6  Because there's simply not enough room, okay.  That happens.

7  Luck of the draw.

8          But when it happens because you have a Government

9  that doesn't like the content of the reporting, now you have

10  the Government putting their finger on the scale of the First      12:03:15

11  Amendment.  We can't have that.

12          I've seen no justification here, not even if we

13  accept the standards that the Government puts forward.  I do

14  not accept them and I don't think this Court should either.  I

15  think the Seventh Circuit was wrong to do so.  But even if we      12:03:35

16  accept them, they have made it clear today that those very

17  standards were not properly employed when they used them to

18  exclude him.

19          So they have the rights, yes, to limit for space,

20  maybe limit for size of publication.  If it was over that, if      12:03:51

21  it was over the size of the publication, I might still be here

22  today making some arguments but not the same that I'm making.

23  But I am making what I think is an easy constitutional argument

24  here, that we do have nothing more than a content-based

25  restriction against a journalist from having the same access      12:04:10

United States District Court

1    that every other journalist should have.

2         Freedom of the Press will not tolerate that, Your

3    Honor.

4         I thank you for your time.  I thank my friends and

5    the witnesses for the time.

6         THE COURT:  All right.  Thank you, Mr. Randazza.

7         And Mr. Trullinger?

8         MR. TRULLINGER:  Thank you, Your Honor.

9         Let me just be clear about one thing.  It's not about

10   content.  It's about quality.  It's about quality and it's

11   about integrity.  Press conferences are a nonpublic forum and

12   all the case law says that if there's a nonpublic forum the

13   Government has a right to set criteria for allowing people to

14   get into buildings and to attend press conferences.

15        The criteria that was selected here for the Maricopa

16   County comes directly from criteria in the Seventh Circuit that

17   was approved.  And some of those criteria which are relevant

18   here is number five:  Is the petitioner a bona fide

19   correspondent of repute in their profession and do they and

20   their employing organization exhibit the following

21   characteristics:  A, they both avoid real and perceived

22   conflicts of interest; and, B, they both are free of

23   associations that would compromise journalistic integrity or

24   damage credibility.

25        Mr. Conradson's articles, again, it's not about the

12:04:13

12:04:21

12:05:04

12:05:26

12:05:45

12:06:03

content.  It's about the quality and the integrity.  He writes    12:06:14

argument without checking facts.  He harasses people by

following them and yelling questions at them.  He publishes

personal photos and contact information for people that he

criticizes in his reporting, continues to try to get into a    12:06:31

building that he was specifically told he does not have access

to.  Three times he's done that.  All of those reasons are

consistent with the County's Press Pass policy.  They are all

content-neutral reasons.  It's all about the integrity of him

and the quality of his -- and professionalism of being just a    12:06:51

journalist.

         For all of those reasons, based on the County's

judgment, he was properly denied a Press Pass.

         In addition to that, there's no harm in any event.

He watches the -- he can watch the press conferences being    12:07:10

streamed and even if they are not all live streamed, they are

all recorded and he can watch it when they are played back

later.  So he has access to all of the press releases in any

event.  And in any event, he went from September 30, 2022, when

he was first denied, all the way through November 10 of 2022    12:07:29

without challenging it.  So didn't send an email, didn't send

an appeal.  He just -- he did nothing and yet the plaintiffs

are calling this an emergency Temporary Restraining Order.

This is not an emergency Temporary Restraining Order.  The

delay alone should be enough to deny the motion for an    12:07:52

United States District Court

injunction and Temporary Restraining Order.

Finally, he is asking for -- plaintiffs are asking for a mandatory injunction.  There's a distinction between an injunction where you maintain the status quo while the lawsuit is going forward and where you're asking for something right now.  They are asking to be given a Press Pass right now.  And this is in the brief but where the movant seeks a mandatory injunction rather than a prohibitory injunction, injunction relief is subject to a higher standard and is permissible when extreme or very serious damage will result that is not capable of compensation of damages and the merits of the case are not doubtful.

Under that standard, the motion for a Temporary Restraining Order should be denied.

One of the things that is interesting in this case today was their expert that testified, essentially said there are no ethics.  There's no ethical rules whatsoever.  You can do whatever you want.  All of these ethical standards that anybody writes are just aspirational.  Yeah, somebody should follow these aspirational ethical guidelines but they don't have to.

The County respectfully disagrees and has the right to set up criteria for ethical reporting.  And they did that in this case.  It's consistent with the Seventh Circuit Court of Appeals criteria and for those reasons also, the motion for

12:07:59

12:08:15

12:08:37

12:08:52

12:09:10

12:09:29

1  Temporary Restraining Order should be denied.

2          Thank you, Your Honor.

3          THE COURT:  All right.  Mr. Trullinger, thank you.

4          MR. RANDAZZA:  Your Honor, do I have a reply?

5          THE COURT:  You carry the burden of proof so you get

6  to speak first and last, Mr. Randazza.

7          MR. RANDAZZA:  Thank you, Your Honor.

8          Your Honor, I will first address the timing issue.  I

9  think that's a fair question.  Correct.  It was denied 40 odd

10 days ago.  This was not a story 40 days ago.  There was no

11 story to report.  If this were Utah or Colorado or New Mexico,

12 we wouldn't be having this discussion because about nobody

13 cares.  It became a story on November 8.  On November 8 is when

14 it mattered.  November 8 is when this, the largest county in

15 Arizona, number of voting machines failed, number of

16 irregularities happened that the public has a right to about

17 and the public wants to know about, so I don't think he should

18 be judged by not considering it to be something worthy of a

19 federal court's time when there's no story.  If I was bringing

20 this case in New Mexico, I believe your colleague there might

21 be looking at me somewhat incredulously thinking, "What's the

22 big deal?"

23          There's also an escalation of hostility.  So there's

24 an escalation of the importance of the story and as escalation

25 of hostility.  First he couldn't go not press conferences.

1    Then he couldn't go into public buildings, buildings that we          12:11:05

2    heard today were open to the public, just not him.  He's the

3    only guy that couldn't go in, yet they say there's no hostility

4    toward him.   Then he couldn't even be on the curtilage of the

5    building, sent over to the free speech zone with the                  12:11:20

6    protesters.

7              So if Your Honor is examining the temporal element

8    here, that temporal element began on November 8.  I don't have

9    the date in front of me.  We filed on November 12.  It's about

10   as fast as we could get going, Your Honor.                            12:11:36

11             Now, they also say that this is not about content but

12   rather about quality.  I don't understand how those two phrases

13   don't contradict each other.  If it's about quality, it's about

14   content.   If we're going to question the quality of his work,

15   we're questioning the content.                                        12:11:58

16             Now if you have a public forum of any kind -- and I

17   agree this is not an open public forum.  Not every single

18   person can walk into that press conference.  But when the

19   Government does open up a forum, even a limited public forum

20   that it has opened up to all journalists, as long as they fill        12:12:16

21   out this form and make these statements and swear to these

22   conditions, then they cannot have any kind of a viewpoint-based

23   or content-based restriction on who gets there.

24             We've cited cases, a string cite of cases in our

25   briefing about this but that it is frequent that the Government       12:12:35

United States District Court

1   will say it's not about content.  But then it is about content.  12:12:38

2   I just haven't seen anything here that says it's about anything

3   other than quality.  And that is quality as judged by this

4   panel of eight that we know only one of who directly said it

5   was about the content.  12:12:53

6   　　　　Now as far as irreparable harm goes, that's just a

7   given.  I don't mean to say that glibly.  A violation of the

8   First Amendment is always irreparable harm.  Every single

9   moment that goes on, there's irreparable harm.  There's

10  irreparable harm to my client for not being able to report  12:13:14

11  fully.  There's irreparable harm to the public for not getting

12  the full panel of voices and views that it should get from such

13  an important event.  There's even irreparable harm to the

14  Government.  I cannot think of a better way for the Government

15  to create mistrust in itself than to say this press that we've  12:13:32

16  mocked, this press that we don't like, this press that costs

17  one of our colleagues their job, this press that we've shown

18  obvious hostility to and vice versa, they can't report.

19  　　　　What better way to tell the public they should be

20  suspicious?  And what better way to dispel that than to say  12:13:54

21  this Government agency is operating on a perfectly above-board

22  manner, come and see for yourselves?

23  　　　　Now, if you think about this, if you think about what

24  they are doing, they are judging the quality of this journalist

25  before they allow them to practice journalism.  You know,  12:14:10

United States District Court

```
 1   anytime I'm arguing a First Amendment case with somebody, I try    12:14:15
 2   to make them understand that imagine that judgment call in the
 3   hands of the worst person you can imagine.  I have no negative
 4   opinion of any of the defendants except for what they have done
 5   here today.  But these people change.  Anybody could wind up       12:14:31
 6   there one day.  And if they can do that to The Gateway Pundit,
 7   why can't they do it to National Public Radio?  Why can't they
 8   do it to CNN?  Why can't they do it to whatever your favorite
 9   news source is?  Why can't they do it to them?
10           So whatever tool you leave in the hands of the              12:14:51
11   Government today, Your Honor, will inevitably be used in a way
12   that we don't predict today.  That is why the First Amendment
13   requires that we look at everything in a content neutral manner
14   when we are making a governmental decision about First
15   Amendment rights.                                                  12:15:08
16           Thank you, Your Honor.
17           THE COURT:  All right.  Mr. Randazza, I have
18   questions for both counsel.  You can remain at your counsel
19   table but keep everybody on even footing here.
20           One or two questions for framing, first of all, for        12:15:41
21   plaintiffs.  I was going to ask you, Mr. Randazza, if there was
22   any contest about whether or not the Court analyzes here in the
23   form of nonpublic forum versus public.  I think I heard you
24   loud and clear to say that the test is that for a nonpublic
25   forum, which has two elements essentially.  One is that any        12:16:04
```

United States District Court

1    action taken then must be reasonable and, two, is that it must       12:16:10

2    not be an effort to suppress the opposing viewpoint.

3         I want to know if your argument goes just to number

4    two because I heard you loud and clear that it's your position

5    that this is an effort to suppress an opposing view point or       12:16:33

6    whether it's also number one.

7         MR. RANDAZZA:  Your Honor, I would say that we do not

8    say it is not a public forum.  It's not -- there are three

9    kinds of public fora.  This is not a general public forum.  I

10   would not argue that in the least.  I don't think it is a       12:16:49

11   nonpublic forum either.  It is a limited public forum.  It has

12   been opened for a certain purpose so once that purpose is open,

13   then it must be done on a completely neutral manner.

14        But even if we do it on the more strict standard that

15   you've asked me about, I do not think that the limitations are       12:17:08

16   reasonable.

17        Reasonable might be -- I'll draft a reasonable policy

18   for them right now.  There are only a certain number of people

19   who can come in.  If more than the number of people who wish to

20   show up on a given day, if they are more than there are seats,       12:17:24

21   then by all means we are going to have a lottery.  Heck, maybe

22   if they want to weight that lottery towards larger

23   publications.  But here I don't think they even understand

24   their own test so how can it be reasonable?  But, nevertheless,

25   you know, part two, if it doesn't meet part two anyway, then it       12:17:44

United States District Court

1    doesn't pass First Amendment muster.                          12:17:50

2         So I would say that that's not the right standard but

3    I don't even need you to get to the right standard.  Even the

4    easiest burden on the Government they have failed on both of

5    those trip wires.                                             12:18:06

6         THE COURT:  My next question has to do with the

7    Court's observation that the scope of the injunctive relief

8    sought appears to have shifted somewhat from when you filed

9    your papers in that I read your motion loud and clear to be

10   about the need to get in there to observe vote counting and now  12:18:31

11   the vote counting in Maricopa County -- and Mr. Gingras is

12   nodding his head -- and now the vote counting in Maricopa

13   County is either over or all but over and so what I'm hearing

14   today is that it's about more than that.  It's about continuing

15   access to press conferences and so forth.                     12:18:52

16        How do I get that out of what you wrote is my point?

17   What got us here?

18        MR. RANDAZZA:  I'm unaware of the state of the

19   recounts.  So -- are we done?  Has there been a concession?  So

20   I would say that that is important.  But this story continues.  12:19:13

21   This very story and, yes, Your Honor, ongoing access in the

22   form of either being granted access or being granted a Press

23   Pass is the relief we're seeking.

24        THE COURT:  So what was the business in the written

25   product about I don't really want a Press Pass because that's a  12:19:30

United States District Court

1   badge of dishonor?  I've got to tell you, that seemed to be          12:19:33

2   beneath the dignity of the process somewhat.

3           MR. RANDAZZA:  Well, I apologize, Your Honor.  But I

4   think if we accept what they are saying, I believe that that

5   rhetoric was necessary to make the point that either -- if the      12:19:49

6   Press Pass is simply a sign that we like your press, we are

7   Government approved press and it's on the basis of quality, and

8   I'll agree, that was an inarticulate way of putting it.  But if

9   it's on the basis of qualities.  If it's saying you are

10  quality, the content of your reporting is so unthreatening to       12:20:11

11  us that here's your nonthreatening pass.  We don't necessarily

12  need that.  But throw it away.

13          If that's not what it is.  If it's not content based,

14  then we'll take one.

15          So which is it?                                              12:20:29

16          THE COURT:  Well, if the overarching thrust of the

17  argument now is that Mr. Conradson and The Gateway Pundit want

18  to be treated like everybody else, that means press credential?

19          MR. RANDAZZA:  Yes, Your Honor, and that is our

20  position now.                                                        12:20:51

21          THE COURT:  I take from Professor Leslie's testimony

22  a large thrust of it was, there is not a hard-and-fast

23  definition of what a journalist is and I understand the point.

24          If that's the case, is it necessarily the plaintiff's

25  position that the answer is to let anyone in who wants to be         12:21:19

United States District Court

1    there?                                                                12:21:27

2              MR. RANDAZZA:  No, Your Honor.

3              THE COURT:  I think I understand you put

4    qualifications on that but I want to hear from you.

5              MR. RANDAZZA:  No, Your Honor, I would not say that.   12:21:33

6    I wouldn't say that anybody who simply walks up is a

7    journalist.  You know, it's probably more akin to Potter

8    Stewart's analysis of pornography:  There's no legal definition

9    but you know it when you see it.

10             Here there's probably a zone where we have no doubt     12:21:50

11   somebody walked in here with a CNN badge, I would have no

12   question that person is a member of the press.  They work for a

13   large organization.  We've all heard of it.  They practice

14   journalism on a regular basis.

15             Then there's the other end where we have somebody       12:22:09

16   with a Myspace page with five followers, they clearly wouldn't

17   fit.  I don't think that my client falls into a gray area

18   however.  My client has been publishing for -- I can't remember

19   the exact date he said he started but it sounded like over a

20   decade.  More than 10 years, millions of viewers, regularly      12:22:26

21   publishes on matters of public concern.

22             So I think you could say there might be a close call

23   here and there, but I hope that you have the luxury now of not

24   seeing this as a close call.

25             But I am not asking you to simply open the flood       12:22:42

United States District Court

1    gates to every single person who shows up and says, "I have a          12:22:46
2    camera phone and a grievance and I would like to be in there."
3    I wouldn't go that far, wouldn't even ask you to go that far.

4              THE COURT:  So how would one draw the line to address
5    the circumstance you just identified?                                  12:23:04

6              MR. RANDAZZA:  Well, I would draw the line the facts
7    that are before the Court today Your Honor, the facts before
8    the Court today on this record are that The Gateway Pundit is a
9    legitimate news source.  And I say that not from terms of
10   quality, not from terms of tone, not from terms of what we like        12:23:22
11   about them but they do deliver the news on a regular basis.
12   They are a real publication.  This isn't -- this isn't anywhere
13   close to the bottom end of heck, if I walked up there and said
14   I wanted press credentials, I don't think they should give them
15   to me.                                                                  12:23:41

16             So on the record before you today, Your Honor, I'm
17   not asking for an overarching change except I am asking -- we
18   have asked as a facial challenge to these two conditions, that
19   they simply be stricken.  However, if you are not prepared to
20   strike them in their entirety, I think if you did, you would           12:23:59
21   not have the flood gates opened to every Tom, Dick, and Harry
22   with a Facebook page and 20 followers, you would still have
23   significant contours here and they could go back and retool it
24   and say, "You've got to have this many viewers."  I like --
25   some of their qualifications I like.  You must have been doing         12:24:16

1    news for I think 18 months.  I don't have a problem with that.    12:24:20

2    Somebody might but I don't.

3         But here even if you don't strike these regulations

4    themselves down as vague -- and I think they should be because

5    I don't think anybody even in this courtroom can come to a real    12:24:36

6    consensus about what they mean, you should absolutely strike

7    down what they have done on an as-applied basis as to this

8    journalist and this publication only.

9         THE COURT:  One or two more questions for you,

10   Mr. Randazza.  The next one I'm going to take you back to the    12:24:54

11   issue of the timing of the application.

12        MR. RANDAZZA:  Yes, Your Honor.

13        THE COURT:  In the materials that plaintiffs have

14   submitted there are stories specifically from Mr. Conradson

15   from the last general election and then in the interim that are    12:25:16

16   all about Maricopa County Attorney and their process and the

17   elections and how they conduct the elections.  The Chucri

18   stories in the summer to fall I think, 2001 (sic), up to the

19   primaries in this go-around.  So I'm having trouble following

20   the argument or crediting the argument that this was not a    12:25:43

21   story.

22        This is your quote from just a minute ago in the

23   argument:  This was not a story 40-odd days ago.  It seems to

24   me that it has been somewhat of a focus for The Gateway Pundit

25   and for Mr. Conradson specifically long before 40 odd days ago.    12:26:02

1          What am I missing?                                        12:26:07

2          MR. RANDAZZA:  Well, Your Honor, you can cover

3     Maricopa County and Maricopa County elections without it

4     becoming -- there's a term used in the journalism industry

5     called hot news.  So this hot news did not become hot enough to  12:26:18

6     warrant relief until November 8.  Everything else he could have

7     reported on separately but this is a hot news situation.

8          When we are having regular press conferences about

9     it, I don't know that they were doing that before.  So

10    throughout all of this period that he's reporting, he did not   12:26:39

11    need this kind of access but that access, remember, was

12    available to him until 41 days ago.  So in those 41 days and 30

13    of those 41 days this was not an exigent circumstance.

14         It became exigent when this became such an important

15    question.  Perhaps I spoke inartfully saying it's not a         12:26:58

16    question but the Maricopa County election became more important

17    on November 8 than that Arapahoe County election in Colorado on

18    that date.  So that's when the emergency came up.  And again,

19    Your Honor, as I stated, there are two escalations here.  Both

20    the escalation of the importance but also the escalation of the  12:27:21

21    exclusion, the exclusion went, as I said, from you can't be in

22    the press conferences, to you can't be in the building, to now

23    you can't even be anywhere near it.

24         So that confluence of circumstances is what led us to

25    seek emergency relief.                                          12:27:37

                    United States District Court

1          THE COURT:  Okay.  Thank you.                              12:27:46

2          Mr. Trullinger, I have a couple of questions for you.

3          As I read both of your written materials and as I

4     process your witness's testimony, the argument that is

5     presented to me is as follows:  That Mr. Conradson in what he   12:28:25

6     writes does not follow many or any of the conventions of

7     journalists.  He doesn't source or confirm many statements of

8     purported fact.  He selects other articles or statements that

9     he either agrees with or doesn't agree with, disagrees with,

10    and then writes his opinion agreeing or disagreeing, at times   12:28:52

11    in rather incendiary language and terms.  He then cherrypicks

12    other tweets or quotes from others that support his position.

13         Is that summary of justification that I just laid out

14    the description of a content-based decision?

15         MR. TRULLINGER:  I don't think so, Your Honor.  The        12:29:21

16    difference is, I think of a content-based decision as we don't

17    like what he says about us.  We don't like the content of his

18    articles.  As opposed to the quality of being a journalist and

19    all of those things, not getting sources.  That is -- that goes

20    to integrity which is a direct element in the Press Pass        12:29:41

21    criteria, avoiding conflicts of interest.  Credibility.  If

22    you're getting your information from -- when you could call and

23    ask for something but you don't, you get something from a tweet

24    like you see a GIF on a tweet and you just make an assumption

25    that that means something.  It's not that you write an article  12:30:06

1    that is unfavorable.  It's that that is not the journal --                    12:30:12

2    that's not good journalism.  It's not within the criteria the

3    County is looking for because it doesn't matter.  It doesn't

4    matter if you are one side or the other.  It doesn't matter

5    what the content is.  It matters that you try to get the facts    12:30:27

6    right.  It matters that you -- and if it is an opinion, you

7    should say it's an opinion.

8             THE COURT:  So if I understand it correctly then,

9    your position is the decision is not the decision to deny the

10   access pass credential here is not based on how Mr. Conradson    12:30:44

11   or somebody else comes out but it's based on, you've said,

12   quality and other things.  I understand that to be almost based

13   on process and is nonconformity with the process.

14            MR. TRULLINGER:  Yeah.  That's a much better way to

15   say what I was trying to say, Your Honor.                         12:31:08

16            THE COURT:  All right.  I think I understand the

17   argument there.  The other thing I wanted to ask you about, and

18   this may be my last question for you, I would like your

19   reaction to -- as Mr. Randazza put it, the attribution of

20   conduct by defendants that, as I understand it, is termed         12:31:32

21   almost as an escalation.  There was a denial of the credential.

22   Then there was a denial of access, Mr. Randazza was very

23   specific, access to a building that others did have access to

24   and then there was a denial even to the curtilage and law

25   enforcement involvement is the factual assertion as laid out.     12:31:55

1   Do the defendants have any issue with that?                        12:32:05

2            MR. TRULLINGER:  Well, it's inaccurate.  So one

3   thing -- there's two problems with that.  One is his conduct by

4   itself, the fact that he knew he didn't have a Press Pass and

5   he kept coming back.  The other thing is that I think it's a      12:32:17

6   misrepresentation to say that -- the escalation was not -- it

7   was because of his own conduct.  So he applied for a Press Pass

8   September 30.  Nothing happens until October 13 when he comes

9   back again.  He comes back again without Press Pass October 13.

10  He was kicked out at that point in time.  Nothing happens to      12:32:37

11  November 10.  November 10 is when they asked him to leave the

12  building.

13           And if you look at Exhibit 14, there's a video dated

14  November 10, 2022.  So it may be that he showed up on -- to

15  make that very thing happen.  I don't know if he did or not but   12:32:57

16  there wasn't -- I don't know that there was an escalation other

17  than by his own conduct.  So it was him coming and trying to

18  get a pass when he was told he didn't have one.

19           And the building was closed to the public at the

20  time, Your Honor.                                                 12:33:19

21           THE COURT:  All right.  Thank you, counsel, for your

22  overall presentation and the marshaling of the materials, the

23  facts and the arguments on such short notice.

24           Give me just one moment.

25           (Discussion off the record.)                             12:34:04

                    United States District Court

1          THE COURT:  All right.  Everyone, thank you for your          12:34:13

2   patience.

3          I'm taking this under advisement.  I'll enter a

4   ruling as soon as I can.

5          Thank you.                                                    12:34:19

6          We are adjourned.

7          (Whereupon, these proceedings recessed at 12:34 p.m.)

8                         *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

United States District Court

1        C E R T I F I C A T E                                   12:34:21

2

3        I, ELAINE M. CROPPER, do hereby certify that I am

4   duly appointed and qualified to act as Official Court Reporter

5   for the United States District Court for the District of      12:34:21

6   Arizona.

7

8        I FURTHER CERTIFY that the foregoing pages constitute

9   a full, true, and accurate transcript of all of that portion of

10  the proceedings contained herein, had in the above-entitled    12:34:21

11  cause on the date specified therein, and that said transcript

12  was prepared under my direction and control, and to the best of

13  my ability.

14

15       DATED at Phoenix, Arizona, this 20th day of November,    12:34:21

16  2022.

17

18

19

20                        s/Elaine M. Cropper                     12:34:21

21                     _____

22                      Elaine M. Cropper, RDR, CRR, CCP

23

24

25                                                                 12:34:21

                     United States District Court